IN THE UNITED STATES DISTRICT COURT FOR THE
         NORTHERN DISTRICT OF OKLAHOMA

IN RE:                   )MDL DOCKET NO. 16-MD-2700
                         )ALL CASES
GENENTECH HERCEPTIN      )Proceeding: Initial Case
(TRASTUZUMAB)MARKETING   )Management Conference
AND SALES PRACTICES      )Date: 6-23-16
LITIGATION               )Court Time: 10:00 a.m.
                         )
                         )


TRANSCRIPT OF HEARING

Before the Honorable Terence K. Kern

June 23, 2016.


ELIZABETH ANN BEHLES, CSR #121

1                          **APPEARANCES**

2

3    For Plaintiffs:        MR. DAVID E. KEGLOVITS
                            MR. STEVEN J. ADAMS
4                           MR. JAMES PEBSWORTH
                            MS. AMELIA A. FOGLEMAN
5                           MR. ADAM C. DOVERSPIKE
                            Attorneys at Law
6                           GABLE GOTWALS
                            100 West Fifth Street
7                           Suite 1100
                            Tulsa, Oklahoma  74103-4217
8

9    For Comanche County Memorial Hospital:

10

11                          MR. JAMES SILL
                            MS. TARA TABATABAIER
12                          MR. CHRISTOPHER J. BERGIN
                            Attorneys at Law
13                          Sill Law Group, PLLC
                            14005 North Eastern Avenue
14                          Edmond, OK 73013

15

16   For Defendant:         MS. ALICIA DONAHUE
     Genentech              MR. JAMES P. MUEHLBERGER
17                          Attorneys at Law
                            2555 Grand Boulevard
18                          Kansas City, MO  64108-2613

19

20        And              MR. WILLIAM W. O'CONNOR
                            Attorney at Law
20                          NEWTON, O'CONNOR
21                          15 West 6th Street
                            Suite 2700
22                          Tulsa, OK  74119

23

24

25

         *MIDWEST REPORTING, INC. 918.455.2631*

1

2          THE COURT:  This matter comes on

3   for case management conference In Re:

4   Genentech Herceptin, MDL docket's 16-2700 on

00:00  5   here.  I'm glad to see that so many of you

6   were able to make it.  You're traveling in

7   packs for safety reasons?

8          All right.  We've got a number of

9   things to handle and this is our first

00:00  10   meeting in this MDL case, and we'll try to

11   establish as much as we can.

12          I think initially I need to get

13   appearances for the Record, so if we could

14   start with the plaintiffs, please.

00:00  15          MR. KEGLOVITS:  Your Honor, Dave

16   Keglovits on behalf of -- there are 15 cases

17   and we represent 14 plaintiffs in 14 of those

18   cases.  I'm happy to go through each of those

19   for your Honor if you want to hear each of

00:01  20   those, but I just want to advise you that

21   that's the allocation.  Mr. Sill, Sill Law

22   Group represents the plaintiff in the other

23   case, the Comanche County Memorial Hospital

24   case.

00:01  25          THE COURT:  Okay.

1           MR. ADAMS:  Steve Adams

2   representing the plaintiffs, co-counsel with

3   Mr. Keglovits.

4           MR. DOVERSPIKE:  Adam Doverspike

00:01   5   also representing the same co-counsel with Mr.

6   Keglovits.

7           MR. SILL:  Your Honor, James Sill

8   representing Comanche County Memorial

9   Hospital, and as indicated we are in the

10   submission presented in court, as I'm sure his

11   Honor has seen, asking that David be appointed

12   as lead counsel, and that we be appointed as

13   co-lead, so consequently I'll only be speaking

14   when asked this morning.

00:01   15           THE COURT:  All right.

16           MR. BERGIN:  Christopher Bergin,

17   also from the Sill Law Group on behalf of the

18   Comanche County Memorial Hospital.

19           MS. TABATABAIER:  Tara Tabatabaier

00:01   20   also from the Sill Law Group on behalf of

21   Comanche County Memorial Hospital as well.

22           THE COURT:  All right.  Is that all

23   from the plaintiffs' side?

24           MR. KEGLOVITS:  Your Honor, Bill

00:02   25   O'Connor on behalf of Genentech, and with me

1   is Alicia Donahue and Jim Muehlberger.

2           MR. MUEHLBERGER: Good morning,

3   your Honor.

4           MS. DONAHUE: Good morning, your

00:02   5   Honor.

6           THE COURT: Good morning. There

7   have been some late filings. We used to call

8   that years ago, fillings that came over the

9   transom. And you younger lawyers will not

00:02   10  understand that terminology at all; it's a

11  ventilation system in old buildings. You

12  could just throw it over the top of -- the

13  windows on top of the doors. And we'll get to

14  those as they come up.

00:03   15          Okay. Mr. Keglovits, you indicated

16  there are 15 cases now; you represent 14?

17          MR. KEGLOVITS: Your Honor, through

18  this week there are actually 16 plaintiffs.

19  We represent 15 of the plaintiffs. I believe

00:03   20  there are 13 or 14 cases.

21          One of the cases is relatively new

22  and thus has not been tagged with a

23  conditional transfer order, so it might not be

24  on what the Court has. It's -- the style is

00:03   25  Blue Ridge Cancer Center in Virginia as the

1    plaintiff.  The others I believe all have

2    either been transferred to your Honor, or in

3    the case of Shindell Oncology case, a

4    conditional transfer order has been provided

00:03    5    and should be --

6              THE COURT:  Okay, and so there are

7    some that we're unaware of.  Let's talk about

8    that while we have this opportunity.

9              What do you anticipate; what do you

00:04    10    have knowledge of?  Are there other cases that

11    you believe are going to be included, or are

12    there other cases that are -- will be filed?

13              MR. KEGLOVITS:  There are other

14    practice groups who are interested in

00:04    15    participating, I think -- I don't want to get

16    too deep into the issues, but from our

17    perspective if we were permitted to file the

18    Third Amended Complaint that we've asked the

19    Court to allow us to file, which would include

00:04    20    a national class allegation, that would make

21    it unnecessary for us to continue to stand up

22    using individualized actions in other

23    jurisdictions.  We're not aware of any other

24    firms that are interested in bringing the

00:04    25    case, at least at this point.

1            THE COURT:  And if, in fact, a

2    class action were allowed, what kind of

3    numbers do you think you're looking at?

4            MR. KEGLOVITS:  In terms of the

00:04   5    number of class members?

6            THE COURT:  Yes.

7            MR. KEGLOVITS:  In the thousands.

8            THE COURT:  Okay.  So Herceptin was

9    basically sold to and used by facilities

00:05  10    throughout the United States, and those

11    facilities would number certainly in the many

12    hundreds, if not thousands.

13            MR. KEGLOVITS:  Yes, your Honor.

14    It's also sold outside of the United States,

00:05  15    but as the proposed classes have been defined,

16    at least at this point, those groups would not

17    be included in this case.

18            THE COURT:  All right.  One of the

19    matters that has been discussed that we need

00:05  20    to determine is of service of additional

21    cases.  There was an indication that the

22    plaintiff wanted to serve by email and that

23    was objected to, and I think appropriately.

24            Mr. O'Connor, is there objection to

00:06  25    service by a certified mail, return receipt?

1        MR. O'CONNOR:  Your Honor, one of

2   the issues was we have some foreign entities

3   that have not been served.  We don't represent

4   them, and that -- and in addition to that,

00:06  5   there was a concern on our side that any kind

6   of email would be a potential waiver of

7   jurisdiction, venue and other issues.  So we

8   had, prior to all of these additional suits

9   coming in, and certainly long before we

00:06  10   received the proposed Third Amended Complaint,

11   we had talked about a stipulation that

12   basically resolved any concerns we had on the

13   defense.

14        So one thing we could certainly do

00:07  15   is go back and try to reach this same

16   stipulation or a similar one that would

17   resolve some of the issues, not certainly with

18   respect to the foreign entities, but would set

19   forth a -- that it's not a waiver of defenses;

00:07  20   that we were not agreeing to any kind of

21   service by certified mail or otherwise of any

22   parent or subsidiary or any division of

23   Genentech.  So we had kind of anticipated this

24   when we first were preparing the proposed CMO.

00:07  25   And I would ask your Honor if we could have

1    some time to maybe try to reach a similar

2    stipulation that would outline the absence of

3    any waiver on our part.  We'd limit who, if it

4    was service by certified mail, who that could

00:07    5    be on, and still preserve the need for them

6    to, you know, comply with the Hague convention

7    and whatever else they'd do if they intended

8    to pursue these foreign companies.

9         THE COURT:  You want to have

00:08   10    certified mail just to you and then you take a

11    vacation?  All right.  Have the foreign

12    entities been served?

13         MR. O'CONNOR:  Not to our knowledge.

14    There was --

00:08   15         THE COURT:  There was some

16    indication --

17         MR. O'CONNOR:  They --

18         THE COURT:  -- of service in the

19    first few cases was considered appropriate.

00:08   20         There was service on Genentech, and

21    there was certainly service on the United

22    States Roche Holdings, but not on anybody

23    else.  And, frankly, as service has proceeded

24    there hasn't been a whole -- any problems to

00:08   25    our knowledge, so I don't understand why there

1   would have to be some novel service issue

2   anyway.  They've, they've accomplished it, and

3   to date -- well, I don't think certified mail

4   is novel though.  We've had that for a while.

00:09   5        MR. O'CONNOR:  Sure, yeah.  We had

6   had this stipulation in mind to try to --

7   which we were on the eve of presenting to your

8   Honor when more cases came along and new

9   counsel came in.

00:09   10        THE COURT:  Mr. Keglovits, do you

11  care about the foreign entities?

12        MR. KEGLOVITS:  Well, to be clear

13  the only case that has foreign entities as a

14  defense is Mr. Sills' Comanche County case.

00:09   15  And the stipulation that Mr. O'Connor is

16  referring to, we think we've agreed to it.

17  And then after we had had those discussions,

18  the Comanche County case got filed and caused

19  folks at this table to say, "Wait a minute, we

00:09   20  need to back up off of it and decide what we

21  want to do." So I'm doubtful after that, if

22  that's okay with your Honor.  And again, not

23  to lobby too much for the Third Amended

24  Complaint, but I think when it's filed then

00:09   25  all this stuff kind of goes away.

*MIDWEST REPORTING, INC.* 918.455.2631

                    THE COURT:   I think that's

certainly possible.   But I'll give you ten

days to come up with some, some agreement with

regard to acceptance of service, and whatever

00:10   appropriate stipulations you need for

protection.

                    MR. SILL:   And, your Honor,

sometimes in comparable cases we've reached an

agreement with defendants to dismiss one

00:10   defendant upon the agreement that that

defendant will indemnify the judgment, or good

judgment, so we will also discuss that with

the defendant.

                    THE COURT:   Very well.   There was

00:10   an indication that the plaintiff wanted to

directly file new actions in the Northern

District and without filing them in the

appropriate district and having been

transferred to the MDL.   The defendant

00:10   objected to that.   I'm not familiar with that

as being a normal procedure, and I don't --

unless the defendant were to consent, it seems

like it raises venue problems that shouldn't

be handled here.   You still want to argue that?

00:11   MR. KEGLOVITS:   Not really.   Again,

1    that was one of the things we had worked out

2    when the Comanche County case got filed on --

3    different defendants served, and backed up off

4    of that.  So I think your Honor doesn't prefer

00:11    5    that process.  We had abdicated for it because

6    it avoids the cost of local counsel in the

7    jurisdictions --

8              THE COURT:  All right.

9              MR. KEGLOVITS:  -- and some

00:11   10    administrative things, but it's not

11    substantive.

12              THE COURT:  What happens when the

13    cases go back though, if they go back?

14              MR. KEGLOVITS:  Under the

00:11   15    stipulation that was discussed between the two

16    of us, we would identify where the home

17    district was, and then those cases would be

18    transferred back to that home district in the

19    direct filing.

00:12   20              THE COURT:  Well, I'll leave that

21    up to you.  If you can reach an agreement,

22    that's fine.  I'm not going to require that.

23         On the point of plaintiffs' leadership,

24    the request has been made that the Court

00:12   25    appoint David Keglovits and Gable Gotwals as

1    lead counsel.  And, Genentech had Matthew Sill

2    on here who --

3              MR. BERGIN:  Your Honor --

4              THE COURT:  -- does someone have a

5    preference here?

6              MR. SILL:  My partner, Matthew

7    Sill, wanted me to apologize for not being

8    here today.  He is the governor from the

9    Oklahoma Association of Justice to the

00:12  10   National American Association of Justice, so

11   he's in Canada for the state meeting today and

12   couldn't be here.  But, yes, and I have -- for

13   Matthew's defense, I have Matthew's short form

14   bio, and he has served on steering committee

00:13  15   and executive committee on a number of

16   multidistrict litigations, and it is he rather

17   than I we're asking you to appoint.

18              Might I approach the bench with

19   this?

00:13  20             THE COURT:  You may.

21              MR. BERGIN:  Thank you.  And I

22   believe that the defendants, to the best our

23   knowledge, have no objections to these

24   appointments.  And we're also asking that Mr.

00:13  25   Keglovits and Mr. Sill be appointed as interim

1    class counsel, and the Court may want to

2    address that a little later.

3              THE COURT:  Mr. O'Connor?

4              MR. O'CONNOR:  Your Honor, we do

00:13    5    concur with the lead counsel and the co-lead

6    counsel that they are -- they have come

7    together on, but we think it's premature to

8    appoint an interim class counsel at this stage.

9              We, for obvious reasons, think they

00:14   10    have a huge hurdle on certification and we

11    have some other issues that you're aware of on

12    the preemption.  But in any event, that's the

13    only issue we had with the leadership

14    structure was we thought it was premature to

00:14   15    appoint interim class counsel at this point.

16              THE COURT:  All right, the Court

17    appoints Mr. Keglovits and Gable Gotwals as

18    lead counsel, and Matthew Sill with the Sill

19    Law Group as co-lead counsel.

00:14   20              One of the matters I referred to as

21    coming over the transom was the plaintiffs'

22    Motion for Leave to File a Third Amended

23    Complaint.

24              Mr. Keglovits, you want to address

00:14   25    that?

1           MR. KEGLOVITS:  Yes, your Honor.

2    It is our attempt to, as I earlier mentioned,

3    create a cooperative case governing document

4    that would bring together all claims of all of

00:15   5    the parties that we as counsel see as

6    appropriate in the first instance, and to

7    reduce the need for some of these other

8    administrative things.

9           Our hope is that working together

00:15   10   with Mr. Sills' group, we can jointly propose

11   a class definition of the motion to certify a

12   class with jointly agreed upon claims.  We

13   spent a lot of time this morning working on a

14   proposal to come to you with today on a number

00:15   15   of items and got some good cooperation.  So

16   our hope is that when we have this Third

17   Amended Complaint, if we get a chance to have

18   a Third Amended Complaint, it's really going

19   to streamline what's going to happen going

00:15   20   forward in the case.  It would include a

21   request to certify a national class, your

22   Honor.

23           THE COURT:  You intend this Third

24   Amended Complaint to govern the MDL?

00:16   25          MR. KEGLOVITS:  That would be our

1    hope in consultation Mr. Sills' group, that

2    would be the operative document for all

3    parties claiming against Genentech.

4                THE COURT:  Okay.

00:16    5                MR. KEGLOVITS:  And in my

6    judgment -- and one more thing.  It doesn't

7    really change the contour of the case as it

8    stands right now.  There are a group of

9    practices that we represent, roughly a billion

00:16   10    dollars' worth of purchases of this drug.  Mr.

11    Sills' group is abdicating for a national

12    class already, and so it's really just going

13    to bring it all together in one place.

14                THE COURT:  And this pretty much

00:16   15    assumes that Comanche County is one of them?

16                MR. KEGLOVITS:  If we get together

17    and get the right class definition and the

18    right claims and the right defendants, it

19    would.

00:16   20                THE COURT:  Well, this Third

21    Amended Complaint seems -- well, okay.  What's

22    the defendant position?

23                MR. O'CONNOR:  Your Honor, now --

24                THE COURT:  You can move that

00:17   25    microphone up just a bit, maybe we can turn it

1    up just --

2             MS. TURNER:  We'll do both.

3             MR. O'CONNOR:  We just saw -- we

4    had this underlying tone from the plaintiffs

5    throughout this of some supposed delay on our

6    end, and yet all of the work we did in

7    preparing the agenda and preparing a proposed

8    CMO, never was there any mention of yet

9    another application to amend the Complaint.

10   We see that on Monday and --

11            THE COURT:  We didn't have Comanche

12   County asking for a class action at that time

13   either.

14            MR. O'CONNOR:  That's correct.

15   Well, we have in the last month, but

16   regardless of that, we're now hearing about

17   another perhaps consolidated -- right now we

18   have two competing overlapping class actions.

19   We're hearing that there may be another but we

20   haven't seen it yet.  It's a little hard to

21   provide our position on it because I don't

22   know what that Complaint's going to look like.

23   Right now they're very different class action

24   allegations.  One has California state law

25   claims.  One has a certain period of time

```
 1   that's --
 2              THE COURT:  All right, fine.  Maybe
 3   I've misled you.  I'm really interested in
 4   whether or not you object to the filing of the
 5   Third Amended Complaint.
 6              MR. O'CONNOR:  Our, our --
 7              THE COURT:  And I'm understanding
 8   that there are allegations that would indicate
 9   they want a class action.
10              MR. O'CONNOR:  Right.  And if
11   we're -- you know, if the Third Amended
12   Complaint that we saw on Monday is the one
13   that would be the class action allegations, I
14   don't think we would have objection if this
15   other Comanche class action complaint either
16   goes away or is assumed into the one that was
17   filed Monday.  But beyond that I just don't
18   know what's coming with this proposed
19   consolidation or resolution.
20              THE COURT:  Well, the elephant in
21   the room is obviously the class action aspect
22   of this, which we haven't gotten to.  But I
23   don't have any problem with the Third Amended
24   Complaint, and I'm going to allow the
25   plaintiff leave to file that Third Amended
```

1  Complaint.  At least in the time frame that

2  we're in right now, that seems to be helpful

3  and not harmful, and it kind of gives us a

4  better base to work with.  That includes both

00:19  5  the Comanche County and the other pending

6  cases so...

7  Now, I understand you're alluding

8  to the fact that this could go a lot of

9  different directions from here, and I

00:19  10  understand that.  I think we're better served

11  by allowing that Third Amended Complaint.

12  Now, that brings us, according to

13  my notes, to the biggest timing issue, and I

14  think that the defendant wants to be able to

00:20  15  file an early Motion For Summary Judgment on

16  the dispositive issue of Federal preemption.

17  The plaintiffs have objected to that and a

18  brief was filed, I guess this morning by the

19  defendant with regard to that.

00:20  20  And Mr. Keglovits, it seems like if

21  you can keep -- if I can keep this from

22  delaying things too long, that this is

23  something that needs to be decided fairly

24  early or you could spend a lot of money

00:20  25  unnecessarily.

1           MR. KEGLOVITS:  Two issues for us,

2    your Honor.  The first is we don't want to be

3    cut by a thousand knifes.  We've been coming

4    to you saying by just denying the preemption

00:21    5    motion, now we've got the next best summary

6    judgment motion that's really going to make it

7    efficient for you to consider and show stay of

8    evidence.  As your Honor knows, this case has

9    been on file for a year and still hasn't

00:21   10    gotten to discovery, so we want to kind of

11    avoid that scenario.  And we also, more

12    importantly, if your Honor allows the filing

13    of this summary judgment motion, which they

14    can file whenever they want to, our preference

00:21   15    would be that it doesn't have impacts on the

16    other aspects of the case.  Because the way

17    they're presenting it right now, they want to

18    file a motion and they want to stay everything

19    else.  And as I understand their proposal,

00:21   20    they want to file a motion, present their

21    summary judgment evidence in a motion, and at

22    that point we can ask to do discovery of the

23    information that's in their motion.  We think

24    that's way too restrictive.

00:21   25           If we're going to commence the

1    case, and I hope we will, and they have a

2    motion that they want to get on file in 30 or

3    60 or 90 days, I would like to use that period

4    of time to begin discovery on the issues that

00:22    5    are germane to the motion.  So because, as

6    your Honor knows, sometimes people don't agree

7    on whether something is discoverable what --

8    like Magistrate Wilson.  There could be a lot

9    of time wasted.  And I hate for them to file a

00:22    10    motion and then the discovery starts, and we

11    have long delays until we can get the

12    discovery revolved and then a response.  So in

13    short, we don't really have a position one way

14    or the other on when they file this motion so

00:22    15    long as it's not at the first or the fourth.

16    But we want the other aspects of the case to

17    proceed as normal while they're considering

18    putting together this motion.

19           THE COURT:  What type of discovery

00:22    20    do you feel is necessary to defend the motion?

21    I mean, you have a good idea of what is

22    coming.

23           MR. KEGLOVITS:  Well, we spent some

24    time talking with counsel for the defense

00:22    25    about this proposal and asking questions about

1    what they needed to file.  And at that point

2    it was last week, they didn't have a lot of

3    specifics about it.  But, for example, one of

4    the questions we asked was:  "Do you intend to

00:23   5    have expert affidavits in support of this

6    motion?"  The answer was:  "We haven't made

7    that decision."

8              We know that there are materials

9    that are provided to the FDA.  We are wanting

00:23  10    to get those materials.  We've been unable to

11    get them in unredacted form by way of a FOIA

12    request.  They raised the issue in the

13    submission that came in earlier this week,

14    Tuesday or Wednesday, and as I understand it

00:23  15    that didn't get filed in the docket, at least

16    I haven't seen it on page streaming.  But in

17    that submission they suggest that going

18    forward as we planned to would make it

19    impossible for them to create a manufacturing

00:23  20    facility that could comply with both the

21    Federal and the State law.  Well, I think it

22    would be fair for us to understand something

23    about their manufacturing processes to try to

24    rebut that allegation.  So those are some

00:24  25    examples of discovery that I think are going

1    to be built into this Motion For Summary
2    Judgment.
3              THE COURT:  Well, how much time do
4    you think is necessary for discovery just for
00:24   5    the preemption issue?
6              MR. KEGLOVITS:  I hate to be one of
7    those lawyers that doesn't give you a straight
8    answer, but not having seen the motion yet, we
9    just kind of got a foreshadowing.
00:24  10              THE COURT:  Do you think you want
11    to wait until you see the motion before you --
12    because you want 60 days before he files a
13    motion?
14              MR. KEGLOVITS:  I'd like to start
00:24  15    on the things that I have identified as being
16    information we think is going to be germane to
17    any motion.  And then once we get the motion
18    we can supplement that with germane --
19              THE COURT:  Germane to any issue
00:24  20    indicates discovery on the merits.
21              MR. KEGLOVITS:  I'm sorry, what I
22    meant was germane to any issue that I see as
23    arising in the preemption contest.  And that
24    their -- this case is going to present a lot
00:25  25    of discovery that has overlap between the

1    merits and particular issues, class

2    verification or issues of relevance.  It's

3    hard to put any limits on it.

4         We understand the efficiencies that

00:25  5    your Honor identified, and we certainly don't

6    want to go spending a whole bunch of money

7    collecting millions of gigabytes of ESI and

8    all kinds of topics if this case determines

9    motions, so we will be responsible in how we

00:25  10    approach it.  We're just really hesitant to

11    have your Honor order limitations on us, not

12    knowing what we're going to get and knowing

13    how the case is processed to this point.

14         THE COURT:  Mr. O'Connor?

00:25  15         MR. O'CONNOR:  Your Honor, it

16    wasn't just a week ago that we had this

17    discussion.  It was -- it was throughout the

18    process that we have been collaborating and

19    trying to confer with plaintiffs' counsel.  We

00:26  20    think this is a question of law for the Court

21    to decide.  And as your Honor stated, we think

22    under the Manual for Complex Litigation and

23    for the statutes that created MDLs, that it

24    certainly promotes efficiency and is

00:26  25    encouraged, particularly when it's potentially

1    a threshold dispositive issue.

2              We would have a motion, and it

3    would be supported by expert affidavit and

4    that would bring into consideration the

00:26   5    specific regulation, as well as the USP that's

6    at issue.  There's been an assertion here that

7    we're not providing the quantity of product

8    that's on the label, and this Federal

9    preemption regulation from the FDA, they all

00:26   10   have a specified parameter that we are

11   required to meet.  Beyond that there's a

12   specification approved by the FDA that even

13   under their allegations of what has been

14   received by these institutions would be well

00:27   15   within those parameters.  So we have a

16   situation where we're dealing with a biologic

17   that's actually grown; there's DNA

18   enhancements.  There's all kinds of -- this

19   isn't just a pill.  It's a -- it's a

00:27   20   complicated, complex biologic that is then

21   freeze dried and delivered with a sterile

22   solution to be reconstituted.

23             All of this, as you might imagine,

24   spent years before the FDA before approval.

00:27   25   And now they're asking that through state

1   warrant, breach of warranty claims that that

2   ignore the entire regulatory framework that

3   exists; that it ignore all of the calibration

4   of manufacturing and everything else that's

00:28   5   been done and blessed by the FDA.  So that's

6   why we believe it is a threshold issue.

7        This is not a -- we don't believe

8   there's a lot of discovery that would be

9   required on the preemption issue because of

00:28   10   the regulations and the language of the

11   specifications as well.  So we think it is --

12   we think it does support and promote

13   everything that the MDL in the name of complex

14   litigation asks us to do, as well as encourage

00:28   15   the Court to do.

16        THE COURT:  Well, if I agree that

17   this is the threshold issue and we need to

18   decide this first, what can you do to

19   expedite?  I think you wanted 60 days from

00:28   20   today's date to file your Motion.

21        MR. O'CONNOR:  (Indicating).

22        THE COURT:  But it seems like you

23   should be giving a lot of this information to

24   the plaintiffs as soon as possible so that

00:29   25   we're not -- I don't like the idea of starting

1    the plaintiffs' discovery after you've filed
2    your motion in 60 days while they're just
3    sitting there doing nothing.  If you have the
4    information that you are going to rely on, it
00:29    5    seems like it would be better served if they
6    can start discovery rather quickly just as to
7    that issue.
8            MR. O'CONNOR:  And again, I don't
9    want to invite discovery disputes, but we
00:29    10   haven't seen much limitation on anything that
11   we've received so far.  And so with the
12   regulation, the expert saying who's -- who is
13   in the industry and has FDA experience, with
14   all of that, I just can't imagine.  And I
00:30    15   sensed a little bit of that from what I just
16   heard, that there are elements of discovery
17   that would go well beyond this fairly simple
18   regulatory framework that we've been
19   preempted as State law claims.
00:30    20           So I -- we would certainly be
21   willing, your Honor, to engage in and provide
22   whatever discovery you think is reasonable,
23   and if the experts relied on it, then we
24   produce it, whatever that is.  I don't
00:30    25   think that -- we're certainly not trying to

```
 1   hide anything with respect to the preemption

 2   issue, but we've just never heard any

 3   reasonable fashioning of discovery that would

 4   be aimed at the preemption issue.  It's always

 5   been let's go get everything we can under the

 6   sun, and meanwhile, you know, prevent us from

 7   trying to go get key issues if they ever got

 8   to a damages phase on their own

 9   reimbursements, where these institutions are

10   reimbursed 106 percent of what they pay us, or

11   113 percent.  Well, then, there's a wide range

12   of what they received, so they have a damage

13   hurdle too.  And I'm getting beyond reaction,

14   but it's just that it's been difficult to

15   agree on what that discovery is, and so I've --

16           THE COURT:  Well, I believe your

17   option is full-blown discovery on preemption,

18   on class, on merits, starting tomorrow.  So it

19   seems like even if you have disputes that come

20   up along the way that you're better off

21   getting your motion heard first in spite of

22   some potential difficulties.

23           MR. O'CONNOR:  I would agree there.

24           THE COURT:  All right.  Mr.

25   Keglovits, anything else?
```

1          MR. KEGLOVITS:  Just two things,

2    your Honor.  First of all, I don't want you to

3    leave here with the impression that we think

4    this is a particularly important motion.

00:32    5    There may have been a whole lot of research

6    done to create the secret sauce, but when you

7    pour it in a can and it says it's a 12 ounce

8    can, it's not too hard to figure out if

9    there's 12 ounces in a can.  And when you know

00:32   10    what the measurement is, it's not too hard to

11    write down what the measurement is.  If you

12    choose to write down a number that's different

13    than what you put in, that's the problem.  So

14    all this secret sauce and science aside, this

00:32   15    is a pretty simple case.

16          Having said that, I just heard now

17    for the first time that they're going to have

18    an expert, and I suppose for the first time

19    we'll get an exact date along with the Motion

00:32   20    For Summary Judgment, which is a little out of

21    phase with the way issues are typically

22    presented to this Court.  I would think you

23    could get his affidavit well in advance of the

24    filing of the motion so we can begin to

00:32   25    understand who we need to get to counter that

affidavit.  And you --

THE COURT:  That's what I thought I
was at least proposing or throwing out is that
the defendant needs to be forthcoming with all
00:33 of the information that they have already that
they are going to use in formulating their
Motion For Summary Judgment, and you can start
discovery on that right away.

MR. KEGLOVITS:  (Indicating).

00:33 THE COURT:  Then after the motion
is filed, I assume you'll want some clean up
time.  But, you know, I think this is an issue
that I don't know whether it's that critical
or not; I have no idea at this time.  But I
00:33 think if it's one that can dispose of the
entire case then we need to go ahead and do
that first.  But I don't want to -- I don't
want to end up being six months down the road
just doing discovery on this motion and your
00:33 responses and so forth.  So it seems like to
me that if the defendant can start giving you
affidavits, information, whatever they already
have possession -- in their possession, and
what they obtain as they go and you can start
00:34 discovery on that, well then you wouldn't need

1  more than maybe 30 days after the motion's

2  filed.

3        MR. KEGLOVITS:  Yes, it all depends

4  on the timing.  And it would be helpful today

00:34  5  if they told us who their expert is or what

6  her or his qualifications are so we can begin

7  our search for the right person to address

8  that.

9        THE COURT:  All right.  I'm not

00:34  10  going to -- I'm going to stay the discovery on

11  the class certification matter and the merits

12  of the case at this time.  I'm going to allow

13  the defendant to file 30 days from today's

14  date, unless that falls on a Saturday or a

00:35  15  Sunday, the Motion For Summary Judgment based

16  on the preemption.  I'm going to require the

17  defendant to provide the name of any and all

18  experts that you're aware of by tomorrow, and

19  any additional experts that you contemplate

00:35  20  using, well, within 30 days of today's date.

21  And I want you to begin the process and begin

22  the process, I mean, like within the next ten

23  days of providing the plaintiffs with the

24  material that you are already have.

00:36  25        (Off the Record)

1          THE COURT:  I'm -- that apparently

2     wasn't what I understood.  Sixty days to file

3     a motion.  What I want to happen within 30

4     days is the names of all potential experts,

00:36     5     whatever experts you're aware of right now I

6     want you to give them tomorrow.

7          But what concerns me is that as

8     this progresses there may be some changes in

9     personnel, and what I want to make sure of is

00:36    10     that at some point before this 60 days is up

11     that everybody knows who's -- who the players

12     are.  And 30 days may be too long, I mean, we

13     can discuss that.  But I want, you know, I

14     want this to be ongoing.  And I want the

00:37    15     discovery to be on issues that bear on or

16     reasonably might bear on the question of the

17     Federal preemption, and that should be taken

18     in a broader sense.

19          I don't agree with the defendant

00:37    20     that it's going to be that narrow.  It can be

21     just wherever your discovery takes you.  When

22     you get -- it gets to the point that it's more

23     on class or on the merits of the case, then

24     all you have to do is call, call me or call

00:37    25     the Magistrate and we'll let you know.

1           Now, Mr. Keglovits, what problems

2     do you see that I've just created?

3           MR. KEGLOVITS:  Well, I want to

4     talk with some of the people who are smarter

00:38     5     than me before I identify them.

6           The thing that's out there that I

7     didn't hear in your order was when our

8     response would come following the filing of

9     their motion.

00:38    10           THE COURT:  Thirty days is what I

11     intended.

12           MR. KEGLOVITS:  All right.  Could

13     we have leave at least to come back to you, if

14     we think it's going to take more than that,

00:38    15     because we're having trouble finding an expert

16     or something like that?

17           THE COURT:  You may, but I assume

18     you're going to -- I assume you already have

19     some ideas about experts that are out there.

00:38    20     But sure, thirty days is what I anticipate it

21     will take you to respond, if you get all the

22     information that I'm hoping that they're going

23     to give you.  And they're going to be

24     forthcoming, and you're going to have this

00:38    25     ahead of time.  And if the games start and,

1    you know, switching experts and switching

2    ideas and reports and stuff then yes, I'll

3    give you more time.

4                    MR. KEGLOVITS:  And then could I

00:39   5    maybe ask your Honor to expedite response time

6    on Interrogatories, Request for Admission,

7    Request for Production to make it 15 days

8    instead of 30, allowing for the compressed

9    schedule?

00:39   10                    THE COURT:  I think that's

11    appropriate.  What other?  Fifteen days

12    response time on the Interrogatories?

13                    MR. KEGLOVITS:  Written discovery,

14    and I don't know whether we're going to need

00:39   15    any depositions of their people, but I'm

16    assuming within this discovery you've outlined

17    we identify someone we need to depose, we've

18    got the leeway to do that.

19                    THE COURT:  In the case of

00:40   20    Genentech it wasn't a case, it was an order,

21    the initial case management scheduling order.

22    They took care of a lot of those things

23    that -- would that be preferable, the Court go

24    ahead and order today and give you time frames

00:40   25    for depositions and spacing depositions be

──── *MIDWEST REPORTING, INC. 918.455.2631* ────

1    completed, Interrogatories?

2              MR. KEGLOVITS:  I think that would

3    help.

4              THE COURT:  All right.  We'll do

00:40   5    that.  So that's going to put you on a pretty

6    short fuse on this.  Is everyone prepared to

7    march forward just on the preemption?

8              MS. DONAHUE:  Good morning, your

9    Honor.  I'm Alicia Donahue, I'm the --

00:40   10             THE COURT:  Do you need more time

11   for you to be able to recover from...

12             MS. DONAHUE:  Yes.  I'm here

13   compromised.  One issue that is outstanding

14   that will affect the discovery situation is

00:41   15   that Protective Order.  Prior to going to the

16   GP&L panel and coming back to you, we had a

17   Protective Order motion with Magistrate Lane.

18   He entered an Order.  There's one provision of

19   the Protective Order that he entered that we

00:41   20   at Genentech have issue with.  We filed an

21   objection with your Honor and briefed that,

22   but then new things -- everything started

23   happening, so that is an issue that's been

24   standing, and it's very important to Genentech

00:41   25   in terms of their highly confidential information

that much of this discovery; in fact, all of
this discovery will be put on the table.

You know, most of our manufacturing
documents are formulas, are very highly
confidential.  They are filed with the FDA,
so, you know, the list is fairly long.  And
we'll --

THE COURT:  Do you anticipate
reaching these issues in this type of
discovery just on preemption?

MS. DONOHUE:  I think a lot of it
will, you know, will come into play, but
assuming that discovery is what the
plaintiff's made it sound like.  I could
propose, the only issue that we have on the
order is that we have asked for an attorneys'
eyes only provision for highly confidential
documents.

The order that the Magistrate
entered allows for two designees from each
corporate defendant -- I'm sorry, or corporate
plaintiff to also review the information.
Given that we are now in a class action
situation and there's multiple plaintiffs,
it's -- Genentech having a right, since it was

put out there.  So what I would propose, your

Honor, is that unless we have the attorneys'

eyes only provision, and their expert of

course who will need to see it, you know, that

it's kept highly confidential for attorneys

and experts to review and not further than

that at this -- at this stage.

THE COURT:  Only for the discovery

that's taking place with regards to --

MS. DONAHUE:  Uh-huh.

THE COURT:  -- the preemption?

MS. DONAHUE:  That would be fine

then.  If need be, and we feel we needed to

further it, should the provision not take care

of the case, we will be back if need be.  But,

you know, hopefully not.  Because I do think a

lot of -- a lot of the information we're

concerned about will be coming out in this

phase given the discovery plan that we've --

that has been put in place.

THE COURT:  Mr. Keglovits?

MR. KEGLOVITS:  The way it was

played out in front of Magistrate Judge Wilson

was we are concerned that if we're not allowed

to share information with our clients, and

most of the officers are clients; most of the

directors of our clients are practicing

oncologists.  We benefit greatly from their

help in understanding the information we get.

00:44   So we want to be able to go to them with what

we receive from Genentech and get their views

about it.

I don't see a real issue here if we

identify only two representatives of each

00:44   client that we can share this information

with, and we're not talking about punitive

class members.

THE COURT:  Well, if you have two

of each client, you're up to about 30?

00:44   MR. KEGLOVITS:  That's right.  And

remember, we're not competitors of Genentech.

We're not trying to manufacture these drugs.

All we want to do is present whatever

scientific information comes to people who are

00:44   very skilled in this science.  And to do

otherwise bars us to go hire a bunch of people

to do what our physicians probably could do

without hiring anyone.  To say nothing of,

ordinarily, unless you've got a competitor

00:44   versus competitor, there aren't restrictions

1    on talking with your clients about the

2    strengths and weaknesses of the case.  So I

3    just don't see that this issue is properly

4    placed in this case.

00:45    5          Now remember, this is a patent

6    communication, so many of these disclosures

7    have been made so that they can get this

8    monopoly position.  I think it's all presented

9    in briefs to your Honor that come out of the

00:45   10   appeal.

11          Our preference would be that your

12   Honor sustain the decision from Magistrate

13   Judge Wilson, and that Protective Order apply

14   to this discovery as well as all the rest of

00:45   15   it.

16          THE COURT:  My understanding

17   originally was they were worried about

18   competitive information and pricing information,

19   and I'm just not sure why we're getting into

00:45   20   much of that on preemptions.

21          MS. DONAHUE:  May I approach, your

22   Honor?

23          THE COURT:  You may.

24          MS. DONAHUE:  There were --

00:45   25   originally, when we were dealing with one of

1    the preemption issues, there were two levels

2    of confidential information that we were

3    concerned about.  One being on regulatory, you

4    know, manufacturing information, and then the

00:46    5    other being commercial as you said.

6              Now, we're concerned, you know,

7    because of where we are with the bench motion,

8    we're concerned solely about the regulatory

9    information for this phase.  And I wanted to

00:46   10    add that if the plaintiffs were to go to the

11    FDA and request, for instance, our

12    biologically -- or biological licensing

13    application, it would come back to them highly

14    redacted because of the trade secret

00:46   15    information that's contained there.  And we

16    cited cases in our brief, but I think also

17    it's just -- it's a great, you know, fear for

18    Genentech that even, you know, the two people

19    that may be designated from each of these

00:46   20    entities, even though they're not competitors,

21    per se, and they're not seen as doing business

22    with them, once the information's out there,

23    it's a very slippery slope.  And given the

24    level of highly, highly, highly confidential

00:46   25    trade secret information that we're talking

1    about, I cannot overstate the importance of

2    this issue from Genentech's, you know,

3    competitive and trade secret point of view.

4    It's just -- it's so important to them, so...

00:47   5    and I don't think that we're asking for too

6    much; the attorneys' eyes only and the expert

7    person matter because it will be covered under

8    the confidentiality agreement.  And if others

9    need to see it, we can address that on a

00:47  10    case-by-case basis.

11            But given the number of plaintiffs

12    we've got and the type of information we're

13    talking about at this point, we would

14    respectfully request our point of view.  Thank

00:48  15    you.

16            THE COURT:  All right.  I'm going

17    to sustain Magistrate Wilson's position and

18    order on the Protective Order with the

19    exception that, you know, we'll entertain on a

00:48  20    case-by-case basis the specific matters that

21    relate to trade secrets and pricing.

22            Is there anything else that's

23    beyond those two things that are -- seem to be

24    creating this spurn?  Okay.

00:49  25            Electronically stored information,

1    apparently you were attempting to come to an

2    agreement on that, and it's broken down or has

3    it been addressed of late?  Is there any

4    reason you can't have the PSI protocol

00:49  5    finalized by the time the Motion For Summary

6    Judgment is ripe?

7            MR. KEGLOVITS:  I wouldn't think

8    so, your Honor, but the hang up has been how

9    many custodians it serves.  Genentech has

00:49  10    proposed that we agree to some fixed number,

11    but we have said is we don't really know

12    enough about an inspection process to know how

13    many people served in a particular role over a

14    number of years, how many roles there are.  I

00:50  15    think our preference would be to have them

16    explain to us how the manufacturing process

17    works and whose got what titles; how the

18    marketing process works and whose got what

19    titles, and then identify for them which of

00:50  20    those titles we want you to search ESI for

21    over those.

22            As I understand it the way we came

23    to kind of a bump in the road, and then the

24    subsequent filings kind of took us off of the

00:50  25    ESI track because of the trip to the MDL.

1           MR. O'CONNOR:  To answer your

2    question, I think we could reach an agreement

3    by the time the Summary Judgment is ripe.

4           THE COURT:  Thank you.  And if

00:50   5    there are problems, of course, we'll handle

6    those as they come up.  It seems like they'd

7    like for you to have future status conference

8    dates in place.  I'm not sure we're ready for

9    that.  You know, I think we might have a

00:51   10   shorter discussion just with lead counsel and

11   co-lead counsel and the defendant's counsel

12   maybe in September to see where we are, and

13   we'll try to find a date that works for

14   everybody.  But I don't -- I don't think we're

00:51   15   going to need a full-blown status conference

16   at that time.  All right.  What could we have

17   that I've not addressed or we have not

18   addressed?

19          MR. KEGLOVITS:  From the

00:51   20   plaintiffs' respective, we're good.

21          MR. O'CONNOR:  Agreed, your Honor.

22          THE COURT:  Okay.  It's been nice

23   seeing you all.  We won't I'm going to go

24   Santa Barbara for July so I won't see you

00:52   25   then.  Let's see, all right, or you might

1    indicate to Ashley your schedules in September

2    and compared with mine and see if there's a

3    time where we can just have a little get

4    together and not as formal as this and just

00:52    5    kind of see where we are and then map out some

6    future conferences from that point forward.

7    MR. KEGLOVITS:  The joint panel on

8    multidistrict litigations was kind enough to

9    invite us to Santa Barbara to have argument on

00:52    10    the question of consolidation -- and I think I

11    will speak for Alicia, but we found it a very

12    helpful place to have arguments, so if your

13    Honor's inclined, maybe that would be good or

14    maybe not.

00:53    15    (Off the Record)

16    THE COURT:  All right.  Thank you

17    all.

(RECORD CONDLUDED)

18

19

20

21

22

23

24

25

*MIDWEST REPORTING, INC. 918.455.2631*

1                     CERTIFICATE
2    STATE OF OKLAHOMA  )
                        )   ss.
3    COUNTY OF TULSA    )

4

5       I, Elizabeth Ann Behles, a Certified
6    Shorthand Reporter in and for the State of
7    Oklahoma, do hereby certify that the above
8    Transcript of Hearing was taken by me on the
9    23rd day of June 2016 and thereafter transcribed.
10        IN WITNESS WHEREOF, I have hereunto
11   set my hand this 28th day of June, 2016.

12

13
              s/Elizabeth Ann Behles, CSR #121
14

15

16

17

18

19

20

21

22

23

24

25