**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| IN RE: GENENTECH, INC., | ) | |
| HERCEPTIN (TRASTUZUMAB) | ) | MDL DOCKET NO. 16-MD-2700 |
| MARKETING AND SALES | ) | ALL CASES |
| PRACTICES LITIGATION | ) | |

## GENENTECH, INC.'S MOTION FOR SUMMARY JUDGMENT BASED ON FEDERAL PREEMPTION AND BRIEF IN SUPPORT

*/s/* William W. O'Connor

WILLIAM W. O'CONNOR, OBA No. 13200
**NEWTON, O'CONNOR, TURNER & KETCHUM**
15 W. 6th Street, Suite 2700
Tulsa, OK  74119
Telephone: (918) 587-0101
Facsimile:  (918) 587-0102
Email: boconnor@newtonconnor.com

-and-

ALICIA J. DONAHUE, Bar No. 117412
*(admitted pro hac vice)*
**SHOOK, HARDY & BACON LLP**
One Montgomery, Suite 2700
San Francisco, CA  94104
Telephone: (415) 544-1900
Facsimile:  (415) 391-0281
Email: adonahue@shb.com

JAMES P. MUEHLBERGER, Bar No. 51346
*(admitted pro hac vice)*
**SHOOK, HARDY & BACON LLP**
2555 Grand Blvd.
Kansas City, MO  64108
Telephone: (816) 474-6550
Facsimile:  (816) 421-5547
Email: jmuehlberger@shb.com

*Attorneys for Defendant Genentech, Inc.*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................ 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................................... 3

FACTUAL RECORD RELEVANT TO SUMMARY JUDGMENT ........................................... 5

I.       Background and Description of Herceptin ........................................................... 5

II.      FDA's Approval and Regulation of Herceptin ...................................................... 6

         A.       The application process for new biologics ............................................... 7

         B.       FDA post-approval regulation of biologics ............................................. 8

III.     The Manufacture of Herceptin .......................................................................... 9

LEGAL STANDARD ............................................................................................................. 11

ARGUMENT ......................................................................................................................... 12

I.       Plaintiffs' Claims Are Preempted by Federal Law ........................................... 12

II.      Plaintiffs' Claims Are Preempted Under "Obstacle" Preemption .................... 13

         A.       Federal law requires allowances for variations in the net weight of
                  prescription drugs ............................................................................... 13

         B.       Plaintiffs' state-law claims are preempted because they pose an obstacle
                  to the purposes of federal statutes and regulations ............................ 20

III.     Plaintiffs' Claims Are Preempted Under "Impossibility" Preemption ............ 24

         A.       State-law claims that would impose obligations requiring prior FDA
                  approval are preempted under impossibility preemption ..................... 24

         B.       Changing the manufacturing process for Herceptin to ensure vials
                  contained 440 milligrams would require prior FDA approval .............. 27

CONCLUSION ...................................................................................................................... 30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adler v. Wal–Mart Stores, Inc.*,
144 F.3d 664 (10th Cir. 1998) ..............................................................................11

*Amos v. Biogen Idec Inc.*,
28 F. Supp. 3d 164, 169 (W.D.N.Y. 2014) .............................................................27

*Barcal v. EMD Serono, Inc.*,
2016 WL 1086028 (N.D. Ala. Mar. 21, 2016) ........................................................27

*Bimont v. Unilever United States, Inc.*,
2015 WL 5256988 (S.D.N.Y. Sept. 9, 2015)...........................................................22

*Bones v. Honeywell Int'l, Inc.*,
366 F.3d 869 (10th Cir. 2004) ..............................................................................11

*Booker v. Johnson & Johnson*,
54 F. Supp. 3d 868  (N.D. Ohio 2014)....................................................................27

*Bruesewitz v. Wyeth LLC*,
562 U.S. 223 (2011)..............................................................................................7

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001)........................................................................................22, 23

*Carter v. Alcon Labs., Inc.*,
2014 WL 989002 (E.D. Mo. Mar. 13, 2014) ..........................................................27

*Christy v. Travelers Indem. Co. of Am.*,
810 F.3d 1220 (10th Cir. 2016) ............................................................................11

*Cook Family Foods, Ltd. v. Voss*,
781 F. Supp. 1458 (C.D. Cal. 1991) .................................................................21, 22

*Dobbs v. Anthem Blue Cross & Blue Shield*,
475 F.3d 1176 (10th Cir. 2007) ............................................................................12

*Farina v. Nokia Inc.*
625 F.3d 97 (3d Cir. 2010)................................................................................22, 23

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
458 U.S. 141 (1982)..............................................................................................12

*Geier v. Am. Honda Motor Co.*,
    529 U.S. 861 (2000) ...................................................................................12, 24

*Hughes v. Talen Energy Mktg., LLC*,
    136 S. Ct. 1288 (2016) .......................................................................................12

*In re Celexa & Lexapro Mktg. & Sales Practices Litig.*,
    779 F.3d 34 (1st Cir. 2015) ..........................................................................27, 29

*In re Universal Serv. Fund Tel. Billing Practice Litig.*,
    619 F.3d 1188 (10th Cir. 2010) ...................................................................12, 20

*Jones v. Rath Packing Co.*,
    430 U.S. 519 (1977) ...................................................................14, 15, 20, 21

*Kraft Foods N. Am., Inc. v. Rockland County Dep't of Weights and Measures*,
    2003 WL 554796 (S.D.N.Y. Feb. 26, 2003) ................................................22, 24

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996) ...........................................................................................23

*Mutual Pharm. Co. v. Bartlett*,
    133 S. Ct. 2466 (2013) ............................................................................. *passim*

*Mwesigwa v. DAP, Inc.*,
    2010 WL 979697 (E.D. Mo. Mar. 12, 2010) ......................................................23

*PLIVA, Inc. v. Mensing*,
    564 U.S. 604 (2011) ...................................................................3, 24, 25, 27

*Riegel v. Medtronic, Inc.*,
    552 U.S. 312 (2008) ...........................................................................................12

*Schneider v. City of Grand Junction Police Dep't*,
    717 F.3d 760 (10th Cir. 2013) ...........................................................................11

*Schrock v. Wyeth, Inc.*,
    727 F.3d 1273 (10th Cir. 2013) ...........................................................12, 26, 28

*Thompson v. Allergan USA, Inc.*,
    993 F. Supp. 2d 1007 (E.D. Mo. 2014) ........................................................27, 28

*United States v. Shreveport Grain & Elevator Co.*,
    287 U.S. 77 (1932) .............................................................................................15

*Wyeth v. Levine*,
    555 U.S. 555 (2009) ......................................................................................24, 25

*Yates v. Ortho-McNeil-Janssen Pharm., Inc.*,
    808 F.3d 281 (6th Cir. 2015) ..................................................................26, 27, 29

*Zogenix, Inc. v. Patrick*,
    2014 WL 1454696 (D. Mass. Apr. 15, 2014) ........................................................23

**Statutes**

2 Okla. Stat. § 2-14-35 ...................................................................................................24

2 Okla. Stat. § 2-14-38a .................................................................................................24

12A Okla. Stat. § 2-313 .................................................................................................18

21 U.S.C. § 301 ...............................................................................................................6

21 U.S.C. § 331 .........................................................................................................7, 13

21 U.S.C. § 343 .............................................................................................................14

21 U.S.C. § 352 ...............................................................................................2, 7, 14, 23

21 U.S.C. § 355 ...............................................................................................7, 8, 16, 18

21 U.S.C. § 356a ..........................................................................................................9, 28

42 U.S.C. § 262 ...............................................................................................................7

**Regulations**

21 C.F.R. § 1.8b ......................................................................................................20, 26

21 C.F.R. § 201.51 ..........................................................................................15, 16, 23, 28

21 C.F.R. § 314.70 ........................................................................................................25, 26, 29

21 C.F.R. § 317.2 .....................................................................................................20, 26

21 C.F.R. § 600.3 .............................................................................................................7

21 C.F.R. § 601.2 .............................................................................................................7

21 C.F.R. § 601.4 .............................................................................................................7

21 C.F.R. § 601.12 ................................................................................................ *passim*

21 C.F.R. § 610.10 ...........................................................................................................7

21 C.F.R. § 610.12 ...........................................................................................................7

iv

21 C.F.R. § 610.13 ..............................................................................................................7

21 C.F.R. § 610.14 ..............................................................................................................7

**Rules**

Fed. R. Civ. P. 56 ...............................................................................................................3

Fed. R. Civ. P. 56(a) ........................................................................................................11

N.D. LCvR 56.1 .................................................................................................................3

**Other Authorities**

DeVita, V., et al., *DeVita, Hellman and Rosenberg's Cancer: Principles and Practice of Oncology* (9th ed. 2011) ..........................................................................5

H.R. Rep. No. 850, 62d Cong., 2d Sess. ..........................................................................14

Korkaya, H., et al., *HER2 and Breast Cancer Stem Cells: More than Meets the Eye*, 73 *Cancer Research* 3489-93 (June 15, 2013) ................................................6

Okla. Admin. Code § 35:10-11-1 ....................................................................................24

S. Rep. No. 1216, 62d Cong., 3d Sess. ............................................................................14

U.S. Const., Art. VI, cl. 2 .................................................................................................12

*U.S. Pharmacopeia* ...................................................................................................15, 16

## INTRODUCTION AND SUMMARY OF ARGUMENT

For nearly twenty years, Herceptin has been an important weapon in the fight against HER2-positive breast cancer, saving the lives of many thousands of women. Plaintiffs agree that Herceptin is an essential medication, and do not challenge its safety or effectiveness. Rather, they complain only that each vial does not contain exactly the amount of Herceptin they were expecting based on the label. But Plaintiffs have no cause for complaint—they received the federally-approved amount of Herceptin and the federally-approved label. Under well-established preemption doctrine, Plaintiffs' state-law claims can require no more.

This litigation began almost a year and a half ago, when two Oklahoma cancer clinics filed suit against Genentech in the Northern District of Oklahoma, raising breach-of-warranty and unjust enrichment claims resulting from Genentech's sale of Herceptin. Subsequently, the case was centralized into this MDL proceeding, which now includes fifteen clinics and hospitals, some of whom have included nationwide class-action allegations. The gravamen of each of Plaintiffs' complaints is that they overpaid for Herceptin because the volume of Herceptin they can extract from the vials is less than the amount expected if each vial had exactly 440 mg of Herceptin and a reconstituted concentration of exactly 21.0 mg/mL (and every last drop of Herceptin solution could be extracted from the vial.) Each of Plaintiffs' state-law causes of action thus stems from their assumption—an incorrect one—that Genentech's references in the Herceptin labeling to a net weight of 440 mg and a concentration of 21 mg/mL were promises that the vial would contain exactly 440 mg of Herceptin and a concentration when reconstituted of exactly 21.0 mg/mL.

Federal law has long mandated that variations must be allowed in the net contents of prescription drug containers due to unavoidable variability that occurs during the manufacturing and packaging process. Specifically, here, the Food and Drug Administration ("FDA") approved

Herceptin for sale in powdered form in vials labeled "440 mg" so long as the actual amount was ███████████████████████████████████ Plaintiffs allege that Genentech violated various state laws because the vials they bought may have contained 3.6% less than 440 milligrams, as labeled, or because the concentration that resulted after adding water was not exactly what they expected.  Plaintiffs thus seek millions of dollars in classwide damages and an injunction barring Genentech from selling Herceptin just as FDA approved it.  Because Plaintiffs seek to hold Genentech liable under state law for something that federal law mandates be allowed, their claims directly conflict with federal law and thus are preempted.

*First*, Plaintiffs' claims are barred under "obstacle" preemption because the Federal Food, Drug, and Cosmetic Act and its implementing regulations expressly allow variations in the actual weight of prescription drugs due to unavoidable deviations during manufacturing.  Indeed, Congress specifically provided that "reasonable variations ***shall*** be permitted[.]"  21 U.S.C. § 352(b) (emphasis added).  FDA implicitly recognized these allowances when it approved Herceptin for marketing in 1998 in vials labeled "440 mg" ██████████████████████.  It is undisputed that the vials Genentech sold were within the federally-approved range.  Plaintiffs' state-law claims thus pose an obstacle to the purposes of federal statutes and regulations and are preempted.

*Second*, Plaintiffs' claims fail independently under "impossibility" preemption.  Plaintiffs allege that the Herceptin labeling promised 440 milligrams in each vial and argue that state law requires Genentech to provide exactly that amount in each vial.  But even if that were possible as a practical matter, Genentech could not do it without changing the manufacturing process for Herceptin, something that expressly requires prior FDA approval.  Because Genentech therefore could not independently do what the purported state-law duty requires, Plaintiffs' claims are

preempted for that reason as well.  *See PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011); *Mutual Pharm. Co. v. Bartlett*, 133 S. Ct. 2466 (2013).

For both reasons, pursuant to Rule 56 of the Federal Rules of Civil Procedure and N.D. LCvR 56.1, Genentech respectfully asks the Court for summary judgment as a matter of law on all of Plaintiffs' claims, including breach of warranty, unjust enrichment, fraudulent misrepresentation and concealment, and violation of California's false advertising and unfair competition laws.[1]

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      FDA approved Herceptin on September 25, 1998.  Letter from J. Siegel to R. Garnick, Sept. 25, 1998 (attached as Exhibit 1).

2.      The FDA-approved Prescribing Information for Herceptin states that Genentech supplies Herceptin in multi-use vials nominally containing 440 mg of Herceptin.  Herceptin Prescribing Information (April 2015) (attached as Exhibit 2).

3.      Herceptin is supplied as a dry solid in the form of lyophilized (freeze-dried) powder.  *Id.*; Declaration of David T. Lin, Ph.D. ("Lin Decl.") ¶ 31 (attached as Exhibit 3).

4.      To prepare Herceptin for use in accordance with its FDA-approved Prescribing Information, health care providers must inject 20 milliliters ("mL") of sterile water into the vial of lyophilized Herceptin powder to form a solution.  Herceptin Prescribing Information (April 2015) (Ex. 2).

---

[1]  Fourteen of the fifteen plaintiffs, who share counsel and have substantively identical complaints, raise only breach-of-warranty and unjust enrichment claims.  The final plaintiff, Comanche Hospital, also includes fraudulent misrepresentation and concealment, and violation of California's false advertising and unfair competition laws, based on the same alleged conduct.



5.

6.

7.

8.

9.

10.

11.

12.    The actual concentration of Herceptin following reconstitution is based in part on the amount of Herceptin in each vial and in part on the amount of sterile water each health care provider injects into the vial during reconstitution.  *Id*. ¶¶ 37, 40.

4

13.     Because vials contain Herceptin in an amount between ██████████ the actual concentration of Herceptin in each vial following reconstitution necessarily varies within a range. *Id.* ¶ 37.

14.     The FDA-approved labeling for the vials and cartons describes the concentration of Herceptin after reconstitution as "approximately 21 mg /mL." Herceptin Carton Label (July 2014) (attached as Exhibit 5); Herceptin Vial Label (January 2012) (attached as Exhibit 6).

15.     If Genentech were required to ensure every vial contains 440 mg of Herceptin, it would have to change various portions of its manufacturing processes, ██████████ ████████████████████████████████████████████████████ ██████████████ Swisher Decl. ¶ 15 (Ex. 4).

16.     ████████████████████████████████████████ ██████████████████████████████

17.     ████████████████████████████████████████ ██████████████████████████

## FACTUAL RECORD RELEVANT TO SUMMARY JUDGMENT

## I.     Background and Description of Herceptin

Herceptin is an FDA-approved prescription medication for the treatment of certain types of metastatic breast cancer and early breast cancer that overexpress a protein called HER2. Herceptin Prescribing Information (April 2015) (Ex. 2). The overexpression of HER2 causes breast cancers to grow and spread faster. DeVita, V., et al., *DeVita, Hellman and Rosenberg's Cancer: Principles and Practice of Oncology*, at 144 (9th ed. 2011). Herceptin helps to slow or stop the cancer's growth by targeting this protein. *Id.*; Lin Decl. ¶ 27 (Ex. 3). The medicine is a highly effective treatment for women with this type of breast cancer. Indeed, the effect of Herceptin in combating this aggressive form of cancer has been described as nothing less than a

"dramatic alteration" in the natural history of the disease, resulting in a "remarkable" 50% reduction in its recurrence when combined with chemotherapy.  Korkaya, H., et al., *HER2 and Breast Cancer Stem Cells: More than Meets the Eye*, 73 *Cancer Research* 3489-93 (June 15, 2013).

Genentech supplies Herceptin in a multi-use vial nominally containing 440 mg of Herceptin in powdered form.  Herceptin Prescribing Information (April 2015) (Ex. 2).  Each vial of Herceptin is accompanied by a 20 mL vial of sterile water that is used to dissolve the powder, a process known as reconstitution.  *Id.*  The FDA-approved Prescribing Information which accompanies each package of Herceptin describes how physicians should prepare and administer the drug.  First, health care providers are to extract 20 mL of sterile water from its vial using a sterile syringe and then inject it into the vial of lyophilized Herceptin powder.[2]  *Id.*  The resulting solution contains Herceptin at a concentration of approximately 21 mg per mL.  Herceptin Carton Label (July 2014) (Ex. 5); Herceptin Vial Label (January 2012) (Ex. 6).  The health care providers then calculate the amount of solution needed for a specific patient based on the patient's body weight (e.g., 2 mg/kg).  Herceptin Prescribing Information (April 2015) (Ex. 2).  Once the dose is calculated, providers withdraw the appropriate amount and inject it into an I.V. bag for delivery.  *Id.*  Any remaining solution can be used for 28 days to treat additional patients.  *Id.*

## II.     FDA's Approval and Regulation of Herceptin

FDA is the federal agency with the authority and responsibility to regulate prescription drugs.  *See* 21 U.S.C. § 301, *et seq*. ("the FDCA").  FDA regulates virtually every aspect of the manufacturing, distribution, evaluation, labeling, and post-market surveillance of drugs marketed

---

[2] The actual amount of sterile water injected into the vial will vary depending on the type of syringe used, the person's skill level, dexterity, and eyesight.  Lin Decl. ¶ 40 (Ex. 3).

and sold in the United States.  Lin Decl. ¶ 21 (Ex. 3).[3]  FDA's regulation of drug manufacture is so "pervasive[]" that it extends right "down to the requirements for plumbing and ventilation systems at each manufacturing facility."  *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 237 (2011).

### A.    The application process for new biologics

To obtain FDA approval for a new biologic product, a manufacturer must submit a biologics licensing application ("BLA").  21 U.S.C. § 355(b); 42 U.S.C. § 262(a).  A BLA includes, among other things, data from nonclinical laboratory and clinical studies demonstrating that the product meets prescribed requirements for safety, purity, and potency, a full description of manufacturing methods, specifications, data establishing product stability, samples of the product, labeling, and containers, and summaries of product test results.  21 C.F.R. §§ 601.2(a); 600.3(kk).  Manufacturers of biologic products must test each lot of their product for, among other things, potency, safety, purity, sterility, and identity.  *Id*. §§ 610.10; 610.12-14.

FDA will approve a BLA and issue a biologics license only if it determines that the manufacturer's facilities and the biological product meet the requirements in the Code of Federal Regulations.  *Id*. § 601.4.  Thus, FDA issuance of a biologics license constitutes a determination that the product is safe, pure, and effective, and that the manufacturer's facilities and processes are adequate to meet these high standards.  *Id*. § 601.2(d).  Further, a manufacturer cannot sell a biologic unless it is accompanied by labeling that conforms to federal law and has been approved by FDA.[4]  21 U.S.C. §§ 331(a), 352; 21 C.F.R. § 601.2(a).  FDA may approve a BLA only if it determines that the drug is "safe for use" under "the conditions of use prescribed, recommended,

---

[3] Genentech submits with this motion the declaration of FDA regulatory expert Dr. David Lin, who served as Deputy Division Director and acting Division Director of the Office of New Drug Chemistry in the Center for Drug Evaluation and Research at FDA.  Lin Decl. ¶¶ 3-5 (Ex. 3).

[4] As relevant for purposes of this motion, the labeling for Herceptin consists of the Prescribing Information for physicians, the carton label, and the vial label.  *See* Exhibits 2, 5, and 6.

or suggested in the proposed labeling." 21 U.S.C. § 355(d). And under federal law, FDA can only approve the labeling if it determines that the labeling is not "false or misleading in any particular." *Id.*

Herceptin went through this rigorous approval process. After reviewing the BLA and accompanying specifications and other data, FDA approved Herceptin for sale in 440 mg multi-dose vials on September 25, 1998. Letter from J. Siegel to R. Garnick, Sept. 25, 1998 (Ex. 1). In particular, as relevant here, FDA approved a specification for the protein content in the Herceptin vials ███████████. Lin Decl. ¶ 32 (Ex. 3). And it approved the Herceptin labeling stating that the Herceptin vial contained "440 mg" of Herceptin and that when reconstituted results in a concentration of "21 mg/mL." In other words, FDA determined that as long as the amount of Herceptin within the vial ███████████, the drug product was not only safe and effective but also properly labeled as 440 mg with a reconstituted concentration of 21 mg/mL. FDA's approval letter states that "[a]ny changes in the manufacture, packaging or labeling of the product or in the manufacturing facilities will require the submission of information to [Genentech's] biologics license application for [FDA's] review and written approval consistent with 21 CFR 601.12." Letter from J. Siegel to R. Garnick, Sept. 25, 1998 (Ex. 1).

**B.    FDA post-approval regulation of biologics**

FDA also closely regulates post-approval changes to medications. Applicants must notify FDA about "each change in the product, production process, quality controls, equipment, facilities, responsible personnel, or labeling established in the approved license application(s)." 21 C.F.R. § 601.12(a). A "major" change is "any change in the product, production process, quality controls, equipment, facilities, or responsible personnel that has a substantial potential to have an adverse effect on the identity, strength, quality, purity, or potency of the product as they

may relate to the safety or effectiveness of the product." *Id.* § 601.12(b)(1); 21 U.S.C. § 356a(c). "Major changes" requiring prior approval include, among other things, any change "in the qualitative or quantitative formulation of the drug involved or in the specifications in the approved application or license …." 21 U.S.C. § 356a(c)(2)(A); 21 C.F.R. §§ 601.12(b)(2)(i). To make a major change, an applicant must submit a supplemental BLA, often called a "Prior Approval Supplement." *Id.* § 601.12(b).  Genentech has made no changes to the net weight specification or the stated concentration since Herceptin was approved in 1998.

### III.    The Manufacture of Herceptin

Herceptin is manufactured in compliance with processes and specifications in the Herceptin BLA approved by FDA.  ███████████████████████████████████████████ ████████████████████████  Biologic medicinal products like Herceptin are produced by the cells of living organisms.  Swisher Decl. ¶ 5 (Ex. 4).[5]  Herceptin is produced by the cells of Chinese hamster ovaries that have been genetically modified with DNA encoded for the Herceptin protein.  *Id.* ¶ 6.  ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[5] Dana Swisher is Genentech's Drug Product Technical Leader for Herceptin and is responsible for technical oversight of the drug product manufacturing process.  Swisher Decl. ¶¶ 2-3 (Ex. 4).



## **LEGAL STANDARD**

"Summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Christy v. Travelers Indem. Co. of Am.*, 810 F.3d 1220, 1225 (10th Cir. 2016) (quoting Fed. R. Civ. P. 56(a) (citation and internal quotation marks omitted)). While the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013). The nonmoving party "may not simply rest upon its pleadings" but instead must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (internal quotation marks omitted); *see also Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) ("To defeat a motion for summary judgment, evidence, including

testimony, must be based on more than mere speculation, conjecture, or surmise."). A finding that Plaintiffs' claims are preempted would entitle Genentech to judgment as a matter of law. *Dobbs v. Anthem Blue Cross & Blue Shield*, 475 F.3d 1176, 1177 (10th Cir. 2007) ("Whether federal law preempts the [plaintiffs'] state-law claims is a question of law"); *see also Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1286-90 (10th Cir. 2013).

## ARGUMENT

### I.       Plaintiffs' Claims Are Preempted by Federal Law

The Supremacy Clause provides that federal law "shall be the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., Art. VI, cl. 2. "Put simply, federal law preempts contrary state law." *Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288, 1298 (2016). "Conflict preemption occurs where it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *In re Universal Serv. Fund Tel. Billing Practice Litig.*, 619 F.3d 1188, 1196 (10th Cir. 2010) (internal quotation marks omitted). Federal regulations preempt state law in the same manner as congressional statutes. *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982). The imposition of damages under state law is a form of state action subject to conflict preemption. *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881 (2000); *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 324-25 (2008).

Plaintiffs' state-law claims are preempted for two independent reasons. *First*, Plaintiffs' claims directly conflict with federal net weight standards and thus would stand as an obstacle to the purposes and objectives of Congress and FDA in allowing for variations in net contents. *Second*, it would be impossible for Genentech to comply with its federal law obligations, which prohibit Genentech from modifying the manufacturing process and net weight specification for

Herceptin without first obtaining FDA approval, and at the same time comply with a purported state-law duty to ensure every Herceptin vial contains 440 mg.  Under either form of conflict preemption, federal law bars Plaintiffs' claims.

## II.    Plaintiffs' Claims Are Preempted Under "Obstacle" Preemption

While Plaintiffs raise various state-law causes of action, each of their claims is based on the assumption that declaring a net weight of "440 mg" and a concentration of "21 mg/mL" in the Herceptin Prescribing Information required Genentech to ensure the vials Plaintiffs received contained exactly 440 mg and resulted in a solution (after reconstitution) with a concentration of exactly 21 mg/mL.  These claims collide head-on with the federal requirement to accept variations in the net contents of Herceptin vials.  Because Plaintiffs contend state law forbids what federal statutes and regulations expressly allow, and would frustrate the very purposes of this federal regulatory scheme, Plaintiffs' claims conflict with federal law and, accordingly, must fail.

### A.    Federal law requires allowances for variations in the net weight of prescription drugs

Federal law is clear—reasonable variations in the net weight of prescription drugs must be allowed and both the variation Plaintiffs complain about, and the actual variation in Herceptin vials, is well within the variability the federally-approved Herceptin labeling allows.

Congress and FDA have established specific requirements for the packaging of prescription drugs.[6]  Federal law prohibits manufacturers from "introduc[ing] or deliver[ing] for introduction into interstate commerce … any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded."  21 U.S.C. § 331(a).  A drug "shall be deemed to be misbranded … [i]f in a package form unless it bears a label containing … (2) an accurate

_____

[6] The term "drugs" includes "biologics."

statement of the quantity of the contents in terms of weight, measure, or numerical count: Provided, That under clause (2) of this paragraph *reasonable variations shall be permitted*, and exemptions as to small packages shall be established, by regulations prescribed by the Secretary [of Health & Human Services]." *Id.* § 352(b) (emphasis added).

Congress long ago concluded that "variations must be allowed" due to "the impossibility of developing completely accurate means of packing." *Jones v. Rath Packing Co.*, 430 U.S. 519, 536 (1977). Simply put, the law reflects Congress's understanding that requiring exact quantities with no variations would make it impossible to sell packaged products:

> It being apparent to everyone that it is impossible to make packages of exactly the same size or to pack them with exactly the same quantity of contents, and it being also apparent that the exact weight and measure of the contents of a package may undergo slight changes from natural causes, it is also apparent that legislation requiring similar packages to contain the same exact quantity in terms of weight or measure, without allowing for any variation, would be destructive and prevent the putting of foods in packages.

*Id.* at 537 n.28 (citing H.R. Rep. No. 850, 62d Cong., 2d Sess., at 2; S. Rep. No. 1216, 62d Cong., 3d Sess., at 2-3). The federal requirement to allow reasonable variations applies equally to food and drugs. *See* 21 U.S.C. §§ 343(e) (food), 352(b) (drugs).

Congress weighed the need to provide consumers with accurate statements of net weight in product labeling against the practical limitations of the manufacturing and packaging process and concluded that these competing policy interests are best served by allowing for reasonable variations from the stated quantity. *See Jones*, 430 U.S. at 537 (describing the rule allowing net weight variations as a "longstanding administrative practice, founded on a legislative statement of necessity"). Indeed, "since 1914, regulations under the food and drug laws have permitted reasonable variations from stated net weight resulting from packing deviations or gain or loss of moisture occurring despite good commercial practice." *Id.* (citing *United States v. Shreveport*

*Grain & Elevator Co.*, 287 U.S. 77, 84 (1932)).  These requirements are currently set forth in 21

C.F.R. § 201.51(g), which states:

> (g) The declaration of net quantity of contents shall express an accurate statement of the quantity of contents of the package.  Reasonable variations caused by loss or gain of moisture during the course of good distribution practice or by unavoidable deviations in good manufacturing practice **will be recognized**.  Variations from stated quantity of contents shall not be unreasonably large.  In the case of a liquid drug in ampules or vials, intended for injection, the declaration shall be considered to express the minimum quantity and the variation above the stated measure shall comply with the excess volume prescribed by the National Formulary or the U.S. Pharmacopeia for filling of ampules.  In the case of a solid drug in ampules or vials, the declaration shall be considered to express the accurate net weight.  Variations shall comply with the limitations provided in the U.S. Pharmacopeia or the National Formulary.

21 C.F.R. § 201.51(g) (emphasis added).  For drugs sold as solids, federal law requires the

labeling to state the accurate net weight within the variations provided in the *U.S. Pharmacopeia*

("USP") or the *National Formulary*.[7]  *Id.*; Lin Decl. ¶ 25 (Ex. 3).  The acceptable variation in net

weight for most prescription drugs, including Herceptin, is described in USP General Chapter

<905>, *Uniformity of Dosage Units*.[8]  *Id.* ¶ 26.  As Dr. Lin explains, USP <905> provides for an

allowable variation of 15% around the label claim (i.e., net weight within 85% to 115% of the

label claim), and FDA traditionally approves specifications requiring the net weight to be within

90% to 110% of the label claim.  *Id.*  If the actual weight in the container is within the range,

then the declared weight is considered accurate.  *Id.* ¶ 23.

Accordingly, under federal law, Herceptin is accurately labeled.  Herceptin is a sterile

solid drug supplied in vials and therefore, pursuant to 21 C.F.R. § 201.51(g) and the USP, vials

---

[7] The *U.S. Pharmacopeia* and *National Formulary* are now published in a single volume.  Lin Decl. (Ex. 3) at 7 n.10.

[8] USP <905> expressly states that it applies to sterile solids like Herceptin that are packaged in single-unit containers after being prepared from solutions and freeze-dried.  Lin Decl. ¶ 26 (Ex. 3); Ex. C to Lin Decl. (Ex. 3) at 491.

are appropriately labeled "440 mg" if they are filled to within *15%* of the label claim.  Lin Decl. ¶ 32 (Ex. 3).



Thus, the vials Plaintiffs purchased were properly labeled under federal law as containing "440 mg."

The fact that each vial of Herceptin need not have a net weight of exactly 440 mg is not only clear from the federal regulations and FDA approval process, it is plain from the labeling

[9] Lin Decl. ¶ 32.  For example, the official USP monographs for sargramostim and alteplase injectable products provide for an acceptable protein content of 90% to 110% and 95% to 111%, of the labeled amount, respectively. *Id.*; Ex. C to Lin Decl. (Ex. 3).

[10] In approving this specification, the FDA determined not only that this was proper as a matter of federal labeling law, but also that if the amount of Herceptin was [redacted] patients would receive a safe and effective dose of Herceptin if the dosage administration directions on the labeling were followed. FDA could not have approved the specification otherwise. *See* 21 U.S.C. § 355(d).

itself.  The Herceptin labeling reflects that the description of the net weight is approximate.  The Prescribing Information on which Plaintiffs base their claims, describes the dosage form and strength as a multidose vial "*nominally* containing 440 mg Herceptin as a lyophilized, sterile powder."  Herceptin Prescribing Information (April 2015) (Ex. 2) (emphasis added).  Further, the label on each carton of Herceptin states "[t]he *nominal* content of each HERCEPTIN vial is 440 mg Trastuzumab."  Herceptin Carton Label (July 2014) (Ex. 5) (emphasis added).  (Each carton label since April 2000 has contained this term.)  These terms, which Plaintiffs completely ignore, have meaning.  "Nominal" in prescription drug labeling refers to a "theoretical" amount and the actual amount in each vial will vary.  Lin Decl. ¶ 33 (Ex. 3).

Plaintiffs have not and could not allege that Genentech sells Herceptin vials that have a net weight of Herceptin outside the FDA-approved range.  Instead, they claim that Genentech should be liable under state law for selling Herceptin vials containing an amount of Herceptin well within the allowable variation under federal law.  Plaintiffs are thus asking this Court to establish a state-law duty that is directly at odds with the federal regulatory scheme.

Similarly, Plaintiffs' alternative complaint that Genentech may have misrepresented the concentration of Herceptin on the label—because the concentration after reconstitution of vials they purchased may have been 21.8 mg/mL and the label says 21 mg/mL—cannot be reconciled with the reasonable variations in net weight that federal law requires.  The concentration of Herceptin following reconstitution is a product of the amount of Herceptin in each vial as well as the exact amount of sterile water injected by the health care provider.  Accordingly, it is impossible to state with decimal-point accuracy the concentration of the solution after reconstitution.  Lin Decl. ¶ 37 (Ex. 3).  Instead, because the amount of Herceptin can vary ███, there will necessarily also be some variability in

the actual concentration of the solution formed after health care providers add the water. When FDA approved the weight range, it implicitly recognized that the concentration after reconstitution would similarly fall within a range. And, in approving the labeling, FDA concluded that despite this variation, there was nothing false or misleading in describing the concentration as 21 mg/mL. *See* 21 U.S.C. § 355(d).

FDA's knowledge that the concentration of each vial would vary slightly is reflected by its approval of the carton and vial labels, both of which state that reconstitution will "yield a multiple-dose solution containing ***approximately*** 21 mg/mL Trastuzumab." Herceptin Carton Label (July 2014) (Ex. 5); Herceptin Vial Label (January 2012) (Ex. 6) (emphasis added). The phrase "approximately 21 mg/mL" dispels any notion that the actual concentration will be precisely 21 mg/mL.[11] To the contrary, "approximately 21 mg/mL" would include the concentration Plaintiffs allegedly obtained: 21.8 mg/mL.[12] Lin Decl. ¶ 36 (Ex. 3).

Even if the concentration could be predicted with pinpoint accuracy, FDA has instructed the pharmaceutical industry not to use decimal points when describing the strength of a drug because this can lead to serious dosing errors if a health care provider does not notice the

---

[11] The description of the concentration in the Prescribing Information is not a warranty in any event. It is a dosing instruction included so providers can calculate the correct dose based on the patient's body weight (e.g., 2 mg/kg). It certainly is not an affirmation of fact that became part of the basis of the bargain when Plaintiffs bought Herceptin. *See, e.g.*, 12A Okla. Stat. § 2-313(1).

[12] In addition, not all health care providers will inject the same amount of sterile water, a fact that would also affect the concentration: "Depending on the type of syringe used and the provider's skill level, dexterity, and visual acuity, the volume of diluent injected will not be exactly 20 mL, as instructed in the labeling. Injecting slightly more or less diluent will result in a slightly different concentration." Lin Decl. ¶ 40 (Ex. 3).

decimal point. *Id*. ¶ 38 (citing FDA Guidance for Industry). As Dr. Lin explains, in the case of Herceptin, this error could lead to significant underdosing of cancer patients.[13] *Id*.

To the extent Plaintiffs allege that Genentech breached a warranty that vials will provide 20.952 mL of solution following reconstitution, that claim also fails on obstacle preemption grounds.[14] Plaintiffs' belief that the solution should be 20.952 mL is based on their wrong assumption that the vial contains exactly 440 mg and will result in a concentration of exactly 21 mg/mL, which conflicts with FDA's allowance for variability under federal law. Further, the volume obtained after reconstitution is a product of the net weight of Herceptin and the amount of water the health care provider injects into the vial. Because federal law expressly requires allowances for variations in net weight, by implication, it also requires allowances for variations in the volume after reconstitution. Finally, Genentech cannot control or predict the precise volume of water the health care provider will inject into each vial.

In short, federal law expressly recognizes that some variation in package contents must be allowed given the realities of the manufacturing process and the needs of commerce. Here, FDA has expressly approved labels that reflect a variation well within what FDA has deemed "reasonable." As discussed next, because Plaintiffs' state-law claims seek to interfere with the federal legal and regulatory scheme, they are preempted.

---

[13] Plaintiffs have argued in prior briefing that Genentech should have rounded up to 22 mg/mL. Dr. Lin explains that rounding down would be appropriate and is consistent with his experience at FDA with the oncology clinical division. According to Dr. Lin, "FDA's thinking is this would ensure that cancer patients will receive an adequate dose of the drug product." Lin Decl. ¶ 39 (Ex. 3).

[14] More fundamentally, this claim fails because the Prescribing Information contains no representation regarding the volume each vial will contain after reconstitution. *See* Exhibit 2.

**B.     Plaintiffs' state-law claims are preempted because they pose an obstacle to the purposes of federal statutes and regulations**

For over one hundred years, Congress and FDA have recognized that reasonable variations in the quantity of food and drugs sold are not only acceptable under federal law, but must be allowed to ensure these products can continue to be sold.  Plaintiffs' state-law claims here would eviscerate this longstanding federal regulatory regime—frustrating the regulations' very purposes and "stand[ing] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."   *In re Universal Serv. Fund*, 619 F.3d at 1196.  Accordingly, Plaintiffs' claims are preempted by federal law and must be denied.

Nearly forty years ago, the Supreme Court considered the language of the Federal Food, Drug, and Cosmetic Act requiring allowances for reasonable variations and found that state-law challenges at odds with this requirement were preempted.  *Jones v. Rath Packing Co*., 430 U.S. 519 (1977).  In *Jones*, several food manufacturers sued the Director of the Weights and Measures Department in Riverside County, California, after he ordered their products removed from sale because the packages were underweight according to state law.  *Id*. at 522.  The products were deemed underweight because, unlike federal law, the statistical sampling process under California law made no allowance for variations due to moisture loss.  *Id.* at 531-32.  The manufacturers argued that California law was preempted by federal regulations, which, as here, allowed for variations caused by "unavoidable deviations in good manufacturing practice" or "loss or gain of moisture during the course of good distribution practices."  *Id*. at 523-24, 533 (citing 21 C.F.R. §§ 317.2(h)(2), 1.8b(q) (1976)).  The Supreme Court agreed.

"Since 1914," the Court recognized, "regulations under the food and drug laws have permitted reasonable variations from stated net weight resulting from packing deviations or gain or loss of moisture occurring despite good commercial practice," and this is a "longstanding

administrative practice" that was "founded on a legislative statement of necessity." *Jones*, 430 U.S. at 537.  The Court interpreted the regulatory language to mean that *"[u]nder the FDCA, reasonable variations from the stated net weight do not subject [the defendants] to prosecution, whether civil or criminal, if the variations arise from the permitted causes." Id.* at 536 (emphasis added).  And the Court found that because the federal Fair Packaging and Labeling Act incorporated the standards of the FDCA allowing for reasonable variations, enforcement of more stringent state law was preempted because it would "prevent the accomplishment and execution of the full purposes and objectives of Congress …."[15]

Similarly, Plaintiffs may not, under the guise of state law, substitute their own requirements for FDA's when it comes to the packaging of prescription drugs.  While the *Jones* case dealt with the net weight of food packaging, the Supreme Court recognized that the requirement that variability be allowed applied to both the "food and *drug* laws."  *Id.* at 537 (emphasis added).  Indeed, the regulations governing net weight at issue in *Jones* are nearly identical to those that govern prescription drugs.  Here too, federal law requires allowances for variability due to unavoidable deviations in manufacturing and moisture loss, and FDA has specified what the allowable variation is for Herceptin: ███████.  Not zero.  Not some other percentage Plaintiffs choose. ███████.  A state law setting a different allowable variation would frustrate the very purpose of these federal regulations and the same is true of state-law claims that would effectively do the same thing.  Just as in the food context, "[t]he language of the federal regulation is explicit, reasonable variations … *will* be recognized." *Cook Family Foods, Ltd. v. Voss*, 781 F. Supp. 1458, 1468 (C.D. Cal. 1991) (holding state law

---

[15] In the companion case, the Court also found that state law was expressly preempted under the Federal Meat Inspection Act, because the more stringent state-law requirements were clearly "different than" the federal regulations. *Jones*, 430 U.S. at 528-32.

preempted by food labeling regulation with language identical to the drug labeling regulation; emphasis in original; internal citation omitted).[16]  And just as in the food context, it follows that "[t]herefore, [Plaintiffs' claims are] an obstacle to the execution of the full purposes and objectives that Congress sought …." *Id.*

Plaintiffs (or a state) cannot second-guess Congress and FDA by re-balancing policy objectives regarding the packaging of prescription drugs and come to a different conclusion than FDA's scientists.  Rather, "[t]he Supreme Court's preemption case law indicates that regulatory situations in which an agency is required to strike a balance between competing statutory objectives lend themselves to a finding of conflict preemption." *Farina v. Nokia Inc.* 625 F.3d 97, 123 (3d Cir. 2010) (citing *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 (2001)).  Thus, for example, in *Farina*, the Third Circuit found that the plaintiffs' breach-of-warranty claims based on the amount of radio frequency radiation emitted from cell phones were preempted because the complained-of emission levels were within limits established by the FCC. The Court of Appeals explained that a finding of preemption was appropriate because "[t]his is a situation 'in which the Federal Government has weighed the competing interests relevant to the particular requirement in question, reached an unambiguous conclusion about how those competing considerations should be resolved in a particular case or set of cases, and

---

[16] *See also Bimont v. Unilever United States, Inc.*, 2015 WL 5256988, at *6-7 (S.D.N.Y. Sept. 9, 2015) (dismissing suit on preemption grounds when "the alleged discrepancies between the actual net weight and listed net weight on [defendant's] products f[e]ll within the permissible range established by federal law"); *Kraft Foods N. Am., Inc. v. Rockland County Dep't of Weights and Measures*, 2003 WL 554796, at *6-8 (S.D.N.Y. Feb. 26, 2003) (granting summary judgment on preemption grounds when a county effectively imposed a minimum weight requirement by failing to allow for reasonable variations below the stated package weight as mandated by federal food packaging regulations).

implemented that conclusion via a specific mandate on manufacturers or producers."  *Id.* at 125

(quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 501 (1996)).[17]  The same is true here.

Congress and FDA have already weighed the relevant considerations and determined that

reasonable variations in net contents of prescription drugs "shall" be recognized.  21 U.S.C. §

352(b); 21 C.F.R. § 201.51(g).  They realized that if allowances were not made for variations in

the packaging of prescription drugs, these products, including life-saving medicines like

Herceptin, could not be marketed.  Further, FDA, taking into consideration the manufacturing

realities as well as its obligation to ensure the safety and effectiveness of drug products, has

determined what the acceptable variations are for each prescription drug.  Just as the Supreme

Court found in *Buckman*, "complying with the FDA's detailed regulatory regime in the shadow

of 50 States' tort regimes" in this context, "will dramatically increase the burdens facing

potential applicants" and do so in a way "not contemplated by Congress in enacting the FDCA

…."  *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001); *id.* at 348 (holding that

after the FDA has struck "a somewhat delicate balance of statutory objectives" and determined

that the manufacturer submitted a valid application to manufacture a medical device, a plaintiff

may not use state law to negate FDA's judgment).[18]

---

[17] *See also Mwesigwa v. DAP, Inc.*, 2010 WL 979697, at *5 (E.D. Mo. Mar. 12, 2010) (holding state-law claims alleging contact cement was unreasonably dangerous due to its inherent flammability were preempted because they conflicted with federal regulations specifically permitting the sale of cement with a flash point of greater than 20 degrees Fahrenheit).

[18] *See also Zogenix, Inc. v. Patrick*, 2014 WL 1454696, at *1-2 (D. Mass. Apr. 15, 2014) (rejecting Massachusetts's effort to ban the sale of the FDA-approved prescription drug Zohydro ER in the state because the drug lacked an abuse-resistant formulation, reasoning that "[i]f the Commonwealth were able to countermand the FDA's determinations and substitute its own requirements, it would undermine the FDA's ability to make drugs available to promote and protect the public health").  Notably, like the plaintiffs in *Zogenix,* Plaintiffs here appear to be seeking not only damages, but also a ban on the sale of Herceptin just as FDA approved it through class-wide injunctive relief.  This request for an injunction further highlights the direct conflict between Plaintiffs' claims and federal law.

If Plaintiffs' claims were allowed to go forward, they would not only directly frustrate FDA's considered policy determinations regarding net weight standards but also significantly burden the pharmaceutical industry and impede its ability to bring life-saving products to the market.[19]  For these reasons, Plaintiffs' claims conflict with federal law and are therefore preempted.[20]

## III.   Plaintiffs' Claims Are Preempted Under "Impossibility" Preemption

Plaintiffs' claims would also fail because ensuring that each vial contained 440 mg, as Plaintiffs demand, would require Genentech to change its manufacturing process and FDA-approved protein content specification, which it cannot do without prior federal approval.[21] Plaintiffs' claims thus fail as a matter of law under impossibility preemption.

### A.   State-law claims that would impose obligations requiring prior FDA approval are preempted under impossibility preemption

"The question for 'impossibility' [preemption] is whether the private party could *independently* do under federal law what state law requires of it." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 620 (2011) (citing *Wyeth v. Levine*, 555 U.S. 555, 573 (2009)) (emphasis added); *see also Mut. Pharm. Co. v. Bartlett*, 133 S. Ct. 2466 (2013).  The outcome in each of these three

---

[19] Further, as the court found in *Kraft Foods*, complying with varying state standards "would be time consuming and costly to a national manufacturer whose packaging and labeling systems are designed to comply with federal laws." *Kraft Foods*, 2003 WL 554796, at *10.

[20] Even if Plaintiffs' claims did not directly conflict with federal law, which they do, Plaintiffs have not identified any state packaging laws Genentech violated.  For example, Oklahoma law also allows for variances in the net weight of products.  *See* 2 Okla. Stat. § 2-14-35(8), (10) (adopting federal standards from Nat'l Institute of Standards and Technology ("NIST") Handbook 133); *id*. § 2-14-38a (same); Okla. Admin. Code § 35:10-11-1 (same); NIST Handbook 133, at 112, Table 2-5 (permitting variation of up to 10% for products with a labeled quantity under 36 grams).  Nor have Plaintiffs explained how, in light of the federal regulations governing what a label claim for a particular net weight means, Genentech could be liable for misrepresentation under state law.

[21] "[The Supreme] Court's pre-emption cases ordinarily *assume* compliance with the state-law duty in question."  *Geier*, 529 U.S. at 882 (emphasis in original).

cases depended on the nature of the duties prescribed by the plaintiffs' claims and the federal regulations governing those duties.

Levine and Mensing both involved failure-to-warn claims based on product labeling. The Court held that the claims in Levine were not preempted because federal regulations expressly allowed the brand-name manufacturer (Wyeth) to unilaterally strengthen the warnings through a "changes being effected" (CBE) supplement without waiting for FDA approval. 555 U.S. at 568 (citing 21 C.F.R. § 314.70(c)(6)(iii)). Because the regulation allowed a unilateral labeling change by the brand-name manufacturer in these particular circumstances, the Court held that preemption would apply only if Wyeth had "clear evidence" FDA would have rejected the CBE labeling change. Id. at 571.

In contrast, the Court held that similar claims in Mensing were preempted because the manufacturer could not unilaterally revise the labeling. 564 U.S. at 617-18. As generic manufacturers, the defendants in Mensing were obligated to keep the "same" labeling as the brand-name counterpart. Id. at 618. The Court held that "when a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes." Id. at 623-24.

In Bartlett, the last of the trilogy, the Court held that a design-related claim against a generic manufacturer was preempted because the manufacturer could not unilaterally change the medication's design. 133 S. Ct. at 2471. The Court found that FDA regulations prohibit a manufacturer—"whether generic or brand-name"—"from making any major changes to the qualitative or quantitative formulation of the drug product, including active ingredients, or in the specifications provided in the approved application." Id. (internal quotation marks omitted).

"[S]tate-law design-defect claims . . . that place a duty on manufacturers to render a drug safer by either altering its composition or altering its labeling are in conflict with federal laws that prohibit manufacturers from unilaterally altering drug composition or labeling." *Id*. at 2479.

The *Levine-Mensing-Bartlett* trilogy establishes that the test for impossibility preemption is whether the manufacturer could take the action required by the state-law claim without FDA's prior approval.  Numerous courts, including the Tenth Circuit and other federal appellate courts, have found claims against manufacturers preempted under this test.

In *Schrock v. Wyeth, Inc.*, the Tenth Circuit applied this test in holding that warranty claims under Oklahoma law were preempted because the manufacturer could not unilaterally alter the labeling or composition of the drug.  727 F.3d 1273, 1286-90 (10th Cir. 2013).  The court found preemption under an FDA regulation with language identical to the regulation at issue here.  *Id.* at 1277 (quoting 21 C.F.R. § 314.70(b)(2)(i)).

The Sixth Circuit applied the Supreme Court's preemption test in *Yates v. Ortho-McNeil-Janssen Pharm., Inc.*, 808 F.3d 281 (6th Cir. 2015).  The court held that the plaintiff's claim that a brand-name manufacturer should have reduced the amount of estrogen in its birth-control patch was "clearly preempted by federal law" because "FDA regulations provide that once a drug, whether generic or brand-name, is approved, the manufacturer is prohibited from making any major changes to the 'qualitative or quantitative formulation of the drug product, including inactive ingredients, or in ***the specifications provided in the approved application***.' " *Id*. at 296 (quoting 21 C.F.R. § 314.70(b)(2)(i)) (emphasis added).[22]  "Based on the plain meaning of the regulation, we are convinced that defendants could not have altered the dosage of estrogen …

---

[22]  The corresponding regulation applicable to biologics, such as Herceptin, is 21 C.F.R. § 601.12(b)(2)(i).   21 C.F.R. § 314.70(b)(2)(i) and § 601.12(b)(2)(i) both state that "major changes" include "changes in the qualitative or quantitative formulation, including inactive ingredients, or in the specifications provided in the approved application."

without submission to the FDA and the agency's 'approval *prior to* distribution of the product made using the change.' " *Id*. (quoting same regulation); *see also Carter v. Alcon Labs., Inc.*, 2014 WL 989002, at *5 (E.D. Mo. Mar. 13, 2014) ("In [*Mensing*] and *Bartlett* the Supreme Court held that state claims that would require relabeling ([Mensing]) or redesign (Bartlett) of a drug that could not be done by the manufacturer without prior approval by the FDA are preempted.").

The First Circuit similarly held that a failure-to-warn claim against a brand-name manufacturer was preempted because the manufacturer could not comply with plaintiffs' claim without prior FDA approval. *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 779 F.3d 34, 41-43 (1st Cir. 2015) (holding that plaintiffs' claim was preempted because the labeling change plaintiffs sought was not based on newly acquired information but rather information that "was plainly known to the FDA prior to approving the label").

Several district courts have held state-law claims against brand-name manufacturers are preempted for the same reasons. *See, e.g.*, *Thompson v. Allergan USA, Inc.*, 993 F. Supp. 2d 1007, 1013-14 (E.D. Mo. 2014) (finding claims preempted because eye drop manufacturer could not change fill volume specifications for dropper vials without prior FDA approval); *Amos v. Biogen Idec Inc.*, 28 F. Supp. 3d 164, 169 (W.D.N.Y. 2014) (dismissing design-defect claim against brand-name manufacturer because change would require prior FDA approval); *Booker v. Johnson & Johnson*, 54 F. Supp. 3d 868, 873-75 (N.D. Ohio 2014) (same); *Barcal v. EMD Serono, Inc.*, 2016 WL 1086028, at *4 (N.D. Ala. Mar. 21, 2016) (same).

### B. Changing the manufacturing process for Herceptin to ensure vials contained 440 milligrams would require prior FDA approval

Genentech could not satisfy Plaintiffs' demand under state law to ensure vials contained 440 mg without changing its manufacturing process for Herceptin and the FDA-approved

specification for protein content.   But as *Bartlett* held, such an outcome would be preempted because a state cannot unilaterally require something that FDA must approve.   Genentech must obtain prior FDA approval for any "major changes" to Herceptin.   133 S. Ct. at 2471.   The changes Plaintiffs demand would certainly be major.

Federal law requires manufacturers to obtain prior FDA approval for any "changes in the qualitative or quantitative formulation, including inactive ingredients, or in ***the specifications provided in the approved application***."   21 C.F.R. § 601.12(b)(2)(i) (emphasis added); *see also* 21 U.S.C. § 356a(c)(2)(A); *Schrock*, 727 F.3d at 1277 (quoting the parallel regulation).   To ensure each vial contained 440 mg, Genentech would have to modify its manufacturing processes and change the currently approved protein content specification ██████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████[23] *Id.*

Federal law requires prior FDA approval to make this change.   Lin Decl. ¶¶ 42-43 (Ex. 3).

This is exactly why the court in *Thompson* found a similar claim preempted.   There, the plaintiffs challenged the volume in each vial of Allergan's eye drop product, Restasis®, claiming that if Allergan filled each single-use vial with less medication consumers would save money. 993 F. Supp. 2d at 1009.   The court found the claims preempted because "reducing the amount of medicine in each Restasis vial is a major change requiring prior FDA approval."   *Id.* at 1014.

---

[23] Ironically, Dr. Lin explains that "[i]ncreasing the target fill weight to ensure a minimum of 440 mg in each vial also would require a labeling change to reflect the new nominal quantity pursuant to 21 C.F.R. § 201.51(g), and the "labeling change would itself require prior FDA approval" under 21 C.F.R. § 601.12(f)(1).   Lin Decl. (Ex. 3) at 15 n.39.

Citing 21 C.F.R. § 314.70(b)(2)(i), which parallels § 601.12(b)(2)(i) for biologics, the court found that "a decrease in the fill volume of a drug product … involves a change to the specifications under the plain meaning of the statute." *Id*.; *see also Yates*, 808 F.3d at 298 (changing amount of active ingredient in birth-control patch would change the "quantitative formulation" and thus requires prior FDA approval). Changing the Herceptin protein content specification to ensure vials contained 440 mg would require prior FDA approval. Plaintiffs' claims are thus preempted for this additional reason.

To the extent Plaintiffs are alleging that Genentech had a state-law duty to provide Herceptin in vials that resulted in a concentration of exactly 21.*0* mg/mL, or a volume of 20.952 mL, after reconstitution, those claims fail under impossibility preemption too. As with Plaintiffs' demand that vials contain 440 mg, Genentech could not ensure this concentration or volume (if at all) without changing its manufacturing process and specifications, which requires prior FDA approval.

Similarly, to the extent the Court construes any of Plaintiffs' claims as imposing a state-law duty on Genentech to provide different labeling for Herceptin rather than a duty to comply with the labeling Genentech *did* provide, any such claims are preempted for the same reasons. Genentech could not change the Herceptin labeling to state a different net weight or a different concentration without submitting "the information necessary to support the proposed change" and "obtain[ing] approval from FDA prior to distribution of the product with the labeling change." 21 C.F.R. § 601.12(f)(1); *see In re Celexa*, 779 F.3d at 37 (finding that "the default rule is that a manufacturer must secure FDA approval for a proposed change prior to distributing the product with the changed label") (citing 21 C.F.R. § 314.70, which parallels 21 C.F.R. § 601.12) (claims held preempted because label change would require prior FDA approval).

## CONCLUSION

The Herceptin vials Plaintiffs bought contained the federally-approved quantity of Herceptin under a federally-approved label.  Plaintiffs' state-law claims demanding that every vial contain 440 mg of Herceptin and have a reconstituted concentration of exactly 21 mg/mL conflict with federal law requiring that allowances be made for variations in net contents due to manufacturing limitations.  Even if Plaintiffs' claims did not conflict with this federal law, impossibility preemption bars Plaintiffs' claims because federal law prohibits Genentech from changing its FDA-approved specifications to ensure vials contain 440 mg without first obtaining prior FDA approval.

For all the foregoing reasons, Genentech respectfully requests that the Court enter summary judgment in its favor on all of Plaintiffs' claims.

Respectfully submitted,

*/s/* William W. O'Connor
WILLIAM W. O'CONNOR, OBA No. 13200
**NEWTON, O'CONNOR, TURNER & KETCHUM**
15 W. 6th Street, Suite 2700
Tulsa, OK  74119
Telephone: (918) 587-0101
Facsimile:  (918) 587-0102
Email: boconnor@newtonconnor.com

-and-

ALICIA J. DONAHUE, Bar No. 117412
*(admitted pro hac vice)*
**SHOOK, HARDY & BACON LLP**
One Montgomery, Suite 2700
San Francisco, CA  94104
Telephone: (415) 544-1900
Facsimile:  (415) 391-0281
Email: adonahue@shb.com

JAMES P. MUEHLBERGER, Bar No. 51346
*(admitted pro hac vice)*
**SHOOK, HARDY & BACON LLP**
2555 Grand Blvd.
Kansas City, MO  64108
Telephone: (816) 474-6550
Facsimile:  (816) 421-5547
Email: jmuehlberger@shb.com

*Attorneys for Defendant Genentech, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of August, 2016, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ William W. O'Connor
William W. O'Connor