1          UNITED STATES DISTRICT COURT FOR THE

2             NORTHERN DISTRICT OF OKLAHOMA

3

4   IN RE:  GENENTECH HERCEPTIN      )
    (TRASTUZUMAB) MARKETING AND      )   Case No. 16-MD-2700-TCK-TLW
5   SALES PRACTICES LITIGATION.      )

6

7

8

9

10

11

12          REDACTED TRANSCRIPT OF RECORDED PROCEEDINGS
                      AUGUST 12, 2016
13   BEFORE THE HONORABLE T. LANE WILSON, MAGISTRATE JUDGE PRESIDING

14                  **DISCOVERY CONFERENCE**

15

16

17

18

19

20

21

22

23

24

25

*Greg Bloxom, RMR, CRR*
United States Court Reporter
Northern District of Oklahoma

```
 1                    A P P E A R A N C E S
                           (TELEPHONIC)
 2
     FOR THE PLAINTIFFS:            MR. DAVID E. KEGLOVITS
 3                                  MS. AMELIA FOGLEMAN
                                    MR. JAMES PEBSWORTH
 4                                  MR. STEVEN ADAMS
                                    MR. ADAM C. DOVERSPIKE
 5                                  Gable & Gotwals
                                    100 W. 5th Street
 6                                  Suite 1100
                                    Tulsa, OK 74103
 7
                                    MR. MATTHEW JAMES SILL
 8                                  MS. KATHRYN EIDSON GRIFFIN
                                    Sill Law Group PLLC
 9                                  14005 N. Eastern Avenue
                                    Edmond, OK 73103
10
     FOR THE DEFENDANTS:            MR. WILLIAM W. O'CONNOR
11                                  Newton, O'Connor, Turner &
                                    Ketchum
12                                  15 W. 6th Street
                                    Suite 2700
13                                  Tulsa, OK 74119

14                                  MR. GABRIEL EGLI
                                    Shook, Hardy & Bacon
15                                  2555 Grand Boulevard
                                    Kansas City, MO 64108
16
                                    MS. ALICIA J. DONAHUE
17                                  Shook, Hardy & Bacon
                                    One Montgomery
18                                  Suite 2700
                                    San Francisco, CA 94104
19
                           * * * * * * * * * *
20

21

22

23

24

25
```

In Re:  Genentech Herceptin (08-12-2016 Discovery Conference)         3

```
 1   PROCEEDINGS:
 2   ---------------------------------------------------------------
 3          THE DEPUTY COURT CLERK:  This is 16-MD-2700-TCK-TLW,
 4   In Re:  Genentech Herceptin Marketing and Sales Practices
 5   Litigation.
 6      Counsel, please enter your appearance for the record.
 7          MR. KEGLOVITS:  Dave Keglovits, Steve Adams, Amy
 8   Fogleman, Adam Doverspike, Wes Pebsworth, of Gable, Gotwals on
 9   behalf of plaintiffs.
10          MR. SILL:  Matthew Sill and Katie Griffin on behalf of
11   plaintiffs.
12          MR. O'CONNOR:  Bill O'Connor, Alicia Donahue, and Gabe
13   Egli on behalf of Genentech.
14          THE COURT:  I've reviewed Mr. O'Connor's letter and
15   then I've also reviewed the updated chart that Mr. Keglovits
16   provided.  It looks like we're making some progress.
17      Mr. O'Connor or Ms. Donahue, do you have any other comments
18   or any updates that weren't contained in the letter?
19          MS. DONAHUE:  Good morning, Your Honor.  Alicia
20   Donahue.
21      I think the letter pretty much speaks for itself.  I do
22   have, if we get there, some more information about what
23   additional resources and requirements on proportionality issues
24   will be necessary to go dig into that regulatory file that
25   we've identified, and I think we have a proposal for the best
```

1  way to handle the additional productions that we intend to make

2  based on what we've found so far in that file.  So I'm happy to

3  discuss that.  But I'm not sure what the plaintiffs -- you

4  know, I'm not sure what more other than what we've told them in

5  our meet-and-confers we'll be producing, what more, if

6  anything, they're going to be wanting to have.  So...

7          THE COURT:  All right.  Mr. Keglovits?

8          MR. KEGLOVITS:  Well, I agree, Your Honor, that

9  Genentech has made some progress in understanding its databases

10 now found and some of the people.  I'm not going to go farther

11 and say that we have made progress in discovery because we, of

12 course, haven't gotten any of the documents that have been

13 identified in the letter.  And there are really, in our view,

14 two substantial areas where we need to I think work on today.

15 I'll be happy to outline those now or wait until the court

16 asks.

17         THE COURT:  Okay.  Go ahead.

18         MR. KEGLOVITS:  Well, and if the court read the

19 letter, I'm sure that you saw the focus from Genentech's

20 perspective continues to be on their communications with the

21 FDA.  We do not see nor have we heard in the two

22 meet-and-confer calls any kind of data collection efforts with

23 respect to internal documents that we'll be discussing, the

24 issues of relevance.  For example, the White e-mail that we

25 attached to our complaint, what has been done to try to capture

1  that type of information, as well as what has been done to try

2  to capture information that has gone external Genentech but

3  does not involve the FDA.  So, that's issue one from our

4  perspective.

5      Issue two is:  What can we do with this regulatory

6  database?  We got, I think, a general description of it in a

7  call on Wednesday afternoon and we don't at this point have any

8  idea how it will be made available to us, whether it will be

9  searchable, those kinds of things.

10          **MS. DONAHUE:**  Your Honor, let me just -- I think if we

11  can kind of put things in perspective on what our understanding

12  of what the plaintiffs are looking for from us.  I think they

13  fall really into three categories.  It's what did Genentech

14  tell the FDA regarding the mass, volume, or concentration of

15  Herceptin in the vials; what did Genentech know but not

16  disclose to the FDA about that, if anything; and what label

17  submissions were made unilaterally by Genentech, which was the

18  big focus of the hearing last week.  So what we have done is

19  scoped -- kind of sectioned things into those categories and

20  figured out what we have or where we might have things related

21  to those.

22      In regard to what Genentech told the FDA, we've produced to

23  them the CMC section of the initial BLA, we've produced to them

24  the prior approval supplements for Herceptin, we've produced to

25  them documents assoc- -- or will be producing today to them

1    documents associated with the removal of references to the 21

2    milliliter yield, which was also a source of a lot of

3    discussion at the hearing, and so that's -- they have that.

4        In regard to category number two, what did Genentech know

5    but not disclose to the FDA about mass, volume, or

6    concentration, that is contained, for the most part, from based

7    on the search we've done to date in technical reports, that one

8    of which is referenced in the e-mails that they keep referring

9    to.  We've told them that we've identified those reports, and

10   this is referenced on page 7 of our letter.  We've told them

11   that we've identified those reports, that we're in the process

12   of reviewing them, and that, you know, we will be producing

13   those as they relate to Herceptin after review and redaction,

14   if necessary.

15       And then onto the third point, what label submissions were

16   made unilaterally by Genentech.  We've identified 37 CBEs,

17   which are changes-being-effected submissions, and we are in the

18   process of reviewing those, as well.  And so that's where we

19   are, and we've told them that in the meet-and-confer and we've

20   told them that in our letter.

21       In terms of correspondence, you know, internal

22   correspondence between folks on these issues, anything relevant

23   will be contained in that regulatory file.  The regulatory

24   file, as we reference in our letter, is, you know, over four

25   million pages of documents.  For us to go through the

1  regulatory file in order to, you know, know what every single

2  thing that's in there and know what may or may not be

3  responsive on Herceptin and on the issue the plaintiffs keeps

4  focusing on, which is on this internal correspondence issue, is

5  going to take us, you know, well over 2,000 hours at least, I

6  mean, at the very least.

7      And so what we would propose at this point is that the

8  plaintiffs take stock of what they've got and get our motion on

9  file and look at the declarations that we've submitted that

10  they now have from one company witness and one regulatory

11  expert that is in support of our motion, and from there, if any

12  more is needed to be produced, we continue to discuss it.

13      But at this point, given the investigation we've done, and

14  we've spent, you know, over 100 hours of attorney time since

15  the last hearing to get to the point we've gotten to now, I

16  honestly -- I said it again, honestly -- but it's just I think

17  we're at the point where the plaintiffs can have sufficient

18  information to review and respond to our motion, and once

19  they've got the motion, if they don't feel that they do, I

20  think we need to have some focused, identified requests that

21  are far more specific than every piece of correspondence or

22  every piece of internal correspondence that might relate to

23  Herceptin since 1997.

24          **THE COURT:**  So, if there, for example, is an e-mail

25  between two Genentech employees discussing the label or

1  discussing this drug, what you're telling me is that would be

2  within this regulatory database?

3          **MS. DONAHUE:**  It could be.  I don't have -- it could

4  be.  I'm not certain that it is.  We also obviously have a

5  number of custodians and custodial files that, again, are

6  thousands and thousands of pages.  And, you know, in order to

7  identify what in those files might be related to Herceptin,

8  again, is thousands and thousands of hours.

9      And internal correspondence about -- I'm having trouble

10  understanding how that is related to the issue at hand, which

11  is preemption.  They will, by virtue of what we're producing,

12  they will know what we told the FDA.  They already have that.

13  They will know from the studies we're producing what we knew

14  about Herceptin, and if they feel that those studies prove that

15  we knew something, especially the one that's identified in the

16  e-mail, then if they have those studies, they will then know,

17  "Oh, you knew this and you didn't tell the FDA," because that's

18  their allegation apparently.  So they've got the studies.

19      What someone, you know, what someone said about the study

20  at this point is -- may have said in an e-mail -- the value of

21  that compared to what we would have to do to try to search and

22  find and identify correspondence related specifically to

23  Herceptin from custodians or in that file is at this point, I

24  think, you know, unproportional to the issue in the motion.

25          **THE COURT:**  I don't take -- and Mr. Keglovits, correct

1  me if I'm wrong -- I don't take the plaintiffs' position to be

2  they want anything that you were aware of and you didn't tell

3  the FDA; in other words, that not telling the FDA is the

4  trigger point for the discovery. My understanding -- and again

5  maybe I've got this wrong -- my understanding is that they just

6  want all correspondence, whether with the FDA or not, related

7  to this drug and its labeling and its content, as well. And

8  it's not -- I mean, there may be information in there that was

9  or was not told the FDA, but I didn't understand,

10 Mr. Keglovits, that that was the threshold question as to

11 whether or not you wanted to see it. Am I wrong about that?

12         **MR. KEGLOVITS:** We do, Your Honor, believe that the

13 Supreme Court has set a standard on this precise issue, that

14 Genentech has to show that it was impossible, as they have

15 framed this argument, to change the label, and to do that they

16 have to show clear evidence that the FDA would not have

17 approved a change if they had proposed it. And so where that

18 takes us is: What did Genentech know? And obviously the

19 communications their employees were having with each other

20 about what it knows about, for instance, the concentration on

21 the label, bears directly on it. And --

22         **MS. DONAHUE:** Your Honor, the only --

23         **MR. KEGLOVITS:** -- let's not forget that this is a

24 national class action that has hundreds of millions of dollars

25 at stake. And so when we're talking about proportionality,

1  it's, to me, very difficult to understand how looking for those

2  e-mails is not proportional, because any one of them will

3  completely undercut this defense that they have asked the court

4  to consider early.

5          **MS. DONAHUE:**  Your Honor, --

6          **THE COURT:**  Go ahead, Ms. Donahue.

7          **MS. DONAHUE:**  -- the technical studies that are

8  referenced on page 7 of our letter, the ING reports and studies

9  that were submitted that are internal, beyond correspondence,

10  those studies -- that's the basis and repository of any

11  knowledge that Genentech had about the product, about

12  Herceptin, about what may or may not, according to the

13  plaintiffs, should have been on the label regarding

14  concentration, mass, or volume.  It's in the studies.  They're

15  going to get the studies.  Correspondence back and forth about

16  those studies is secondary.

17     So, at the very least at this point in time, I would

18  suggest that we produce the studies, which we're planning on

19  doing, they take a look at them, and they identify, you know,

20  what past those they want or need over and above the fact that

21  the studies speak for themselves.  I mean, if Genentech did a

22  study and a study shows blank, Genentech knew blank.  What

23  someone said about it in an e-mail is secondary.  And to go

24  through a mass search to find that kind of information in

25  internal correspondence at this point, when they haven't even

1  looked at the studies we're going to provide them yet, is

2  premature.  And, you know, we're talking about 20 years of

3  correspondence.

4       **THE COURT:**  All right.  I want to get back and make

5  sure I understand, though, Mr. Keglovits's approach on this.

6     I mean, you're not alleging or arguing that you're trying

7  to show that Genentech, I mean, as Ms. Donahue was referring

8  to, committed a fraud on the FDA.  You're saying that if there

9  was information that could have been provided the FDA and

10  wasn't, whether or not that was intentional or unintentional or

11  there was any ill intent behind it or whether the intent was

12  entirely pure, that you believe that if you can show that had

13  the FDA obtained that information, then the labeling would have

14  been different, then you can prevail on Genentech's preemption

15  defense.

16       **MR. KEGLOVITS:**  I think very close to that, although I

17  would say the standard is kind of a negative of what you just

18  said.  Genentech has to show that if the FDA had the

19  information that Genentech has, the FDA would have refused to

20  approve a label change.

21       **THE COURT:**  Yeah.  Right.  Okay.  I think I follow

22  your position there, and I suspect Ms. Donahue may disagree

23  with it.  But the point is you just want to know -- I mean,

24  what you're driving at is you want all information available

25  with respect to the labeling of this drug?

1              **MR. KEGLOVITS:**  Yes, and that includes, for example,

2     in one of the interrogatory responses we just got, it said the

3     FDA initiated a change with respect to concentration because,

4     according to Genentech, the FDA had received complaints from

5     users about the concentration.  Well, one would imagine that

6     those complaints might have made their way to Genentech before

7     they made their way to the FDA.  Of course, we haven't seen any

8     of those, we don't know whether that's in the regulatory

9     database, and we don't even know if those would have been

10     included in the technical reports, which we also haven't seen.

11              **MS. DONAHUE:**  Your Honor, a couple of points on the

12     labeling change issue.

13         First of all, you know, I have to state for the record that

14     we disagree obviously with plaintiffs' interpretation of our

15     impossibility, you know, preemption defense and what our motion

16     will be based on.  Our impossibility preemption defense is

17     based on the fact that in order to -- in order to do what

18     plaintiffs apparently think we ought to do, which is have 440

19     mgs in each vial of Herceptin, we would have to make

20     manufacturing process changes, and that's the basis of the

21     impossibility preemption, and they know that now because they

22     have the declaration from our company witness that's the basis

23     of that position.

24         So, this concept that we need to show and we plan to and

25     we're going to argue that it would have been impossible for us

In Re:  Genentech Herceptin (08-12-2016 Discovery Conference)            13

1   to change our label is not the basis of our motion.  That's

2   something we need to make clear from the get-go.

3       In regard to our submissions on labeling changes, if you

4   look at page 5 of our letter, the first full paragraph, I think

5   we lay out there what the label change submission issue is and

6   what you're going to produce in terms of that.  This reference

7   to the discovery responses we just served today, yes, that was

8   the 21 mL change that was made at the request of the FDA is

9   we've amended our interrogatory response and we're producing

10  the documents related to that change today.

11      Over and above that, we've identified I think 36 or 35

12  additional labeling changes.  I don't think very many, if any,

13  relate to the issues in this case, but we are willing to

14  produce them to the plaintiffs and then they will know and have

15  everything that we -- all the labeling changes that we made to

16  Herceptin, whether they were at the request of the FDA or not.

17  So, they will -- and that's what they told you they needed at

18  the hearing, because their position is they need to be able --

19  they want to be able to show, "Oh, Genentech knew they could

20  make this kind of a change," which, by the way, is dictated by

21  law; what we can and can't change unilaterally is dictated by

22  law, not by Genentech.

23      So, what I would propose one more time is that they look at

24  what we're going to produce to them before we are forced to go

25  digging into custodial files and, you know, wherever else we

1   would be finding over 20 years of correspondence on the issue

2   of labeling changes to Herceptin. I just -- it's --

3           THE COURT: So, Ms. Donahue, what if there is -- I

4   mean, let's talk about this issue of changing the manufacturing

5   process. I mean, if that issue -- and I don't think it's

6   unreasonable to believe it came up at some point within

7   Genentech -- I mean, if that issue is the subject of four or

8   five days or a couple of weeks of e-mails between Genentech

9   engineers or scientists talking about whether or not a label

10  change would require or a change in the manufacturing process

11  or whether or not providing vials with whatever it was, the 21

12  milliliters of this active ingredient, would require a

13  manufacturing change, I mean, those e-mails between Genentech's

14  employees which may say, "Hey, we would have to change the

15  manufacturing process," or might say, "We wouldn't have to or

16  it wouldn't be that difficult to do it without changing the

17  manufacturing process," I guess I haven't --

18          MS. DONAHUE: Let me --

19          THE COURT: -- heard from you that the discovery

20  you're wanting to provide would capture those e-mails.

21          MS. DONAHUE: Your Honor, the change in the

22  manufacturing process is not something that Genentech has ever

23  considered doing. This drug is approved at a spec of a range

24  that we have told the plaintiffs and Genentech manufactures

25  within that specification.

1      The impossibility preemption defense is a matter of law and

2  a legal argument.  But Genentech internally has not sat around

3  and discussed, "Oh, let's change our manufacturing

4  process."  They manufacture a lifesaving drug at a broad spec,

5  and what the plaintiffs are pretty much seeking through this

6  lawsuit is to force Genentech to change the way it makes the

7  drug that saves -- that has been saving lives for 20 years, as

8  approved by the FDA.

9      So, please do not -- I hope I didn't confuse you by

10  saying -- by pointing out our impossibility preemption defense.

11  It's not something that Genentech has considered doing or plans

12  to do; it's simply a legal defense.  I mean, the correspondence

13  there, I can pretty much say for certain there is no

14  correspondence on that because it's not --

15          **THE COURT:**  But what you're saying is, as part of your

16  defense, is that you would have to change the manufacturing

17  process; right?

18          **MS. DONAHUE:**  That's the basis of the impossibility

19  preemption defense that plaintiffs keep changing into.  It

20  would be impossible for us to change our label.

21          **THE COURT:**  And you're saying that whether or not you

22  would have to change your manufacturing process is an issue of

23  law?

24          **MS. DONAHUE:**  I'm saying the impossibility preemption

25  is an issue of law.

1        **THE COURT:**  Right.  But my question is whether or not

2   you would have to change your manufacturing process.  You're

3   saying that's an issue of law?

4        **MS. DONAHUE:**  No; that's as set forth in the

5   declaration of our company witness that they've received.

6   That's an issue of fact.

7        **THE COURT:**  Right, and so what it seems to me you're

8   saying is, "Trust our company rep; it's going to be too

9   difficult or too time consuming for us to give you any factual

10  materials we might have on what our company rep is saying and

11  so you've just going to have to trust us."

12       **MR. O'CONNOR:**  Your Honor, Bill O'Connor.

13     A couple of points here, because I think we're now into,

14  one, plaintiffs misconstruing the impossibility defense, and

15  then about seven layers of assumption since then.

16     Our first preemption defense is that the federal

17  regulations allow for variation in the actual weight of the

18  drug.  And so the heart of their claim, this warranty claim, is

19  that somehow we're supposed to hit 440 on the head, and what

20  the regulations provide is that 440 means what its

21  specification provides, which is 440 XXXXXXXXXXXXXXXX.  So,

22  that's what we manufacture within.  We've produced every lot --

23  every paper describing every lot of production that establishes

24  the weight is within that range.

25     So, they love to talk about an improper construction of the

In Re:  Genentech Herceptin (08-12-2016 Discovery Conference)          17

```
1   second prong of our preemption defense, and I understand they
2   don't want to talk about number one because they can't overcome
3   it, and it's a stand-alone preemption that ends these claims.
4   So, we're only into impossibility because it's an alternative
5   second stand-alone way for the court to dispose of these claims
6   and it would never have been considered because we comply with
7   the regulations that we've worked on, that the company invested
8   so much in, before its approval in '97 and since.
9       So, it's really -- I mean, to suggest that there's -- I
10  mean, now to hear speculation from the plaintiffs that there's
11  somehow internal correspondence or memoranda about should we
12  change our manufacturing, no, there would be absolutely none
13  because what we do complies with the specification.
14      So, we're really -- you know, we're sitting here after --
15  and again, I don't want to harp on what's been done because I
16  think you're well aware of it, I think you're well aware, too,
17  of the task that we had to go find I guess an e-mail over the
18  course of 20 years, anything that relates to it.  But again,
19  that task is certainly not proportional to where we are in this
20  case, which is focusing on the fact that the federal regulation
21  provides a specification that we comply with it, and they're
22  trying to use state law claims to somehow change that
23  regulatory scheme and the framework that is in existence, which
24  is improper.
25          MR. KEGLOVITS:  Your Honor, this is Dave Keglovits.
```

1     The answer to your question is yes, they are saying, "Trust

2  us."  Back on June 24th when we had this hearing they told

3  Judge Kern what the plaintiffs should do is take stock of what

4  we're going to give them, the CMC, review the motion and review

5  the declarations and then decide what kind of discovery, and

6  Ms. Donahue just repeated that for you, we're now two months

7  down the road from there.

8     And, you know, ask yourself:  Would you have known about

9  this Mr. White e-mail if we didn't get it through an outside

10  source?  Would you have known about the complaints that the FDA

11  received if we hadn't had the hearing last week?  This stuff is

12  coming out in dribs and drabs.  And I know Bill and Alicia are

13  trying as hard as they can to find this information, but I

14  don't have a lot of confidence that their client is really

15  motivated to do what it's supposed to do.

16         **THE COURT:**  All right.  Well, here's what we're going

17  to do.  It sounds like some progress has been made in the

18  production of at least documents related to the labeling change

19  and correspondence with the FDA.  That should continue to move

20  forward.  Genentech should continue to determine where these

21  other documents would be, and not to go sear- -- should not be

22  searching them yet.  I'm not directing Genentech to and I don't

23  think anybody wants to, and frankly I think it would be a waste

24  of a lot of time and energy to start reading through these

25  e-mails one at a time.  That should not happen and Genentech

1    should not be doing that.

2       But in terms of requests that the defendants have made, I

3    think I was clear last time, and I'll say it again this time,

4    what I want Genentech to do is find out what is out there and

5    what would be involved in gathering it together.  I don't want

6    to know what would be involved in searching it one at a time.

7    I want to know what would be involved in gathering it together

8    and putting it into some sort of repository that would be

9    searchable, and then I'll make a decision as to whether or not

10   that search ought to take place.  But if the search does take

11   place, it will not be a document-by-document search.  I think

12   we're about 10 years past doing searches in that manner with

13   ESI.  So, I want Genentech to continue that process.  It sounds

14   like, Ms. Donahue, you've made quite a bit of progress in that

15   regard and hopefully the rest of this won't take any longer

16   than the time you've spent so far.

17      What I want to know, and what I think the defendant is

18   entitled to know is:  What is out there that is potentially

19   responsive to their discovery requests, where is it, how much

20   data is it, and in what sort of format is it in.  And,

21   Ms. Donahue and Mr. O'Connor, you can certainly tell me and

22   tell the plaintiffs how much time it would take to put it into

23   a repository that's searchable.  But that's what I want

24   Genentech to continue and work on.  In terms of these other

25   documents it is going to produce, Genentech should go ahead and

```
 1   do that.
 2       Your dispositive motion is due, what, on the 23rd?
 3           MS. DONAHUE:  Yes.
 4           THE COURT:  All right.  Then we'll set another status
 5   conference in this case that week of the -- let's see, the
 6   23rd -- I think I'm going to be in that week -- at some point
 7   the week of the 23rd.  Is that a Monday, the 23rd?
 8           MR. O'CONNOR:  It's a Tuesday.
 9           THE COURT:  It's a Tuesday?  Okay.  So probably that
10   Thursday or Friday.
11       Am I in town, Camie?
12           THE DEPUTY COURT CLERK:  Uh-huh.
13           THE COURT:  Okay.  So I'll probably set another
14   telephone conference that Thursday or Friday, and at that point
15   I should be able to know or Mr. O'Connor or Ms. Donahue should
16   be able to tell me, you know, where all this information would
17   be located and how it would be gathered and placed into some
18   sort of a searchable repository.  I don't need to know how long
19   it would take you to search it because I'm not going to order
20   anybody to do it.  And I will at that point have taken a look
21   at the dispositive motion and we'll certainly have a better
22   feel for what information, additional information, might be
23   relevant and how we might go about conducting the necessary
24   searches to satisfy the plaintiffs' discovery requests on a
25   proportional basis.
```

1       In terms of the attorneys'-eyes-only issue, Mr. Keglovits,

2   have you had a chance to talk to Mr. O'Connor and Ms. Donahue

3   about their proposal in their letter?

4           **MR. KEGLOVITS:**  Well, on Wednesday we had a meet-and-

5   confer.  We, the plaintiffs, proposed that, number one, we did

6   not want any attorneys'-eyes-only designation in this case;

7   but, number two, we would agree to limit particular

8   distribution of particular portions of the CMC to eight people

9   initially for purposes of this motion with the caveat that we

10  could come back to you and ask if we wanted to go beyond eight.

11  So that's what we proposed.  We heard back from Genentech

12  yesterday that the company was unwilling to do that, and the

13  company again is remaking the argument it's made previously

14  about the need for attorneys' eyes only.  As I said, we are

15  unwilling, until we're ordered to, to be burdened by an

16  attorneys'-eyes-only restriction.

17          **THE COURT:**  So, Mr. Keglovits, you proposed eight --

18  to have with certain aspects of the discovery that's been

19  produced by Genentech to limit the number of people who could

20  see it to eight?

21          **MR. KEGLOVITS:**  Yes; what we said is, "If you identify

22  for us what portion of the CMC you want subject to this

23  restriction, we will not go beyond eight employees of our

24  clients, whether they're pharmacists, oncologists, nurses,

25  those kinds of people who could provide us some technical help,

1    we'll limit it to those eight initially."  And obviously, as I

2    said, if we need to go more, we'll come back to you and ask for

3    more, and I think Mr. Sill agreed with that.

4           **THE COURT:**  And, Mr. Keglovits, on those aspects of

5    it, do you have any problem having those discussions always be

6    with attorneys and not actually providing these eight people

7    with copies of this information?

8           **MR. KEGLOVITS:**  Yes.  Frankly, I am very reluctant to

9    have to handle a large document like this by pulling pages out,

10   especially when the people I'm dealing with know much more

11   about this information than I do.  And again, these are not

12   competitors, we're not trying to make Herceptin.  We just want

13   to be able to sit down with our own clients and show them

14   what's been produced in the case.

15          **THE COURT:**  All right.  So, Ms. Donahue, I think I've

16   already ruled on this twice.  What's the -- why are you making

17   another run at it?

18          **MR. O'CONNOR:**  Your Honor, Bill O'Connor.

19      What we have done, and I believe we had told you that we

20   had committed to do, in addition to the discussions on the

21   number of people, we went through the entire production and we

22   basically asked them to agree that there's 500 pages of the

23   production that goes -- that's labeled in the BLA, the CMC

24   section of it, as the drug substance portion.  There couldn't

25   be anything that's more trade secret than the formula for

1    Herceptin.  This is the chemistry and the biology.  This is not

2    the drug product, which is the issue in this case.  They have

3    made allegations about final dosage and we have agreed to

4    remove that or to stop the effort to limit those sections to

5    attorneys' eyes only.

6        But with respect to the drug substance, which is the active

7    ingredient, which is the fundamental most sensitive information

8    possible, this information is not even disclosed within the

9    company; it's incredibly limited to who has access to that

10   information.  It's not supplied to other countries that don't

11   have IP protection.  It is --  It could not be treated in a

12   more confidential way.

13       So, to sit here and listen to the suggestion that the drug

14   substance provisions, that the formulas for the drug is such a

15   burden to them, is a bit frustrating, to say the least,

16   especially -- and again, I know you've heard this, and I know

17   it's been heard several times, and since then there's been a

18   significant effort to identify a discreet number of pages that

19   we are asking for this kind of treatment.  It would be wholly

20   inconsistent.  And again, I'm not challenging whether

21   Mr. Keglovits or his clients will misuse or do something with

22   it.  It's about the protection so that the potential isn't out

23   there.  These people change jobs all the time.  This industry,

24   the people are moving, they're mobile, and so why would we

25   ever -- why would they ever need the formula for Herceptin?  It

1   has absolutely no relationship to their claims.  It has

2   absolutely no relationship to certainly the preemption but

3   ultimately even the merits of the case.  If we ever got there,

4   this would still not be at issue.  So, I just don't --  Any

5   minor burden on them is far outweighed by the protections that

6   Genentech I think is entitled to on its trade secret formulas.

7          **THE COURT:**  All right.  Mr. Keglovits, anything else

8   on that topic?

9          **MR. KEGLOVITS:**  No, Your Honor.  I think we've heard

10  this several times.

11         **THE COURT:**  All right.  Mr. Keglovits, why don't you

12  pick two of your client representatives, they can view the full

13  scope of the discovery that has either been produced or is

14  going to be produced, including those provisions identified as

15  attorneys' eyes only.  If you're able to come back to me and

16  give me a reasonable explanation, of course after having heard

17  response from Genentech as well, as to why the portions that

18  Mr. O'Connor and Ms. Donahue are talking about as to the

19  formula need to be disclosed on a broader basis, in other

20  words, if your client looks at them and says, "Yeah, this would

21  be beneficial to our case to have more people view this," and

22  you can make that argument to me, and Mr. O'Connor and

23  Ms. Donahue don't convince me otherwise, then I might be

24  willing to broaden it.  But at this point I'm going to keep it

25  at two.  The names of those two people need to be disclosed to

1   Genentech, and obviously they need to sign the affidavit at the

2   back of the protective order and then we'll go from there.

3        As to this other information, again, Ms. Donahue,

4   Mr. O'Connor, what I'll expect when we get to this next hearing

5   is for you all to be able to articulate, with respect to the

6   information that the plaintiffs have sought, how you would

7   gather it in a manner that would be searchable, what that would

8   take.  And I'm not asking again how long it would take to

9   review this.  I'm not asking, you know, arguments about, you

10  know, we might spend a thousand hours looking for one or two

11  e-mails.  I'm not concerned with that in the least at this

12  point.  What I'm concerned with is:  What would it take to

13  gather this information and put it in a repository that

14  actually was searchable.  And then by that point I will have

15  had a chance to look at your summary judgment motion and I

16  think make a more informed decision as to how we should proceed

17  with this other discovery.  And in the interim, you all should

18  continue to work on the production that has been laid out thus

19  far in your letter.

20       So, Ms. Donahue, Mr. O'Connor, any questions?

21         **MS. DONAHUE:**  No, Your Honor.  I think we understand.

22  Thank you.

23       I just want to correct the record on one thing, because I

24  can envision this iss- -- my statement about the issue of fact

25  on the manufacturing changes coming back to haunt me some day,

1  and especially if you're looking at our motion.

2      I want to clarify what our impossibility preemption defense

3  is on manufacturing, and it is a legal issue, not a factual

4  issue, and it's that what plaintiffs demand would require

5  manufacturing changes that would require FDA approval.  So,

6  just for the record to be clear, I don't want there to be any,

7  you know, misunderstanding that the manufacturing issue is an

8  issue of fact.

9      Other than that -- and I also want to just respond that

10 Genentech is motivated and is doing everything that the court

11 has requested it to do and ordered it to do and, you know, I

12 don't appreciate Mr. Keglovits saying differently.  But that's

13 it.  Thank you.

14      **THE COURT:**  All right.  Mr. Keglovits, anything else?

15 Also, obviously if at the next hearing I look at the summary

16 judgment motion and am convinced that we're going to need more

17 discovery, then, Mr. Keglovits, you'll obviously be provided

18 with additional time to respond to that motion for summary

19 judgment.

20      **MR. KEGLOVITS:**  Thank you, Your Honor.

21      Can I ask for a little bit of clarification on the order

22 the court just made about the dissemination of this information

23 to two representatives --

24      **THE COURT:**  Yes.

25      **MR. KEGLOVITS:**  -- just to make sure I don't do

1   something I'm not supposed to do?

2           **THE COURT:**  Sure.

3           **MR. KEGLOVITS:**  Genentech yesterday pointed us to the

4   table of contents, pages 8, 9, 10 and 11 of the table of

5   contents, and asked that those -- the subject contained within

6   those pages be afforded attorneys'-eyes-only protection.  We've

7   gone, and I think it's at least two volumes, I'm not sure how

8   many pages, but could we have them give us the Bates numbers of

9   the pages that would be subject to this two-representative

10  restriction so we can mark it internally to make sure we're not

11  doing what we're not supposed to do?

12          **THE COURT:**  Mr. O'Connor, any objection to that?

13          **MR. O'CONNOR:**  I can tell you right now, and we can

14  confirm, but it's BL-8 to BL-509.

15          **MS. DONAHUE:**  And we'll go back, and if there's

16  additional pages, we'll let you know, but at this point that's

17  what we've identified as that portion.  We'll confirm that

18  again.

19          **THE COURT:**  Okay.  All right.

20          **MR. KEGLOVITS:**  And, Your Honor -- sorry.

21          **THE COURT:**  No.  Go ahead.

22          **MR. KEGLOVITS:**  To make sure I'm tracking the way the

23  court is thinking, we do now have two declarations, one from a

24  fact witness, one from an expert.  Is Your Honor expecting we

25  will not be deposing those people before we come back to the

1    status conference?

2          **THE COURT:**  That's right.  That's right.  I mean, I'll

3    certainly listen to an argument from you that would indicate

4    you want to depose those prior to then, but it seems to me that

5    this will be more efficient if we wait until the next status

6    conference and then we all have a better feel for how much and

7    what the scope of discovery will be and then you can take those

8    depositions at that time if they're still -- if they're

9    warranted.

10         **MR. KEGLOVITS:**  Thank you, Your Honor.  Nothing

11   further from us.

12         **THE COURT:**  Okay.  All right.  I appreciate

13   everybody's time.  We'll get that hearing set.  If you all have

14   any -- just like this last time, if you have any concerns with

15   the setting, then you can talk to Camie and we'll do what we

16   can to accommodate those.  Hope everybody has a nice weekend.

17   Thank you.

18         **MS. DONAHUE:**  Thank you.

19         **MR. O'CONNOR:**  Thank you.

20         **MR. KEGLOVITS:**  Thank you, Your Honor.  Have a nice

21   weekend.

22      (PROCEEDINGS CLOSED)

23

24

25

```
 1                    REPORTER'S CERTIFICATION

 2        WHILE NOT PRESENT IN PERSON TO STENOGRAPHICALLY REPORT THE

 3   FOREGOING PROCEEDINGS, I CERTIFY THAT IT WAS TRANSCRIBED TO THE

 4   BEST OF MY ABILITY FROM A DIGITAL AUDIO RECORDING.

 5
                         CERTIFIED:     s/Greg Bloxom
 6                                      Greg Bloxom, RMR, CRR
                                        United States Court Reporter
 7                                      333 W. 4th Street, RM 4-548
                                        Tulsa, OK 74103
 8                                      (918)699-4878
                                        greg_bloxom@oknd.uscourts.gov
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Greg Bloxom, RMR, CRR**
United States Court Reporter
Northern District of Oklahoma