1     UNITED STATES DISTRICT COURT FOR THE

2      NORTHERN DISTRICT OF OKLAHOMA

3

4 IN RE:  GENENTECH HERCEPTIN  )
 (TRASTUZUMAB) MARKETING AND  ) Case No. 16-MD-2700-TCK-TLW
5 SALES PRACTICES LITIGATION.  ) ALL CASES

6

7

8

9

10

11

12   REDACTED TRANSCRIPT OF RECORDED PROCEEDINGS
      NOVEMBER 17, 2016
13 BEFORE THE HONORABLE T. LANE WILSON, MAGISTRATE JUDGE PRESIDING

14       **MOTION HEARING**

15

16

17

18

19

20

21

22

23

24

25

In Re:  Genentech Herceptin (11-17-2016 Motion Hearing) (REDACTED)      2

```
 1                    A P P E A R A N C E S

 2  FOR THE PLAINTIFFS:              MR. DAVID E. KEGLOVITS
                                     MS. AMELIA FOGLEMAN
 3                                   MR. JAMES PEBSWORTH
                                     MR. STEVEN ADAMS
 4                                   Gable & Gotwals
                                     100 W. 5th Street
 5                                   Suite 1100
                                     Tulsa, OK 74103
 6
                                     MR. MATTHEW JAMES SILL
 7                                   MS. TARA T. TABATABAIE
                                     MS. KATHRYN EIDSON GRIFFIN
 8                                   Sill Law Group PLLC
                                     14005 N. Eastern Avenue
 9                                   Edmond, OK 73103

10  FOR THE DEFENDANTS:              MR. WILLIAM W. O'CONNOR
                                     Newton, O'Connor, Turner &
11                                   Ketchum
                                     15 W. 6th Street
12                                   Suite 2700
                                     Tulsa, OK 74119
13
                                     MR. GABRIEL EGLI
14                                   Shook, Hardy & Bacon
                                     2555 Grand Boulevard
15                                   Kansas City, MO 64108

16                                   MS. ALICIA J. DONAHUE
                                     Shook, Hardy & Bacon
17                                   One Montgomery
                                     Suite 2700
18                                   San Francisco, CA 94104

19                    * * * * * * * * * *

20

21

22

23

24

25
```

```
 1   PROCEEDINGS:

 2   ---------------------------------------------------------------

 3           THE DEPUTY COURT CLERK:  This is case number

 4   16-MD-2700-TCK-TLW, Genentech Herceptin Marketing and Sales

 5   Practices Litigation.

 6      Counsel, please enter your appearance for the record.

 7           MR. KEGLOVITS:  On behalf of plaintiffs, Dave

 8   Keglovits, Steve Adams, Matt Sill, Wes Pebsworth and Amy

 9   Fogleman, and I think Katie Griffin is on the phone.

10           MR. O'CONNOR:  On behalf of Genentech, Bill O'Connor,

11   Alicia Donahue and Gabe Egli.

12           THE COURT:  Let's talk about this ESI order first.  I

13   think, in general, it looks like it's well thought out and I

14   don't have the any concerns about it.  I have a few questions

15   and I guess I've got one potential concern.

16      In terms of the searches that are contemplated, are you all

17   simply talking about agreeing on a list of words and then the

18   database will then be searched for documents that contain those

19   words on them, or are you contemplating a situation that's more

20   sophisticated where you might pull some documents that are

21   clearly relevant and then utilize a third-party vendor to use

22   some algorithmic functions that would then provide, you know, a

23   better set of relevant documents?

24           MR. EGLI:  I think the former, Your Honor, talking

25   about running word search terms --
```

1          **THE COURT:** Okay.

2          **MR. EGLI:** -- on the database.

3          **THE COURT:** And I'm just curious. I mean, why would

4   you -- I mean, there's been a lot of research into this area

5   and it tends to show that that method is slightly better than

6   putting an eyeball on every document, but just barely slightly

7   better, and that oftentimes putting an eyeball on every

8   document and simply using search terms is -- I don't want to be

9   too extreme in this, but I think the research shows this can be

10  grossly ineffective, and so why would you do it that way?

11      The problem with those, as well, is that you tend to end up

12  with thousands if not millions of documents that aren't real

13  helpful to the case. So, I mean, what's the thinking there?

14  Why wouldn't you utilize the current state of technology and

15  try to get a smaller set of more relevant documents?

16          **MR. EGLI:** Your Honor, I think the search terms, if

17  used properly with some quality control can actually be pretty

18  reliable. The TAR methodology I think that you're talking

19  about, the Technology Assisted Review, there are additional

20  cost considerations there.

21      If you're dealing with a larger volume, it tends to make

22  more sense, but setting it up and getting those things running

23  mean a lot more in terms of costs on the front end.

24          **THE COURT:** Well, maybe I misunderstood. I mean, my

25  impression is that if we go forward with some of this

```
 1  discovery, we're talking about a very large number of documents

 2  to be searched.  But what you're saying is that it's just not

 3  that large?

 4       MR. EGLI:  We don't, I think, know, probably, Your

 5  Honor, at this point how large that's going to be.  But, you

 6  know, I think we've seen, in addition to using things like TAR,

 7  sometimes search terms, they'll get used to feed those

 8  documents in as well.  So I think that, you know, we started

 9  with the search terms just because that was something that both

10  sides felt comfortable with had used before effectively, and

11  there would probably be fewer negotiation points along the way

12  if all we're talking about is generating those terms as opposed

13  to figuring out how exactly we're going to be feeding documents

14  into a Technology Assisted Review system.

15       THE COURT:  Okay.  All right.  Well, you know, in the

16  end, it is -- anything from the plaintiffs in that regard?

17       MR. KEGLOVITS:  I'll only confess ignorance.  I had

18  not thought this was going to come up.  Mr. Doverspike is the

19  one who's been handling that on our end, so I may not

20  understand everything that we're talking about.  I know there

21  are particular documents that we believe we should get, and

22  we've given them a list of those.  I don't think what we're

23  talking about, but again I'm going to confess my ignorance, is

24  going to replace that kind of searching.  If it is intended to

25  replace the kind of searching, then I would go back to the
```

1    first question and say I want to do more than just search terms

2    against a database.

3         **THE COURT:**  Okay.  Well, I'll sign the order.  I mean,

4    my interest in this is one of efficiency and the concern, you

5    know, like most people have, is that federal court litigation

6    has just become too expensive, particularly in these large

7    cases.  And my understanding of the Technology Assisted Review

8    is that you do oftentimes begin with a couple of search term

9    searches and then the goal being to find documents that one

10   side or both agree actually are relevant as opposed to, you

11   know, somebody's name appearing on a document 1,500 times on an

12   issue that has nothing to do with the case and then using those

13   documents to then generate searches that will pull more similar

14   documents as opposed to the documents that aren't relevant.

15      But, you know, if you all want to -- I mean, you seem to be

16   in agreement because you presented the order.  You know, I

17   don't mean to be critical, I'm certainly not trying to do that.

18   I was just curious because it appeared to me as though it was

19   going to be a search term effort as opposed to a TAR effort.

20   So, if the parties are okay with the order, then I'll go ahead

21   and sign it.

22         **MR. EGLI:**  Yeah.  Your Honor, if I could say one more

23   thing.  If it turns out that we're dealing with a large volume,

24   we may revisit that, and I think the protocol actually

25   contemplates revisiting if we needed to to amend an order for

1   TAR, although the parties may just agree to do that --

2          **THE COURT:**  Okay.

3          **MR. EGLI:**  -- in that event.

4          **THE COURT:**  And that would be fine.  You know, one of

5   the things I'm trying to break through, and I'm beginning to,

6   you know, be a bit older and so maybe I fall into this

7   category, but, you know, the idea that, you know, putting an

8   eyeball on every document or doing these old traditional

9   searches is actually an effective way of finding relevant

10  information I think has pretty well been dispelled.  And at

11  least it doesn't sound like you all are planning on doing that,

12  looking at every document that might be relevant.  So I'll sign

13  the order, and if you all have any issues, then just raise it

14  with Camie and we'll get everybody back in here and we'll get

15  them resolved.

16     Okay.  Camie is letting me know.  Yeah, Mr. Keglovits, can

17  you pull that mic up?  And so I'm not going to have you all

18  come to the podium.  This is going to be more a discussion than

19  anything else, so if you want to, you can certainly remain at

20  the table.  Just when you're speaking, make sure you're

21  speaking into the microphone so that we get everything taken

22  down.

23     All right.  Let's move on to the discovery disputes in this

24  joint submission that you all made.  I assume there are no

25  updates since then.  Any progress has been made, no progress?

1  All right.  I see shaking heads no, so then we'll move forward.

2      All right.  I've read the summary judgment motion a couple

3  of times, and if I understand it correctly, I mean, there's

4  essentially two arguments in that summary judgment motion, and

5  one is that plaintiffs' claims directly conflict with federal

6  net weight standards and, thus, would stand as an obstacle to

7  the purpose and objectives of Congress and the FDA in allowing

8  for variations in that content.  I mean, this is essentially,

9  you know, the obstacle preemption argument.

10      And then the second one, the impossibility, is that it

11  would be impossible for Genentech to comply with its federal

12  law obligations which prohibit it from modifying its

13  manufacturing process and net weight specifications which it

14  would have to do in order to comply with the state law upon

15  which plaintiffs' claims are based.

16      On the first one -- well, and then let me go ahead and say,

17  in reviewing the motions and the joint submission, my

18  understanding of plaintiffs' discovery requests is that they

19  essentially involve two areas, and one is -- one was initially

20  stated as the availability of labeling changes including

21  discovery of information putting Genentech on notice of the

22  fact that such changes were necessary.  And then, two, really

23  the manufacturing processes that would require modification.

24      I mean, have I, in a very general sense, captured the

25  summary judgment motion and then sort of the areas of discovery

1  that plaintiff is seeking?

2         **MR. KEGLOVITS:**  From the plaintiff's perspective, Your

3  Honor, yes.

4         **THE COURT:**  Okay.  All right.  How about from the

5  defendants' perspective?

6         **MS. DONAHUE:**  Yes, you've captured the motion -- the

7  essence of the motion.

8         **THE COURT:**  All right.  Then am I right that the

9  labeling issue relates primarily to the first point on the

10 summary judgment motion?

11        **MS. DONAHUE:**  From a defense perspective, yes, Your

12 Honor.

13        **THE COURT:**  Okay.  Mr. Keglovits, is that the same?

14        **MR. KEGLOVITS:**  I think primarily, but I think there

15 is an element of obstacle in what we're trying to learn about

16 particularly communications to and from the FDA to ascertain

17 the FDA's actual stated position on some of the things from

18 which we get a declaration -- or on which we get a declaration

19 from their expert.

20        **THE COURT:**  Okay.

21        **MR. KEGLOVITS:**  But I do think primarily it's

22 impossibility.

23        **THE COURT:**  Okay.  But the labeling issue, the issue

24 of labeling is related to, as I understand it, the obstacle

25 preemption argument, and the manufacturing issue is related

1    primarily to the impossibility.  Have I got that right?

2            **MR. KEGLOVITS:**  Well, I think impossibility sweeps up

3    both manufacturing and labeling.  For instance, on obstacle,

4    they have an expert who is opining that Herceptin is a solid

5    drug.  That's the linchpin to their obstacle preemption

6    argument.  So, if there are communications back and forth with

7    the FDA about whether the FDA's position is that this is a

8    solid drug, then I think that would be discoverable.

9            **THE COURT:**  Okay.  Right.  Right now I'm just talking

10   about in terms of the labeling issue, do you think the labeling

11   -- the discovery you seek on the labeling, do you think it goes

12   to both the obstacle and the impossibility?

13           **MR. KEGLOVITS:**  No, I -- yes, I think, if I'm

14   understanding the question.

15           **THE COURT:**  Okay.  So help me understand how discovery

16   as to the label relates to the impossibility preemption

17   defense.

18           **MR. KEGLOVITS:**  Well, the FDA is obviously involved in

19   the labeling process, and so coming back to the fundamental

20   question of communications with the FDA on things like whether

21   it's a liquid or a solid drug, or whether the FDA, in approving

22   a particular aspect of the label, took into account another

23   aspect of the CMC.

24           **THE COURT:**  Okay.  But my understanding of Genentech's

25   argument on impossibility is that the reason the impossibility

1  defense is applicable is because in order to comply with

2  Oklahoma State law they would have to change their

3  manufacturing process which would then put them outside the FDA

4  regulations with respect to Genentech.

5      I mean, Ms. Donahue, do I misunderstand that?

6          **MS. DONAHUE:**  Our impossibility defense is based on

7  the fact that in order to comply or reach what the plaintiffs

8  would like us to reach in terms of the vial fill amount, we

9  would have to get FDA approval to change our manufacturing --

10         **THE COURT:**  Process?

11         **MS. DONAHUE:**  -- process.

12         **THE COURT:**  Right, right.

13         **MS. DONAHUE:**  And what "impossibility preemption"

14  means is that if, in order to comply with the state law claim

15  or state law requirement, one would have to seek FDA approval,

16  then that is preempted.

17         **THE COURT:**  Okay.  Right.  But --

18         **MS. DONAHUE:**  It's not whether you can do both.  It's

19  whether, even to do both, you would have to get FDA approval to

20  do what the plaintiffs are saying --

21         **THE COURT:**  Yeah.  And let --

22         **MS. DONAHUE:**  -- you've got to do.

23         **THE COURT:**  I want to set the legal issue -- the

24  argument over the legal issue aside.  I mean, the factual basis

25  of your impossibility defense is we would have to change the

1  manufacturing process.

2          **MS. DONAHUE:**  And in order to do that, we would have

3  to get FDA approval.

4          **THE COURT:**  And we would have to get FDA approval.

5          **MS. DONAHUE:**  Yes.

6          **THE COURT:**  Okay.  So, if that's the factual basis of

7  Genentech's motion for summary judgment on the impossibility

8  defense, how does labeling relate to that?  I mean, because

9  right now all we're doing is talking about how do we make sure

10 that the plaintiffs are well situated to respond to the summary

11 judgment motion.

12         **MR. KEGLOVITS:**  Well, I guess I didn't understand

13 their argument to be that narrow.  And perhaps what they will

14 do is stipulate that they could have independently changed the

15 label to say the net weight is XXXXXXXXXXXXXXXXXXXX or the

16 concentration is a number different than 21 milligrams per

17 milliliter, but I don't hear them saying that.

18         **THE COURT:**  Okay.  Well, again, I mean, the labeling

19 issue -- and, Ms. Donahue, maybe you and I need to flush this

20 out a little bit -- the labeling issue, it seems to me, goes to

21 the obstacle preemption --

22         **MS. DONAHUE:**  Correct, Your Honor, --

23         **THE COURT:**  -- defense --

24         **MS. DONAHUE:**  -- yes, the obstacle preemption.

25         **THE COURT:**  -- and not to the impossibility defense.

1   That the impossibility defense is simply, "We can't do this

2   because we would have to change our manufacturing process which

3   would require us to go to the FDA and seek approval and,

4   therefore, we can't comply, it's impossible for us to comply

5   with both sets of laws."

6        And so if that's their -- I mean, I hear -- I think I heard

7   Ms. Donahue say this, I don't know that we necessarily need a

8   stipulation, but I think what she is saying is, and this is

9   certainly how I read the summary judgment motion, is, "The

10  factual basis of our impossibility defense is simply that we

11  would have to change the manufacturing process in a way that

12  would require us to get FDA approval."  Am I right,

13  Ms. Donahue?

14           **MS. DONAHUE:**  Yes.

15           **THE COURT:**  Okay.  So, it's not that -- they're not

16  saying that we would have to change the label.  They're not

17  saying -- I mean, they're saying that on the -- they're

18  addressing the label on the obstacle preemption issue, but on

19  the impossibility, if Ms. Donahue is saying that right now,

20  "Look, this is the factual basis of our claim, of our defense,"

21  then on the impossibility defense -- and we'll get to obstacle

22  in a minute -- but on the impossibility defense, I'm trying to

23  figure out why we should be talking about any discovery that's

24  not related to the manufacturing process.

25           **MR. KEGLOVITS:**  Well, ultimately, I think the label is

1  implicated in one or both of the defenses that have been

2  raised.  And certainly we can respond to the impossibility

3  defense by saying, "Let's assume you're right, that you don't

4  have to change the manufacturing, but it is possible to change

5  the label, and you can then do, independent of the FDA, what

6  needs to be done to comply with both federal and state law, and

7  therefore it is not impossible."

8          **THE COURT:**  Okay.  But that's a legal issue.  I mean,

9  that's a question for the court to determine, whether or not

10  they can -- whether or not they can do that.  I mean, setting

11  aside the manufacturing process, whether or not they can seek a

12  change in the label or comply with both sets of laws, that's a

13  legal issue.  The factual issue is the manufacturing process.

14          **MR. KEGLOVITS:**  I respectfully disagree that it's a

15  pure legal issue, and that's, of course, why they have a

16  declaration on the labeling issues.  And certainly if you look

17  at the regulations, there are exceptions that clearly allow a

18  manufacturer, if a certain factual predicate is met, to

19  independently change the label.  For example, the newly

20  acquired information test.  So, we would have to develop a

21  factual record to support that they would qualify under that

22  exception to independently change the label.

23          **MS. DONAHUE:**  Your Honor, those points just there are,

24  in fact, issues of law.  This doesn't -- and the declaration

25  that we've submitted in support of our obstacle preemption

1   defense is by an FDA regulatory expert who is simply setting

2   forth for the court what the regs are that apply in this case.

3   It's a legal issue.  We don't fall within the exceptions that

4   they continue to point to.  There was no newly acquired

5   information because the FDA knew at the time of approval that

6   there this was this spec range and that we were required -- and

7   it was labeled with the knowledge of the spec range.  The FDA

8   approved the label, approved the manufacturing process,

9   approved the drug with the spec, and has had -- and it has been

10  the same ever since.  The FDA's knowledge nor Genentech's

11  knowledge didn't change over time.  That's the reality of the

12  situation since 1998.

13      So, in terms of obstacle preemption, it's based on the reg,

14  it's based on the approval letter from the FDA where they say

15  to us, "If you want to change your label, you need to come back

16  and propose it and get approval pursuant to your BLA," and we

17  have that letter.  So, I mean, it is a legal issue.  The first

18  part of our motion is a purely legal issue.

19          **MR. KEGLOVITS:**  The idea that their state of knowledge

20  has never changed or the FDA's state of knowledge has never

21  changed or the FDA has never recommended a change is a factual

22  question.

23          **THE COURT:**  If -- okay.  Let's just follow this for a

24  minute, this line of reasoning.  If you were to obtain

25  discovery that indicated that there was some newly acquired

1  information that -- that what, that they could manufacture it

2  within the current FDA specs and make sure they had 400

3  milligrams in every vial?  I mean, is that the sort of

4  information you're looking for?

5          **MR. KEGLOVITS:**  Well, I guess --

6          **THE COURT:**  I mean, what --

7          **MR. KEGLOVITS:**  -- two points.  On the labeling,

8  purely, and not manufacturing, we attached to the joint

9  submission as exhibit 1 the meeting notes from the October,

10  2014, meeting between the FDA and Genentech.  XXXXXXXXXXXXX

11  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX  This

15  is happening in 2014.  So --

16          **THE COURT:**  Okay.  So relate that to the impossibility

17  defense.  Because if the label's revised, then --

18          **MR. KEGLOVITS:**  Here's how I see it relates.  XXXXXX

19  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21          **THE COURT:**  Okay.  So how does that relate to the

22  impossibility defense?

23          **MR. KEGLOVITS:**  Well, impossibility is bound up in the

24  idea that you cannot independently do what we say needed to be

25  done to comply with state law.  And what this reg says is you

1    can change your label to provide the accurate information about

2    what your manufacturing process generates, you can do that

3    independently, and therefore you could have complied with both

4    federal and state law. So it's not impossible to comply with

5    both.

6         **THE COURT:** XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14        **MR. KEGLOVITS:** Well, that's in the regulations, and

15   the regulations say, for this kind of change, that you can do

16   it with a CBE, you can independent do it as long as you submit

17   a changes-being-effected notice to the FDA. You don't have to

18   get preapproval to do that.

19        **THE COURT:** And you're saying that situation occurs

20   under what factual scenario?

21        **MR. KEGLOVITS:** XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24        **THE COURT:** Okay. So you've got that document. So

25   you're looking for, what, other documents --

1              **MR. KEGLOVITS:**  Sure.

2              **THE COURT:**  -- that would indicate that the FDA had

3    said this before?

4              **MR. KEGLOVITS:**  Because I'm going to guess that

5    Genentech isn't going to stipulate today that that note in that

6    document is sufficient to trigger the exception in the reg that

7    we've identified.  So we need to know the entire discourse

8    between the FDA and Genentech about --

9              **THE COURT:**  Well, you don't need the entire discourse.

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13             **MR. KEGLOVITS:**  Yeah, ultimately that's where we want

14   to go, but I don't think the volume of communication between

15   the FDA and Genentech has been demonstrated to this point to be

16   so high that we couldn't look at it all and not be forced to

17   rely on someone else's filter to tell us what we need and what

18   we don't need.

19       You know, just as a point here, so far in production we

20   have nine faxes to the FDA and six e-mails from Genentech to

21   the FDA.  We have zero Genentech internal e-mails, zero

22   customer or third-party inquiries which could give rise to

23   newly acquired information, zero the manufacturing agreements,

24   zero the manufacturing standards and instructions, zero the

25   quality controls and audits.  And so we're not sitting on top

1  of a mountain of information right now.  All we're asking is

2  that they go back with respect to this issue and provide us the

3  catalog of what has gone back and forth with them and the FDA.

4       **MS. DONAHUE:**  So, Your Honor, if we could just focus

5  on the labeling issue for a minute --

6       **THE COURT:**  Yeah, go ahead.

7       **MS. DONAHUE:**  -- and address two points, I think, that

8  are important to remember in response to Mr. Keglovits.  And

9  Mr. O'Connor is going to talk about the 2014 submission.  But

10  in terms of XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11  XXXXXXXXXXXXXXXXXXXXXXXX a changes-being-effected process

12  versus seeking FDA approval, we have produced to the plaintiffs

13  over 60 changes-being-effected submissions that we sent to the

14  FDA on Herceptin.  Okay?  Of those, eight were label related.

15  And because CBEs are appropriate in cases where there are

16  safety issues, which makes sense because the FDA wants safety

17  issues to be addressed quickly and says to the companies, "Go

18  ahead and make your change right away if you think there's a

19  safety issue."  And that's what the *Wyeth* case the plaintiffs

20  keep pointing to relates to.

21      The reg is clear that in a case such as ours where we're

22  talking about quantity, quality content of a drug or biologic,

23  a, you know, submission requesting approval is the only way

24  that a company is allowed to change that portion of the label.

25  It's what our approval letter from the FDA tells us and it's

1    what's the reg tells us.

2        So, any communications that we might have had about

3    labeling changes, they know what our CB- -- they know every CBE

4    we've submitted and we're about to give them any supplements to

5    those.  But, I mean, there's --

6             **THE COURT:**  Okay.  Let --

7             **MS. DONAHUE:**  -- over 60 --

8             **THE COURT:**  Let me --

9             **MS. DONAHUE:**  -- and they don't relate to this issue.

10            **THE COURT:**  Let me -- maybe I'm just being thick about

11   this.

12       All right.  What I'm being told is that the attorneys we

13   have on the phone can hear me but they cannot hear you all.

14   Maybe that's a good thing.  So, as you all are speaking, then

15   you're probably going to have to bring those mics closer to

16   you.  I mean, if you want to come to the podium, you can.  That

17   just is, to me, it disrupts things.

18       All right.  Again, on this labeling issue, you know, I'm

19   just -- and maybe I'm just missing something -- Genentech is

20   saying, "We can't change the manufacturing process and there's

21   no way we can manufacture the drug to be consistent with what

22   Oklahoma law requires us to do."  And one response I'm hearing

23   from the plaintiff is, "But they could have changed the label

24   without getting approval."  But I don't hear Genentech saying,

25   on the impossibility defense, "We couldn't have changed the

1  label."  I hear them saying that on the obstacle preemption,

2  but on the impossibility defense I don't hear them saying that,

3  "We couldn't have changed the label."  I only hear them saying,

4  "We would have had to change our manufacturing process."

5      **MS. DONAHUE:**  Because under obstacle preemption, where

6  there is a federal regulation or law in effect, then that is

7  obstacle preemption.

8      **THE COURT:**  Okay.

9      **MS. DONAHUE:**  Impossibility preemption is we would

10 have to seek FDA approval but not necessarily under any

11 specific regulation.

12     **THE COURT:**  Okay.  But what I understood your summary

13 judgment motion to be arguing on impossibility preemption is

14 not, "We have to change our label."  You're not -- in other

15 words, as Judge Kern looks at this or when the plaintiffs

16 respond, your reply is not going to be on the impossibility

17 defense, "But we couldn't change our label."

18     **MS. DONAHUE:**  No, it's not.

19     **THE COURT:**  So, why -- and, again, I'm only talking

20 about the impossibility defense.  So I understand,

21 Mr. Keglovits, what's you're saying, but what you're saying

22 seems to me, since they're not raising it at this stage of the

23 litigation, it seems to me to go potentially to the ultimate

24 merits, but not to a preemption defense on impossibility

25 because they're not saying -- they're not taking the position

1  that they couldn't change the label on that defense, they're

2  not using that as a reason to assert that defense.  So why

3  is -- and, again, I'm only talking about the impossibility

4  defense -- so why is that discovery relevant to that defense?

5          **MR. KEGLOVITS:**  Well, again, I think it's because it

6  allows us to win.  If we can show --

7          **THE COURT:**  Win the case?

8          **MR. KEGLOVITS:**  Well, yes, but win this issue.  If we

9  can convince Judge Kern you don't even have to look at

10  manufacturing, and we can talk about it in a second because we

11  haven't, there's a lot of facts there we want to talk about,

12  but you don't have to look at manufacturing, forget about

13  manufacturing because they could have solved this problem by

14  changing the label.

15          **THE COURT:**  But if you convince him, "Forget about

16  manufacturing, there might be discovery out there that would

17  render that issue moot," then don't you win the summary

18  judgment issue, because they're not arguing that?

19          **MR. KEGLOVITS:**  Right, but we want to develop the

20  factual support for that argument so we can win it.  And --

21          **THE COURT:**  But --

22          **MR. KEGLOVITS:**  -- I have to say I'm a little

23  surprised that the correspondence between Genentech and the FDA

24  about Herceptin, and particularly about the Herceptin label, is

25  even something that they're resisting discovery on.  This is

1   one of the things that extemporaneously I mentioned to Judge

2   Kern when we first talked about doing this expedited summary

3   judgment process as the discovery that we would need, and no

4   one stood up and said, "Oh, wait a minute, that's not going to

5   be necessary."  Really, we're talking about the communications

6   between this company and the regulator.  It is not --  No one

7   has established in any form or fashion that it would be

8   burdensome to produce that to us.  There's nothing that says

9   it's a million pages or even a hundred pages.  They're just

10  saying, "We're right on the law and therefore we don't have to

11  produce it."

12          **THE COURT:**  All right.  So, I want to stay to the

13  point I'm talking about.  So your position then is even if

14  they're right, even if you were to concede that they would have

15  to change their manufacturing process and that would require

16  FDA approval, they still don't win on the impossibility defense

17  because they could have changed the label without getting FDA

18  approval.  That's your position?

19          **MR. KEGLOVITS:**  If you accept the premise that a

20  change in manufacturing is simply a red herring, that the only

21  thing that needed to be done was to change the label so that

22  you could independently comply with federal and state law, then

23  we win.

24          **THE COURT:**  All right.  Okay.  So I think I understand

25  the parties' positions now.

1    Now let's talk about -- I'll go ahead and address this

2  issue.  I mean, on the correspondence between the FDA and

3  Genentech, I mean, what volume are we talking about?  Is there

4  -- I mean, how hard would it be to simply produce the

5  correspondence?  My understanding, I've read the law, and again

6  I'm not an expert in this as you all are, but as I've read the

7  law and that information used to be obtainable -- I guess it's

8  not the correspondence -- but the way I read the law, that

9  information, with the exception of anything that would be a

10  trade secret, would be producible by the FDA under a FOIA

11  request.

12          **MS. DONAHUE:**  So, I'll let Gabe talk about the volume,

13  but first off I just want to make sure that it's understood on

14  the record that we have produced correspondence between the FDA

15  and Genentech on the Herceptin labeling, and that is contained

16  in the 15,000 pages of documents we've produced including the

17  CMC of our BLA.

18          **THE COURT:**  Yeah.

19          **MS. DONAHUE:**  Every single CBE submission is

20  correspondence with the FDA.

21          **THE COURT:**  Right, but what --

22          **MS. DONAHUE:**   And the 2014 dialogue that they have

23  referred to, that also is correspondence with the FDA.

24          **THE COURT:**  Okay.  But in terms of, as Judge McCarthy

25  would say, what do you have that you haven't produced?  Just on

1  the correspondence issue, that's all I'm talking about.  I'm

2  not talking about any of the other requests.  Just in terms of

3  correspondence that the FDA has sent you on the labeling issue

4  or you have sent the FDA.

5         **MR. EGLI:**  Your Honor, we have a regulatory database

6  that contains this.  I don't know that there's a way to really

7  separate out what's a submission, which I think would still

8  qualify as correspondence with FDA versus, you know, an e-mail

9  or a fax, for example.

10        **THE COURT:**  But a submission would be formal enough

11 that you would know whether it dealt with the labeling.  I

12 mean, I would imagine that your systems are sophisticated

13 enough to cull out submissions that didn't relate to labeling.

14        **MR. EGLI:**  I think that would be part of the process,

15 Your Honor.  The fact of the matter is the regulatory database

16 contains all of the submissions and correspondence, and that's

17 one of the things that we have, I think, concerns about here is

18 that the request is for all communications regarding labeling

19 regardless of whether they have anything to do with the content

20 or concentration issues that are going on here, because a lot

21 of those correspondence have to deal with -- have to do with

22 clinical trials, for example, and --

23        **THE COURT:**  Okay.  Well, I mean, let's say that we

24 limited it to what is going on here.  How much are we talking

25 about, and are your systems capable of culling that out?

1          **MR. EGLI:** I think if we could come to some search

2    terms, it would probably be capable of that. One of the

3    complicating aspects of it is a lot of these documents have

4    cover sheets where you check boxes as to what it relates to.

5    Without opening each of those, they're going to contain a label

6    in that sheet, so it's not as simple as just using a label as a

7    search --

8          **THE COURT:** You've got to look at the sheet to see if

9    there's a check box, a label check box?

10         **MR. EGLI:** I suppose that that would apply to the

11   submissions. The correspondence pieces, yeah, you might have

12   to look more closely.

13         **THE COURT:** But the correspondence pieces, if you're

14   using search terms, they are less likely to deal with -- to not

15   deal with labeling if they have the word "labeling" in them?

16         **MR. EGLI:** Correct. Yeah. But if there's going to

17   be, you know, a lot of what's contained in the regulatory

18   database, which I think we've indicated at this point is well

19   over four million pages, a lot of that stuff is going to be

20   unrelated to labeling issues. I mean, as Ms. Donahue pointed

21   out, we've produced over 60 CBEs, eight of those are labeling

22   related, five of those are related to safety changes, and there

23   are a couple of others that happened in 2000 where the labeling

24   was changed to add things like nominal content is 440 and the

25   concentration is approximately 21.

In Re:  Genentech Herceptin (11-17-2016 Motion Hearing) (REDACTED)      27

1          **THE COURT:**  Well, Mr. Keglovits, what's the likelihood

2     that a submission -- because the correspondence you're

3     referring to obviously wasn't a submission by Genentech, it was

4     just a letter from the FDA.

5          **MR. KEGLOVITS:**  Well, it was a formal meeting between

6     the FDA and Genentech which was memorialized in these minutes.

7          **THE COURT:**  In the minutes.  Okay.  So, I mean, is

8     there really, on this topic, any need for Genentech to search

9     the submissions?  I mean, aren't what you're really looking for

10    is either minutes or letters or maybe e-mail that somehow

11    addresses the labeling issue?

12         **MR. KEGLOVITS:**  Not knowing what a submission is, it's

13    kind of hard to answer.  I mean, if the CEO of Genentech was

14    sitting where you were and asked these folks, "Give me tomorrow

15    all of the communications with the FDA on these issues," I

16    guess the answer wouldn't be, "We've got a four-million page

17    regulatory database that we really can't search so we can't do

18    that."  I've got to believe that there's somebody there who can

19    untangle this knot and provide some organization to it for us,

20    and maybe that's taking the deposition of a person who's in

21    charge of their records system.

22       We know, from the documents they have produced, we know

23    they've got commercial and launch teams for Genentech; we know

24    they've got product investigative reports; we've got --

25    Genentech and Roche conduct product complaint investigations.

1     **THE COURT:** Okay. Well, let's just do this. I mean,

2 the federal rules contemplate just a discussion. I don't think

3 that we need a deposition of anybody from Genentech to address

4 this issue. On the issue of the labeling and any

5 correspondence, I want you all to get together and have a

6 discussion with whoever it is at Genentech that knows the

7 database or how records are kept. And I want both sides to

8 keep in mind -- this really is directed towards the

9 plaintiff -- that I am concerned about proportionality here and

10 the costs involved.

11     By the same token, I mean, it does seem to me that

12 obtaining most of what the plaintiffs are asking for in this

13 regard shouldn't be that difficult. I mean, with a company

14 like Genentech, I would tend to probably agree with what

15 Mr. Keglovits is saying, is that there's got to be some way to

16 obtain this correspondence as far as it relates to labeling.

17 So I want you all to get together.

18     My understanding of the term "submission" is we're talking

19 about some kind of formal document that maybe is required by

20 the regs, maybe it was requested by the FDA, because my

21 understanding from what Mr. Egli said is -- am I pronouncing

22 that right?

23     **MR. EGLI:** You are.

24     **THE COURT:** Okay. -- what Mr. Egli said is that

25 there's some form on the top of it and they check a box. I

1  mean, to me, that feels more formal than really, Mr. Keglovits,

2  potentially what you're looking for.  And so I want you all to

3  talk about that.

4      I am going to allow discovery into correspondence between

5  the FDA and Genentech on the issue of labeling, but I want it

6  to be proportional.  You know, whether it's search terms or

7  whatever it is, I want you all to get together and talk about

8  that because we're not going to search every document Genentech

9  has for a needle that could be, you know, a potential e-mail

10 that in the third paragraph talks about, you know, labeling,

11 when the rest of the e-mail talks about something else.  I

12 mean, if you happen to find that document, fine, but I want you

13 all to have an honest discussion about, you know, how you would

14 obtain this information.

15         **MR. EGLI:**  Just a question for clarification, Your

16 Honor.  Are we talking about labeling-related correspondence

17 that deals with these content and concentration issues?

18         **THE COURT:**  Is there any reason that you at this stage

19 of the litigation would need anything else, Mr. Keglovits?

20         **MR. KEGLOVITS:**  I don't think so.

21         **THE COURT:**  Okay.  Yes.

22         **MR. EGLI:**  Thank you, Your Honor.

23         **MR. KEGLOVITS:**  But also on clarification, I know Your

24 Honor realizes that this is a putative nationwide class with

25 hundreds of millions of dollars of damages, and this issue,

1  according to Genentech, makes it all go away.  So it's hard for

2  me to put that proportionality filter over an issue as

3  important as this.

4        **THE COURT:**  No, I understand that, but I also -- I

5  understand your point, but simply because, you know, a case has

6  got, you know, maybe a billion dollars at stake doesn't mean

7  that we should throw out the idea of proportionality.  I just

8  don't think that's what the rules are asking us to do.  And

9  you've already got one document that you think indicates that

10  their defense is not going to succeed.  I know you're looking

11  for more of those similar type documents, and you ought to

12  be -- my view is you ought to be entitled to obtain those, but

13  we're not going to spend, you know, $100,000 looking for that

14  document.  I mean, if it's there, you all ought to be able to

15  come up with some search terms.  We've limited the scope that

16  are most likely to find this information.

17       And my view on discovery is always, you know, if you come

18  up -- if you start coming up with e-mails, letters, minutes

19  that address this issue time and again, well, then, I'll be

20  willing to consider expanding the scope.  But until then -- I

21  mean, part of me wonders, you know, if you don't already have

22  what you need, if Judge Kern agrees with your view legally and

23  factually on this issue, then part of me says, "Well, you've

24  already got what you need."  I mean, he can look at those

25  minutes.  If Judge Kern says -- I mean, I guess in my reading

1   of this information, I don't see Judge Kern saying, "Well, I

2   agree with you completely, Mr. Keglovits, but you only have one

3   set of minutes.  If you had 15, then you would prevail -- you

4   would beat this summary judgment, but you've only got one."  I

5   don't see that happening.

6           **MR. KEGLOVITS:**  Well, if I was confident that Judge

7   Kern would say I would win based on this, I wouldn't ask you

8   for this.  It's the conundrum you're always in in discovery

9   when you get a little bit from the defendant that opens the

10  window into the world that you imagine has a lot more there.

11  Oftentimes the court will say, "Well, don't you have enough,"

12  and until the end of the fight you don't know.

13          **THE COURT:**  Yeah.  Well, and that's what we're trying

14  to do here.  So I think --

15          **MR. O'CONNOR:**  Your Honor, may I say something here?

16          **THE COURT:**  Go ahead.

17          **MR. O'CONNOR:**  One of the problems we're having is we

18  haven't turned to Rule 56(d) or the Manual on Complex

19  Litigation, both of which would require some specificity in the

20  form of an affidavit from somebody beyond just conclusory

21  assertions or advocacy from a lawyer.  I mean, I've just

22  listened patiently to what he's saying about a phone call that

23  occurred with the FDA.  A phone call occurred.  That phone call

24  was documented.

25          **THE COURT:**  Right.

In Re:  Genentech Herceptin (11-17-2016 Motion Hearing) (REDACTED)       32

1          **MR. O'CONNOR:**  There's no action since then.  In fact,

2    there's been action by the FDA that's completely contrary to

3    this, and so we have an expert who was the division director

4    from the FDA that --

5          **THE COURT:**  Right.  I understand that, Mr. O'Connor.

6          **MR. O'CONNOR:**  So if there is an expert, --

7          **THE COURT:**  Well, but --

8          **MR. O'CONNOR:**  -- somebody that would say, "We need

9    this to respond," because what I'm hearing over here is

10   completely nonsense in the regulatory scheme and doesn't --

11   certainly doesn't counter what Dr. Lin, who is the expert on

12   this issue, has professed, that it's proper to have 440, that

13   that is properly labeled as meaning XXXXXXXXXXXXXXXX that the

14   manufacturing processes to change would require approval, that

15   the label change would require FDA approval.  But instead, I

16   just hear a lawyer over here saying, "Hey, you can do this

17   under this reg," without any approval --

18         **THE COURT:**  Well, --

19         **MR. O'CONNOR:**  -- and that's contrary to the very --

20         **THE COURT:**  -- but Mr. O'Connor, I mean, he has a

21   document that indicates under a -- and I'm not saying I agree

22   with his argument -- but under at least a good faith argument

23   that might assist him in avoiding your summary judgment motion.

24   And I understand what you're saying, and we struggle with these

25   issues all the time in these large cases, and, that is, you

1  know, how piecemeal do you pursue the litigation?

2     I mean, certainly, you know, I could require Mr. Keglovits

3  to go out and obtain an expert that rebuts the things that your

4  expert says and then lists all the factual material that expert

5  would need, and then we could pursue discovery that way, but

6  that's not typically how we do it, and I'm trying to reach, you

7  know, a balance here between a very far-reaching search and one

8  that hopefully will be designed to obtain the sort of

9  information that I think Mr. Keglovits has laid out a good

10  faith basis that it's actually relevant, and I think I have

11  probably reached the right balance here because Mr. Keglovits

12  is clearly unhappy with my decision, and Mr. O'Connor, you

13  clearly are unhappy as well, so I'm probably right where I

14  ought to be.

15     So you all --

16        **MR. O'CONNOR:**  I just didn't want you to -- I didn't

17  want you to make these decisions based on what counsel is

18  advocating versus what's real, because what they -- I mean, I

19  could go into a list of 10 things they haven't shared with you.

20  They haven't shared that Genentech proposed some language to

21  the FDA.  They haven't shared that the FDA hasn't done

22  anything, has taken no action in two years.  They didn't share

23  even any part of Genentech's detailed response.  They didn't

24  share that the guidance itself says that this is just suggested

25  or recommended, it's not required.  They didn't share in the

1   very letter approving the drug that the FDA says, "Any changes

2   in the manufacture, packaging or labeling of the product or in

3   the manufacturing facilities will require the submission of

4   information to your biologic's license application for our

5   review and written approval consistent with 21 CFR 601.12."

6       So, I just don't want to start going down a path here where

7   we think it's -- you know, they've said in their papers, one,

8   that this issue is fatal to our preemption defense.  They've

9   said that they have many -- in another part of their response

10  they say this is one of many -- of numerous reasons which will

11  be shown to overcome summary judgment.  I mean, we have

12  produced what relates to what he finally disclosed as what they

13  want.  They finally told us, "Here's what we want.  Either put

14  at least 440 milligrams of the drug in each vial or change the

15  labeling."  You can't do either one of those without FDA

16  approval.  End of claims.  Now they want us to go -- they want

17  to talk about what maybe should have been warranted instead of

18  what's warranted.  They want to talk -- a lawyer wants to tell

19  what the FDA requires or doesn't require.

20      All we're asking for is if they're ready to oppose the

21  motion, let's set a date and do it.  If they want to take some

22  depositions, let's take the depositions.  If they have an

23  expert that wants to sign an affidavit and says, "We need this

24  to respond," then I think it would bring more clarity to where

25  this discovery goes, because there doesn't seem to be any end

1   to what the plaintiffs want.  There's never -- and I'm not

2   looking for a pat on the back of what's been done, but the

3   resources committed thus far have been significant in the

4   gathering, the collection, the review, and then the

5   identification of what might be out there from other sources as

6   Your Honor had asked us to do.

7      So I just didn't -- I think if we're going to just accept

8   conclusory assertions of a lawyer, then I don't think -- I

9   don't think we're ever going to conclude this preemption

10  discovery that Judge Kern had contemplated when he -- when back

11  in June he ordered the initial preemption discovery.

12     And, Your Honor, they've had our disclosed expert since

13  June 30th.  We've served the declarations early, as Judge Kern

14  had wanted, on August 9.  Two weeks later we filed the summary

15  judgment.  So now, after two months of silence since the joint

16  submission was submitted, we just get these global, broad,

17  "Give us all the communications you have with the FDA, give

18  us --" I mean, these requests couldn't be framed any broader,

19  and --

20         THE COURT:  Yeah.  I mean, it occurs to me, you know,

21  that one thing I could do, and I'm really half joking here, but

22  one thing I could do is say, "Okay, look, just respond fully to

23  every one of their requests," and then what you just said I

24  think would be appropriate.  But that's not what I've done.

25  I've limited them so far on the correspondence for the FDA to

 1  the issues involved in this specific case and I've told you all

 2  to get together and make sure that you take into account

 3  proportionality when you do that.  I think in my discussion

 4  with Mr. Egli, I've been very clear that, you know, you need to

 5  find out how difficult this information is going to be to get.

 6  It sounds to me like in my discussion with him that there's

 7  going to be a way to limit it such that it's not overly

 8  burdensome on your client.  And believe me, Mr. O'Connor, I

 9  appreciate your thoughts and your concerns.  I've been on both

10  sides of this issue before before I took the bench, so I

11  understand.

12       One comment -- I mean, I think I've said this, you know,

13  over and over again, and I do appreciate all the work Genentech

14  has done, but I think I said at the outset of all this not to

15  go gathering documents, but to just find out what it would take

16  to gather the documents.  And it appears to me, and I'll assume

17  in an effort to be very cooperative you've actually gone and

18  gathered documents, but that's not something I directed you to

19  do.  And so to the extent that you've incurred expenses doing

20  that, that was, in large part, your own decision.  Now, it

21  probably will turn out that maybe that was all necessary

22  anyway.

23       But I understand your concerns, Mr. O'Connor.  I'm trying

24  to take them into account and that's why I'm focusing on this

25  proportionality.  And again, you know, I'll say it again,

1  clearly Mr. Keglovits wants more than I'm giving him, and you

2  all think -- believe he ought to get a lot less, and so, as I

3  said in many ways, that tells me I'm probably in the right

4  spot.  So that's how we're going to handle the correspondence

5  with the FDA on the labeling issue.  And we can walk through

6  the specific discovery requests later and see which ones that

7  impacts, but I'm certain it narrows a number of them.  It

8  really wasn't my goal to get into the labeling issue then, but

9  we took care of it.

10     All right.  Let's go ahead and talk about the broader

11 labeling issue, and that relates, I believe, to the obstacle

12 preemption.  And as I said at the beginning, my understanding

13 was that -- I guess before I go on, let me make sure,

14 Ms. Griffin, are you able to hear everyone now?

15         **MS. GRIFFIN:**  Yes, we can hear.  Tara Tabatabaie

16 is on the phone, as well.  But thank you for speaking into the

17 mic, counsel.

18         **THE COURT:**  All right.  Well, I'm glad you said

19 Ms. Tabatabaie -- did I say that right, the name -- because I

20 was not going to get it right.

21         **MS. TABATABAIE:**  You got very close.

22         **THE COURT:**  Okay.  So you all can hear.  Good.

23     All right.  So plaintiffs' discovery, the first area is the

24 availability of labeling changes including discovery of

25 information putting Genentech on notice of the fact that such

 1   changes were necessary.

 2       In terms of the information that I have just indicated is

 3   to be produced in discovery, Mr. Keglovits, what else do you

 4   think you would need?  Is there anything else that would not be

 5   included?

 6           **MR. KEGLOVITS:**  Well, are you asking for me to point

 7   to our specific discovery requests?

 8           **THE COURT:**  Well, I mean, my intent is to walk through

 9   those later and then you all can tell me we've addressed it or

10   we haven't addressed it.

11           **MR. KEGLOVITS:**  Okay.

12           **THE COURT:**  But I'm talking on this broader issue of

13   the availability of labeling changes, including discovery.  I

14   mean, what are the factual underpinnings of that sort of

15   category of documents?

16           **MR. KEGLOVITS:**  Right.  Well, I think there are two

17   other areas that we haven't talked about that will be important

18   to the labeling, and one of these area will overlay with

19   manufacturing, too.  The first is the internal Genentech

20   e-mails and communications.  As I mentioned before, we have

21   zero Genentech-to-Genentech employee e-mails.  Whether those

22   deal with labeling or the myriad of manufacturing issues, we

23   absolutely feel like we need to get into that.

24       And then the other area is going to include the customer or

25   third-party communications that come to Genentech and the way

1   they formulate responses to them.  As just a small example, you

2   know, there was a letter written to the New England Journal of

3   Medicine about this issue, about the fact that you were not

4   getting what was warranted you were going to get, and that's,

5   of course, my characterization of the article, and I've got

6   it -- or the note -- if you'd like to see it.

7       Genentech formulated a response and wrote a letter to the

8   New England Journal of Medicine about that.  Well, surely that

9   was more than someone who just typed it off the cuff and sent

10  it off.  I bet there was a group that worked on it, that

11  researched it.  We want to know all about that stuff.  And we

12  can also show you e-mails we have collected outside of the

13  formal discovery where oncology practices are contacting

14  Genentech and are being told, "This is a person who will

15  respond to you," or "I can't respond to that; it's been routed

16  to a different department in Genentech and they're going to

17  respond to you."  So, there was a process within Genentech that

18  was created to deal with customers, distributors, whoever it

19  is, saying, "We're getting shorted on the Herceptin.  We don't

20  understand why."  And so we think that has to do with labeling,

21  newly acquired information, and better information on the

22  label, and we need that; we don't have those customer

23  complaints or inquiries at all from Genentech.  We fortunately

24  have been able to get a few of them from sources, as I say,

25  outside of Genentech.  So those are the two principal areas

 1   with respect to labeling.

 2          **THE COURT:**  All right.  And then in your -- the joint

 3   submission, I think, in the reply near -- I'm trying to

 4   remember what issue it was under but I think it was near the

 5   end, you seem to -- well, you may this argument based on

 6   *Trayhan vs. Sandoz*, that you aren't arguing fraud on the FDA,

 7   in other words, that Genentech essentially fooled the FDA into

 8   approving a label that shouldn't have been approved, but you're

 9   saying that your position is that they should have requested a

10   better label in the first place, essentially.  I mean, have I

11   summarized that correctly?

12          **MR. KEGLOVITS:**  That portion dealing with the claim

13   that we keep hearing that somehow we're bringing a fraud on the

14   FDA claim, yeah.

15          **THE COURT:**  Okay.  So I want to talk about two things.

16   First, on the labeling discovery, how is -- beyond what I've

17   already addressed, how is this other labeling information

18   directly responsive factually to the defendants' summary

19   judgment motion?

20          **MR. KEGLOVITS:**  Meaning the internal discussions about

21   the --

22          **THE COURT:**  Right.

23          **MR. KEGLOVITS:**  -- label?  I think the third-party

24   complaints and the internal discussions with respect to just

25   this labeling issue really goes to what we're trying to

1  accomplish on impossibility.

2          **THE COURT:**  Okay.  So you're back to -- okay.  So your

3  position is all this labeling stuff goes to the idea that it's

4  not impossible because they could have changed the label.  But

5  I thought the linchpin or sort of the cog in the wheel there

6  was that if the FDA said to change it, then they could change

7  it.  Are you also arguing that -- I mean, you think there might

8  be some internal correspondence that indicates that Genentech,

9  notwithstanding what the FDA said to them, could believe they

10  could change it and therefore they could change it even if the

11  FDA didn't ask them to?  I mean, what's the --

12          **MR. KEGLOVITS:**  Within the regulatory structure, there

13  are these types of changes enumerated in the CFR that Genentech

14  is allowed to make independent of approval from the FDA and

15  they're divided into two groups.  One is those that require a

16  CBE, a simultaneous report that we have changed the label, and

17  the other is you don't even have to do a simultaneous report,

18  you can do an annual report at the end of the year just telling

19  the FDA what you've changed.

20      And, again, part of the linchpin to the CBE stuff is newly

21  acquired information.  And if there is a belief that changing

22  the label adds or strengthens an instruction about dosage and

23  administration, then you can make that CBE type of change.  So

24  that's a separate exception from the one we're talking about --

25  we talked about earlier about the FDA requesting you make the

 1   change.  This is a separate one that you can make independent

 2   of the FDA.

 3       And then on the annual report, I mean, you can make a

 4   change if you believe it's simply editorial or a minor change.

 5   So if you wanted to say it's not 21 is the concentration but

 6   it's some different fraction that's actually being

 7   reconstituted, and you believe that that's an editorial or

 8   minor change, someone writes that within Genentech, that's a

 9   pretty important piece on the labeling because that's going to

10   push us right into an exception that would allow them to do it

11   independently and destroy impossibility.

12           **THE COURT:**  And, Ms. Donahue, your argument is that,

13   look, it doesn't matter what -- it does not matter if they get

14   an e-mail from a Genentech scientist saying we could do this,

15   it's okay for us to do it or somebody in the regulatory

16   department saying, "We can do this, we can make this change, we

17   don't have to seek FDA approval, this is not a problem and we

18   ought to just do it."  I mean, let's say that smoking gun is

19   out there for purposes of this argument.  Your position on

20   summary judgment is it doesn't matter; am I right about that?

21           **MS. DONAHUE:**  Our position is, yes, under the approval

22   letter and the regulation, that the regulation that does apply

23   in this case, and it's not the CBE portion of the regulation,

24   it's the portion that requires prior approval as borne out by

25   the 2014 submission that they keep talking about.  We have to

 1   submit proposed changes for approval to the FDA.  That's what

 2   that document shows.

 3            **THE COURT:**  Okay.  Right, right, but let me --

 4            **MS. DONAHUE:**  So let me just finish.  Sorry.  I'm

 5   sorry.  I'll get to your point.  So my point would be that, two

 6   things.  Number one, complaints about, "We're not getting, you

 7   know, the 440 from a customer, from anyone, or internal

 8   communications that Genentech somehow knew because it did that

 9   people were complaining about that," we've produced to them

10   certificates of analysis XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX  I mean, what they

13   want goes to notice and knowledge, and I think to the extent

14   that's an issue, which it's not under obstacle preemption, is

15   what he just said, but, you know, they have that evidence.  So

16   what more do they need?  I mean, we produced our own

17   manufacturing documents XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19            **THE COURT:**  All right.  Let me get back to -- I

20   understand what you're saying, but let me get back to my

21   question.  Okay.  So think of the worst document that could be

22   in the files that Mr. Keglovits says he's looking for, and your

23   position is, "I don't care how bad that document is, it doesn't

24   matter, this is a legal issue and we win."  I mean, am I right

25   about that?

1           **MS. DONAHUE:**  You're right about that for purposes of

2     the motion for summary judgment.

3           **THE COURT:**  Right.  Right.  Okay.  So why don't we, on

4     this issue, why don't you all -- Mr. Keglovits, I mean, I'm

5     certain that you can, you've sort of done it here, that you can

6     come up with the factual -- the facts that you believe the

7     discovery you're seeking might show.  I mean, am I right about

8     that?  I mean, you know -- you know what you're looking for.

9     You know -- I would imagine if I asked you now and I gave you a

10    little bit of time, you could say, "Okay, the golden egg, the

11    smoking gun, the best we could hope for through this would be a

12    document that says X."  What I hear Ms. Donahue saying is, "I

13    don't care.  You can get 500 of those documents and we still

14    win on the preemption argument."

15          So why don't you come up with a factual statement that

16    Ms. Donahue can say, "We don't agree with this at all, but for

17    purposes of ruling on our summary judgment motion we'll agree

18    that there may be documents out there that say this.  Judge

19    Kern, make your decision."  And if Judge Kern rules in their

20    favor, then it doesn't matter what you would have found.  And

21    if he rules against them and says, "No, if there are documents

22    out there that say this, then summary judgment on the

23    preemption issue would not be appropriate," and then you all

24    can -- I mean, the risk for Genentech on this, but I'm kind of

25    asking that you put your money where your mouth is, is at that

 1    point you would then have to proceed with merits discovery and

 2    the documentation that they're asking for may not even exist,

 3    and if you had allowed them to look, they might not have ever

 4    found it and so you would have resolved that whole issue, you

 5    know, right now.  I mean, do you follow what I'm saying?

 6            **MS. DONAHUE:**  No.  I do need you to repeat that.

 7            **THE COURT:**  Okay.  So if you agree to submit to Judge

 8    Kern on this issue, or any number of these issues, essentially

 9    it's not a stipulation that you're agreeing this information is

10    out there but essentially saying, "Look, our position is even

11    if the documents that Mr. Keglovits hopes to find exist, even

12    if they say A, B, C, D, which is what he is hoping they will

13    say, we still win.  This case is over, it's preempted, we're

14    done."  So, to avoid a lot of this discovery, certainly on this

15    issue, Mr. Keglovits says, "Okay, these are the facts we are

16    thinking we will find out there," and you say, "Fine, we'll

17    agree that those facts -- that those facts might be out there

18    but we win anyway," -- don't let me interrupt you two.

19            **MS. DONAHUE:**  I'm sorry.

20            **THE COURT:**  Okay.  "So we believe that we win anyway

21    even if those facts are out there."  And then Judge Kern, in

22    ruling on that, says one of two things, either, one, "Yeah,

23    Ms. Donahue, I agree with you; even if Mr. Keglovits finds

24    these documents, the claim is preempted, we're done."  I mean,

25    Mr. Keglovits, the case is over then and you haven't had to go

 1   through all this discovery, you haven't spent all that money,

 2   and you've avoided a big hassle.

 3        But if Judge Kern says, "No, wait.  If there are documents

 4   out there that say what Mr. Keglovits says he thinks he's going

 5   to find, then either, one, it's not preempted, or, two, I'm

 6   going to have to take some other issues under consideration."

 7   If he does that, well then in my view you roll into discovery

 8   on the merits and you're just going to have to address that

 9   issue at some point later on down the road.  I don't think

10   Judge Kern is going to agree to a bifurcated summary judgment

11   process by which we submit this issue and then we engage in

12   preemption discovery and then we engage in merits discovery.

13        And so what I'm saying is if you're certain you're right

14   about that, why not agree to go forward on, for purposes of

15   preemption only, a stipulated set of facts that says, "We don't

16   believe this stuff is out here, but even if it is we win, and

17   if we don't win on that, well, then, we're going on to merits

18   discovery and at some point down the road we'll file another

19   summary judgment motion that will include preemption in there

20   because we don't think they're going to find any of these

21   documents."  What I'm saying to you is that's a way to avoid a

22   lot of this discovery right now, but what you could find out

23   later on is, "Well, if we had only let them pursue this

24   discovery, you know, prior to the preemption issue, well then

25   we would have avoided all the merits discovery."  I mean, does

1  that make sense?

2          **MS. DONAHUE:**  Okay.  I think I understand what you're

3  saying now.  So just to kind of be a little more specific, from

4  a legal perspective on the obstacle preemption issue, our

5  position is is that internal communications about potential

6  labeling changes doesn't change the fact that the FDA approves

7  the label as is and has been in effect for 20 years and,

8  therefore, we win on obstacle preemption.  That's our legal

9  position on that issue.  So -- and I would agree that therefore

10  that's why our position is that they're not entitled and

11  shouldn't be entitled to discovery because --

12          **THE COURT:**  "Because it doesn't matter what they

13  find," --

14          **MS. DONAHUE:**  Yes.

15          **THE COURT:**  -- "we win anyway."

16          **MS. DONAHUE:**  However, when you phrase it as and then

17  you're rolling the dice and taking a risk because if I don't

18  allow them this discovery, this and this could happen, I mean,

19  if that's how -- if you're going to couch your ruling on

20  something like that, I would have to go talk to my client

21  because --

22          **THE COURT:**  Yeah.

23          **MS. DONAHUE:**  -- they're going to have to make the

24  decision.

25          **THE COURT:**  Well, and here's what I'm thinking.  I

1  think ultimately I probably have the authority just to do this,

2  because I think Judge Kern would probably -- I think he would

3  probably go along with it -- you know, Genentech is saying, "We

4  don't need anymore discovery, we have everything we need, and

5  no matter what the plaintiffs find, we still win.  I mean, come

6  up with your best set of documents, create them out of thin

7  air, and we agree you're going to find those in spades with our

8  company and we still win."  I mean, that's essentially what

9  Genentech is saying.  Because if you're not saying that, then I

10  think you have to knowledge that their discovery is relevant.

11  "So, come up with those documents, you find them, we still

12  win."

13      So, why not, rather than engage in, you know, a million,

14  two million dollars worth of discovery here, why not have

15  Mr. Keglovits say, "Factually, this is exactly what we believe

16  we're going to find, and, in fact, we already have some of

17  it," --

18          **MR. KEGLOVITS:**  And --

19          **THE COURT:**  -- and then go to Judge Kern in your

20  response and say, "Judge Kern, they've agreed that for purposes

21  of this motion alone this stuff may be out there, or maybe even

22  is out there, but they win anyway, but for purposes of the rest

23  of the case, they're in total disagreement that this stuff

24  exists."  And so the plaintiffs' position is, "If this stuff is

25  out there, we avoid summary judgment."

1        **MR. KEGLOVITS:**  That sounds wonderful in theory, and

2   certainly we would be willing to try to work on the stipulation

3   that would be satisfactory to us.  I have to wonder, though, if

4   Genentech really believes this motion involves only legal

5   issues.  If so, why are there two declarations attached to the

6   motion that contained a group of factual statements?

7        **THE COURT:**  Yeah.  I mean, I think --

8        **MR. KEGLOVITS:**  They would have to withdraw those.

9        **THE COURT:**  Well, I mean, I hadn't thought all the way

10  through that issue.  I'm not certain I agree with that.  I

11  mean, we haven't talked about the manufacturing issue yet, and

12  that is an issue that I think is -- that I just think is

13  fraught with factual issues.  But it just seems to me -- I

14  mean, what I keep hearing from Genentech is, "This is a big

15  waste of time.  It doesn't matter what they find.  We've given

16  them everything they need, it doesn't matter what they find,

17  we're still going to win on preemption."

18      And what I hear Mr. Keglovits saying is, "Look, we've

19  already got these documents and we need to do this additional

20  discovery because they've made a bunch of factual allegations

21  in the summary judgment motion," and this, I believe, was

22  Genentech's request to Judge Kern to deal with the preemption

23  issue first.

24      So, I mean, what's the harm in -- I mean, I guess,

25  Ms. Donahue, Mr. O'Connor, why am I not giving you everything

1  you want if, rather than doing any of this discovery, you sit

2  down with Mr. Keglovits and he says, "Here are the facts I

3  believe I can show if I get the discovery," and you all then

4  agree, "Okay, for purposes of this motion, we'll agree you're

5  going to find those facts, only for purposes of this motion.

6  We're not agreeing that they're actually out there but we'll

7  agree Judge Kern can assume that you might find -- that you'd

8  find information that would support these factual allegations."

9  And if you're right on your arguments, then Judge Kern is going

10 to look at those factual stipulations -- or I don't even like

11 to call them stipulations because they're only for purposes of

12 this motion -- but he's going to look at that list and say,

13 "That doesn't matter, Genentech, you win anyway, and so we're

14 done."

15         **MS. DONAHUE:**  So, two things, I think.  First, I would

16 want to see the factual list before agreeing to that.  And,

17 number two, I guess that would also assume that they are not

18 going to introduce a declaration from an expert saying, "If I

19 had this and this and this, I could respond to your

20 motion."  Because if it's a legal issue, it's a legal issue;

21 right?  I mean, our regulatory expert is interpreting the regs

22 for the court.  That's not raising a factual issue.  But I'm

23 just concerned about agreeing to -- you know, first of all, we

24 don't think there are additional documents out there, so we

25 don't want to go on record saying that, assuming there are.

1   But, number two, I really think in order to reach that

2   agreement without seeing the facts that you're talking about

3   would be doing something in a vacuum.

4          **THE COURT:**  Well, I wouldn't ask anybody to do that

5   today.  I mean, it seems to me Mr. Keglovits would have to

6   consult with whatever experts he's been talking to and come up

7   with a list of -- and it seems to me it would also, if we can't

8   reach an agreement, really narrow the issues on the discovery

9   --

10          **MS. DONAHUE:**  So --

11          **THE COURT:**  -- because Mr. Keglovits would be saying,

12   "These are the facts that I believe either we need to show or

13   we'll be able to show if we get more discovery."

14          **MS. DONAHUE:**  I think that's an expeditious way to

15   handle the obstacle preemption issue, I really do, if we can,

16   because you've got it right.  If it's purely a legal issue and

17   if they think that there's factual stuff that would help them

18   overcome that legal issue, tell us what it is and then we'll

19   decide if more discovery -- if we're amenable to more discovery

20   or if we have to battle it all out.  But at this point, as

21   Mr. O'Connor kind of said, you know, we're kind of operating in

22   a vacuum in terms of why they specifically need a whole bunch

23   of stuff that goes to what we believe to be a legal issue.

24          **THE COURT:**  Okay.  So on the obstacle preemption

25   issue, Mr. Keglovits, why don't we -- why wouldn't we want to

1   pursue it that way?

2        **MR. KEGLOVITS:**  So -- and I'm just thinking out loud

3   here -- the reg gives them coverage for reasonable variation in

4   net weight if those are due to good distribution practice or by

5   unavoidable deviations in good manufacturing practice, that's

6   the reg that they hang their hat on.  So we're talking about

7   stipulating that these variations are not due to good

8   distribution practice or unavoidable deviations?

9        **THE COURT:**  No.  What I'm thinking is come up with a

10  list of factual statement, if you will, maybe something that --

11  well, with a factual statement, you know, "Here are the facts

12  that we are trying to establish to beat your obstacle

13  preemption defense, and we believe there are going to be

14  documents that help us establish this," and then present that

15  to Ms. Donahue and Mr. O'Connor.  And if they're all factual

16  statements, I don't think it's stipulating that, you know, with

17  respect to a reg; it's purely factual issues, because that's

18  what we're talking about here in discovery.  Then they're going

19  to have to look at that and say either, one, "Yeah, even if you

20  establish all those facts, we still win on the obstacle

21  preemption."  And if the response is, "No, you know what, we

22  can't agree that if you establish that fact we still win, and

23  then we've got to have discovery on that issue."

24       But Mr. O'Connor and Ms. Donahue appear very confident that

25  on the obstacle preemption issue, "This is purely a legal

1   issue, it doesn't matter what you find factually, we still win

2   on this."  And so then if they look at that list of facts and

3   say, "Fine, even if we assume you can establish those facts, we

4   still prevail on obstacle preemption, that's the nature of the

5   agreement."  It's not -- they're not agreeing that you can't

6   establish those facts or that there are even any documents out

7   there that address those facts.  But it's simply, "Even if you

8   can establish those, we win anyway."  And then we avoid all

9   discovery on the obstacle preemption and then all we've got to

10  do is talk about the impossibility defense.

11          **MR. KEGLOVITS:**  Yeah, I mean it sounds wonderful from

12  our perspective, the plaintiffs' perspective, in theory.  I

13  just think we should put a very short window on this because

14  I'm not optimistic we're going to be able to get them, for

15  example, to stipulate that this is a liquid drug, not a solid

16  drug.

17          **THE COURT:**  Okay.  Well, -- okay.  Again, it's not a

18  stipulation.  It's --

19          **MR. KEGLOVITS:**  Yeah.

20          **THE COURT:**  It's if -- I mean, there's an example, if

21  one of the things you think is going to help you avoid the

22  obstacle preemption defense is factual proof that it is a

23  liquid drug or a solid drug, if that's one of the factual

24  issues you think would help you, then Ms. Donahue and

25  Mr. O'Connor should be able to say, "Fine, we don't care.

1   Judge Kern can agree that you're going to be able to establish

2   that and we still win on the obstacle preemption," and then

3   move on to the next one.  And if you hit a fact that really is

4   a fact, and Ms. Donahue and Mr. O'Connor are saying, "No, we

5   can't agree to that one," it seems to me we've now hit upon an

6   issue upon which everybody has to agree discovery has got to be

7   conducted.  I mean, that's my thinking, and I wouldn't think it

8   would be a long -- I mean, I'm talking about you guys ought to

9   get together next week and figure this out.

10          **MR. KEGLOVITS:**  Uh-huh.

11          **THE COURT:**  Now, on the impossibility preemption, we

12   have addressed the correspondence with the FDA.  I mean, I

13   guess one of my thoughts on this issue is -- and, Ms. Donahue,

14   I guess I ought to hear from you on this.  Looking through the

15   summary judgment argument, and I've actually highlighted it, I

16   could run through them all with you here but that probably

17   won't be necessary, but in looking through your summary

18   judgment motion and your affidavits, there are a lot of

19   allegations about what can and cannot be done in the

20   manufacturing process, and those to me seem to be factual

21   issues.

22      In other words, in the manufacturing process that Genentech

23   uses and has used, is it a correct statement that in order to

24   make sure you get at least 400 milligrams, you're going to have

25   to bump up the upper level?  I mean, that's a factual issue,

 1  which means that the plaintiffs are going to need to delve into

 2  in probably quite a bit of detail the manufacturing process.

 3      So, one thing that occurs to me is that if you all are able

 4  to reach an agreement on how we proceed on the obstacle

 5  preemption, understanding that there's going to be a lot of

 6  discovery on the impossibility preemption issue, why not

 7  present the obstacle preemption issue to Judge Kern, and then

 8  if you don't prevail on that, then we just proceed with

 9  discovery on both the merits and the impossibility preemption

10  because it's going to be a lot of discovery anyway.

11          **MS. DONAHUE:**  Short of conferring with my client, that

12  sounds like a good idea.

13          **THE COURT:**  Mr. Keglovits?

14          **MR. KEGLOVITS:**  Well, I want to talk to my colleagues.

15  But I'll be honest with you, we embarked on this -- and there I

16  did it, I said I'll be honest with you --

17          **THE COURT:**  I actually -- I know, Ms. Donahue, I gave

18  you a hard time about that, but I actually said that in a

19  hearing last week, and I caught myself, and so I was giving you

20  a hard time.

21          **MS. DONAHUE:**  Thank you.

22          **MR. KEGLOVITS:**  I'll be completely candid with you --

23          **THE COURT:**  Okay.

24          **MR. KEGLOVITS:**  -- and not hold anything back.  We

25  started down this road in early June thinking that it would end

 1    quickly, and the process now has, as you're describing, now

 2    even pushes us further out, and so --

 3          THE COURT:  See, I don't think it does.  I actually

 4    think it gets you there quicker, because if we -- if I give you

 5    the discovery that you're asking for on the impossibility

 6    defense, and it's going to be quite a bit of discovery, you go

 7    through that process, then you file your response to the

 8    summary judgment motion, which I can't imagine will be within

 9    90 days, I mean maybe, but I can't imagine that you're going to

10    get through this that quickly, and then Judge Kern rules, and

11    then if you win, if you avoid the summary judgment, then we go

12    to merits discovery, and I know you guys are going to agree on

13    everything once we get to the merits, and so, you know, we're

14    way out there before we ever get to merits.

15        If you do it this way, you get -- it's sort of -- it's a

16    nice compromise because you get the obstacle preemption issue

17    decided, and if Judge Kern does not rule in favor -- if Judge

18    Kern rules in favor of Genentech, the case is over anyway.  And

19    if he doesn't, then you engage on full discovery, impossibility

20    defense and the merits.

21          MR. KEGLOVITS:  Okay.

22          THE COURT:  And so to me that gets you down the road a

23    lot more quickly than you would be otherwise.

24          MR. KEGLOVITS:  I misunderstood.  I thought we were

25    going to do obstacle and then --

1              THE COURT:  No.

2              MR. KEGLOVITS:  -- if we win on that then we have to

3    go to impossibility.

4              THE COURT:  No.

5              MR. KEGLOVITS:  Okay.  Well, if you would, just give

6    us a moment, as they confer with their client, to think about

7    it internally and see if that's acceptable to us.

8              THE COURT:  Yeah.  I mean, do you guys want to talk

9    about it, take a break and talk about it now, or do you want to

10   go back and talk to your client?  I mean, what do you want to

11   do?

12             MS. DONAHUE:  I think I probably need a day.

13             THE COURT:  Okay.  So --

14             MR. KEGLOVITS:  A day is fine, yeah.

15             THE COURT:  Okay.  All right.  Then let's -- okay.

16   It's Thursday.  What's our schedule Monday?

17      (A DISCUSSION WAS HAD OFF THE RECORD, AFTER WHICH THE

18   FOLLOWING PROCEEDINGS WERE HAD:)

19             MS. DONAHUE:  We could do it tomorrow, Your Honor, if

20   that's helpful.

21             THE COURT:  I'm thinking about doing it by phone.  So,

22   Mr. Keglovits, would tomorrow work?

23             MR. KEGLOVITS:  Let me get my calendar to work here.

24   And I hate to impose, but if we could just do it outside of the

25   2 to 3 window, when I've got another obligation, tomorrow would

1  work for me.

2          **THE COURT:**  How about if we do it at -- I mean, would

3  4 o'clock tomorrow work?  Is that too late?

4          **MS. DONAHUE:**  I just have to check my flight schedule.

5  I'm sorry.

6          **THE COURT:**  Yeah, take a look.

7     What you're hearing is me trying to avoid the black robe

8  syndrome.  I ask Camie, "When should we do this," and her

9  response is always, "Whenever you want to do it."  And so then

10  we argue about whether that ought to be her response.

11          **MS. DONAHUE:**  I'm sorry.  What time are you saying?

12          **THE COURT:**  At 4 tomorrow.

13          **MS. DONAHUE:**  I'm on a flight.

14          **THE COURT:**  Okay.  What are your flights?

15          **MS. DONAHUE:**  So my flight leaves here at 11.

16          **THE COURT:**  Does it give you a long enough time if we

17  do it late morning?

18          **MS. DONAHUE:**  I can call this afternoon, I'm sure.

19          **THE COURT:**  Okay.

20     (A DISCUSSION WAS HAD OFF THE RECORD, AFTER WHICH THE

21  FOLLOWING PROCEEDINGS WERE HAD:)

22          **THE COURT:**  Why don't we do it at 10:30 tomorrow

23  morning?  Does that give everybody enough time?  Okay.

24          **MR. O'CONNOR:**  You leave at 11?

25          **MS. DONAHUE:**  Yeah.  Well, I'll be in the airport, if

```
 1   you don't mind airports.
 2           THE COURT:  I'm fine, as long as you're okay with
 3   that.
 4           MS. DONAHUE:  It will be a quick call.  I mean, it's
 5   just a yea or nay.
 6           THE COURT:  Yeah.  All right.  Just, you know, so
 7   everything is transparent, I'm going to talk to Judge Kern
 8   about this.  I think he'll be fine with it.  So you'll know,
 9   the risk you always run, he may just say, "I like that and
10   that's how we're going to do it."  But I think he'll probably
11   take your input, as will I, tomorrow.  So, tomorrow morning,
12   10:30.  Can somebody set up a call-in number?  That might be
13   the best way to do it.
14           MR. O'CONNOR:  We can.
15           MS. DONAHUE:  We can do that.
16           THE COURT:  Okay.  I guess Mr. O'Connor will set up a
17   call-in number and so then we'll talk tomorrow morning at
18   10:30.
19           MR. KEGLOVITS:  And, Your Honor, if we happen to talk
20   between then and now and agree on it, should we just call you
21   and let you know that --
22           THE COURT:  All right.  That would be great.  That
23   would be great.
24           MR. KEGLOVITS:  -- to save you the trouble of --
25           THE COURT:  Yeah.
```

1          **MR. KEGLOVITS:**  -- of everybody getting together?

2          **THE COURT:**  That would be great.  And then if you do

3    that, then call with a deadline for you all to get back to me

4    on the factual -- the agreement -- kind of the basis of the

5    agreement that would allow you to go forward on the obstacle

6    preemption.

7          **MR. KEGLOVITS:**  Okay.

8          **THE COURT:**  And then we would just enter a minute

9    order.

10         **MR. KEGLOVITS:**  So, to make sure I'm clear, I'm

11   supposed to say whether we'll agree to go forward on obstacle

12   only, and we are going to work on whatever -- and I'm using the

13   word "stipulation" because I don't know what the right word is,

14   but --

15         **THE COURT:**  Yeah.

16         **MR. KEGLOVITS:**  -- but I understand it's not a

17   stipulation, what set of facts we would agree to for purposes

18   of that motion --

19         **THE COURT:**  Right.

20         **MR. KEGLOVITS:**  -- to keep us from doing any

21   discovery?

22         **THE COURT:**  Right.  And the nature of Genentech's

23   agreement would simply be, "Even if they were to establish

24   this, it doesn't matter," and that's kind of a crude way of

25   saying it, but --

1           MS. DONAHUE:  However, if we say, "Well, yeah, maybe

2     we do need to do some discovery on obstacle preemption," I

3     mean, we're still operating within that, let's just go with

4     obstacle first, and then --

5           THE COURT:  I mean, if you decide you need to do that,

6     you all talk.  I mean, it's going to be -- then I'm going to

7     begin weighing how long will that take, what sort of discovery

8     is it, and does it make sense to then just go ahead and pursue

9     the impossibility, as well.

10          MS. DONAHUE:  Okay.  And then one other point that I

11    want to make sure I understand.  I would assume that for Judge

12    Kern, if they provide an expert declaration that said, "If I

13    only had this and this and this, had been able to assess it,

14    not necessarily whether it proves one thing or another, I would

15    have been able to" -- I mean, I'm just a little worried that

16    there's -- you know, that would be something that we would be

17    entitled to I think under Rule 56, you know, in order for us to

18    respond to that.  So I'm just a little nervous about that, if

19    these factual issues --

20          THE COURT:  If you all -- I mean, my view is if you

21    all come to an agreement on the factual issues -- I mean, they

22    may have an expert report but that expert's going to have to

23    assume that those factual issues are established.  I mean, that

24    would be --

25          MS. DONAHUE:  Okay.

1       **THE COURT:**  -- the nature of it because you all are

2    saying --

3       **MS. DONAHUE:**  So it's not -- the expert's going to

4    have to assume the facts were established, not say, "Because I

5    didn't get a chance to look at this," whatever --

6       **THE COURT:**  Right, right.

7       **MS. DONAHUE:**  -- it might be, you know.

8       **THE COURT:**  I mean, I would think that would be the

9    nature, is Mr. Keglovits can go to his expert and say, "For

10   purposes of this motion, we're assuming that I can show these

11   facts."

12      **MS. DONAHUE:**  Okay.  That's -- yeah.

13      **THE COURT:**  I mean, and I know there's some details

14   you guys are going to have to work out, --

15      **MR. KEGLOVITS:**  It's tremendously difficult when

16   they've got an expert who is saying, "Based on the facts as I

17   learned them when I used to work at the FDA, this is a solid

18   drug, not a liquid drug."

19      **THE COURT:**  And I understand that, but I mean I really

20   view this, one, Ms. Donahue and Mr. O'Connor have made it very

21   clear on obstacle preemption, "It doesn't matter what the facts

22   are, we win."  Okay.  So that should give a lot of leeway to

23   the plaintiffs in coming up with whatever facts they want.

24      And then on the plaintiffs' side, you all -- and I'm not

25   saying you haven't done this -- in pursuing your discovery,

1   you've got to be able to articulate the facts you want to be

2   able to show, because if you're not, then how do I give you

3   discovery?  So those facts would be the ones that you would be

4   showing an expert anyway and that's what the expert would then

5   be opining on.

6       So, with that, you all get together, we'll talk tomorrow at

7   10:30, if I don't hear from you beforehand.  If you both agree

8   to go forward this way, then we'll have a short period of time

9   for you all to get together the factual issues and then I'll

10  just set another conference call to get an update on that.  If

11  you all reach an agreement, then the same thing on all of this,

12  you can contact Camie and say, "We're good."

13          **MR. KEGLOVITS:**  Okay.

14          **THE COURT:**  Okay?

15          **MS. DONAHUE:**  Good.

16      One last question.  How does this affect the original or

17  your initial order on the correspondence?

18          **THE COURT:**  No, no.  That's --

19          **MS. DONAHUE:**  Gone?

20          **THE COURT:**  If you reach an agreement on this, then

21  there won't be any further discovery until --

22          **MS. DONAHUE:**  Okay.  Thank you, Your Honor.

23          **THE COURT:**  Okay.  All right.  So, Mr. Keglovits,

24  anything else?

25          **MR. KEGLOVITS:**  No, Your Honor.

1              **THE COURT:**  Okay.  Ms. Donahue?

2         **MS. DONAHUE:**  No, Your Honor.

3         **THE COURT:**  Okay.  And I'll sign the ESI orders.

4    Thanks for your time.

5         **MS. DONAHUE:**  Thank you.

6         **MR. KEGLOVITS:**  Thank you.

7         **THE DEPUTY COURT CLERK:**  All rise.

8      (PROCEEDINGS CLOSED)

9                    **REPORTER'S CERTIFICATION**

10       WHILE NOT PRESENT IN PERSON TO STENOGRAPHICALLY REPORT THE

11   FOREGOING PROCEEDINGS, I CERTIFY THAT IT WAS TRANSCRIBED TO THE

12   BEST OF MY ABILITY FROM A DIGITAL AUDIO RECORDING.

13
                        CERTIFIED:   *s/Greg Bloxom*
14                                   Greg Bloxom, RMR, CRR
                                     United States Court Reporter
15                                   333 W. 4th Street, RM 4-548
                                     Tulsa, OK 74103
16                                   (918)699-4878
                                     greg_bloxom@oknd.uscourts.gov
17

18

19

20

21

22

23

24

25