1           UNITED STATES DISTRICT COURT FOR THE

2               NORTHERN DISTRICT OF OKLAHOMA

3

4   IN RE:  GENENTECH HERCEPTIN      )
        (TRASTUZUMAB) MARKETING AND     )  Case No. 16-MD-2700-TCK-JFJ
5   SALES PRACTICES LITIGATION.      )   ALL CASES

6

7

8

9

10

11

12           TRANSCRIPT OF RECORDED PROCEEDINGS
                    OCTOBER 10, 2017
13   BEFORE THE HONORABLE JODI F. JAYNE, MAGISTRATE JUDGE PRESIDING

14                   **SCHEDULING CONFERENCE**

15

16

17

18

19

20

21

22

23

24

25

*Greg Bloxom, RMR, CRR*
United States Court Reporter
Northern District of Oklahoma

```
 1                    A P P E A R A N C E S

 2  FOR THE PLAINTIFFS:            MR. DAVID E. KEGLOVITS
                                   MS. AMELIA FOGLEMAN
 3                                 MR. JAMES PEBSWORTH
                                   MR. ADAM C. DOVERSPIKE
 4                                 Gable & Gotwals
                                   100 W. 5th Street
 5                                 Suite 1100
                                   Tulsa, OK 74103
 6
    FOR THE DEFENDANTS:            MR. WILLIAM W. O'CONNOR
 7                                 Newton, O'Connor, Turner &
                                   Ketchum
 8                                 15 W. 6th Street
                                   Suite 2700
 9                                 Tulsa, OK 74119

10                                 MR. GABRIEL EGLI
                                   MS. REBECCA JOY SCHWARTZ
11                                 Shook, Hardy & Bacon
                                   2555 Grand Boulevard
12                                 Kansas City, MO 64108

13                                 MS. ALICIA J. DONAHUE
                                   Shook, Hardy & Bacon
14                                 One Montgomery
                                   Suite 2700
15                                 San Francisco, CA 94104

16                        **********

17

18

19

20

21

22

23

24

25
```

In Re:  Genentech Herceptin (10-10-2017 Scheduling Conference)          3

```
 1   PROCEEDINGS:
 2   --------------------------------------------------------------
 3        THE DEPUTY COURT CLERK:  This is case number 16-MD-
 4   2700-TCK-JFJ, In Re: Genentech Herceptin Marketing and Sales.
 5     Counsel, please enter your appearance for the record.
 6        MR. KEGLOVITS:  Dave Keglovits, Amy Fogleman, Adam
 7   Doverspike and Wes Pebsworth on behalf of plaintiffs.
 8        MR. O'CONNOR:  Bill O'Connor, Alicia Donahue, Gabe
 9   Egli and Becky Schwartz for Genentech.
10        THE COURT:  All right.  Before we get started today, I
11   just want to cover two quick procedural issues.  I know you all
12   are aware of both the these but I just want to be clear and put
13   it on the record.
14     Judge Kern issued, I think, five discovery orders, and he
15   took over handling all discovery issues after Judge Wilson's
16   resignation.  Going forward, obviously, we're going to be
17   operating pursuant to our normal local rules' referral of
18   discovery process.  I think it's possible, given that he's
19   entered five discovery orders, he may want to -- I mean, it's
20   possible he will withdraw some of those referrals if they
21   relate specifically to his orders, but you all should assume
22   that any discovery issues are going to be decided by me unless
23   you see something on the record.
24     The other thing is that, as I'm sure you all are aware, I
25   was -- I was Judge Kern's law clerk on this case before I
```

1  became the magistrate judge, so I am familiar with a lot of

2  these issues, I have background on these issues that a new

3  judge would not typically have.  I just wanted you to be clear

4  on that.  That doesn't mean I don't want your education, I

5  always welcome education on any issues, but when you file

6  briefs, you're not starting from the blank slate that you might

7  normally be with a new judge.

8      Are there any questions about either of those two things?

9          **MS. DONAHUE:**  No, Your Honor.

10         **THE COURT:**  Okay.  We're here today on Judge Kern's

11  referral of the issue of amending the phase I scheduling order.

12  I guess that the prior order is docket 188 and it's called Case

13  Management Order Number 2.  So we're here on the issue of

14  amending that.  Your briefs on this issue are at docket 266 and

15  267.

16      I want to conduct this hearing, I think, in three parts.

17  First, I want to hear from the plaintiff on any anticipated

18  additional requests, and I'm talking about additional

19  custodians or additional things that are going to come up.  I

20  know we have Mr. Nolden, but I want to know anything else that

21  you think I need to know could possibly impact how long we need

22  on this schedule.  And then I want to hear from each of you on

23  arguments in favor of your proposed schedules.  And then,

24  third, I want to cover the expert rebuttal affidavits issue.

25  And I'm going to take those each separately.  So, first,

1  whoever from plaintiffs, I'd like to hear from you to start.

2      My understanding from Judge Kern's September 12th order is

3  that he specified sort of a universe of custodians, and said

4  these are the people for now, and if you want anybody else,

5  there's a process that you're going to need to go through and

6  here's the process.  So, I want to know where you are on that

7  and how many more we might be expecting.

8          MR. KEGLOVITS:  Okay.  If I may start, Your Honor,

9  with welcome to the case.

10         THE COURT:  Thank you.

11         MR. KEGLOVITS:  I'm delighted you're on the bench.  I

12  know I speak for Bill and Alicia and her team, that we're

13  really glad to have you in a new capacity in the case.

14         THE COURT:  Thanks.

15         MR. KEGLOVITS:  I brought a little list of hearing

16  topics that we thought might be helpful in working through some

17  of these issues, and they include the things that you just

18  mentioned, so I can hand that up to Your Honor or just work off

19  this as my notes.

20         THE COURT:  Why don't you tell -- sure, you can hand

21  it up, but also tell me what I didn't cover that you think we

22  need to cover.

23         MR. KEGLOVITS:  Okay.

24         THE COURT:  You didn't think I was going to be ready,

25  did you, Mr. Keglovits?

1          **MR. KEGLOVITS:**  I knew you would.  As I get older, I

2    need things like this to help me remember what I'm supposed to

3    say.  And, for the record, I called Bill and Alicia yesterday

4    and we walked through these things, so I don't think --

5          **THE COURT:**  Okay.  Well, I --

6          **MR. KEGLOVITS:**  These are not submitted jointly, but

7    they do at least know the things that I'm interested in talking

8    about.

9       So, what I've got here is the phase I discovery schedule.

10   The Patheon production deadline, I think, is going to be a

11   piece of this puzzle that really I don't know was covered in

12   any of the three things that you mentioned specifically, as

13   well as the privilege claim process, --

14         **THE COURT:**  Okay.

15         **MR. KEGLOVITS:**  -- because that is starting right now.

16      As far as additional items, you are correct about the

17   custodians.  And to date, we have provided all the custodians

18   we think we will need, and Genentech has confirmed that they

19   will produce from all of those custodians.  So, as I'm standing

20   here today, I don't have any additional --

21         **THE COURT:**  Okay.

22         **MR. KEGLOVITS:**  -- custodians I intend to ask

23   Genentech to search.  As I told Alicia and Bill yesterday on

24   the call, that's always subject to the caveat that, as we get

25   additional documents, we may find someone that we never thought

1   we would see.  But as we stand here now, I don't think you're

2   going to have additional custodians to deal with.

3       There are some questions about the sources of documents

4   that are being searched, and I think that may be germane to the

5   question of how long this will all take.  If you don't mind,

6   Mr. Doverspike can deal with that and then --

7           **THE COURT:**  Let me stop you.  On the source --

8           **MR. KEGLOVITS:**  Okay.

9           **THE COURT:**  -- of the documents, is that the issue in

10  the September 19th letter from Ms. Donahue to you that sets

11  forth the databases and so you're talking about you might

12  need -- now that you have that letter, that's impacting some of

13  the scope of where you want them to look; is that correct?

14          **MR. KEGLOVITS:**  It has to do with one of the

15  databases, what they call their standard operating procedures

16  database, as well as paper documents, because we focused a lot

17  on all of the electronic places where information is stored and

18  we want to get some understanding of whether paper documents

19  are being searched, and those would be paper documents

20  obviously not included electronically in a database.

21          **THE COURT:**  Okay.  Well, then let's take those --

22  okay.  Go ahead.  Tell me about number 2 and number 3.

23          **MR. KEGLOVITS:**  Number 2 on my list is just the

24  briefing schedule, as Your Honor mentioned.  I'm not sure --

25          **THE COURT:**  Okay.

1              **MR. KEGLOVITS:**  -- if that's the number 2 you're

2      referring to.

3              **THE COURT:**  Yeah, yeah.

4              **MR. KEGLOVITS:**  Okay.  And then number 3 is a hearing

5      calendar, because as we were thinking about this, I thought it

6      would be either helpful to leave today with another date

7      scheduled on the docket so as we make progress or we don't make

8      progress we're moving toward another time to appear before Your

9      Honor, or if Your Honor would prefer to have even a more

10     regular setting like every two weeks or four weeks or whatever

11     it would be.  But the plaintiffs' preference would be to have

12     something else on the calendar when we leave today.

13             **THE COURT:**  And I am amenable to that.  Once we set

14     this schedule, my goal is going to be to keep that schedule and

15     I'm going to view it as part of my job to help you all do that

16     and I want to be available, and Camie's phone line is going to

17     be open to you.  Even if there's issues -- I was going to say

18     this at the end -- but you know local Rule 37.2(b) allows for

19     phone calls, you know, and if you don't want to have a full

20     briefing cycle because that's going to put us, you know, where

21     we can't get this decided in time, I welcome you to call Camie

22     and try to set that up.  I might say, "Listen, I can't decide

23     that on the phone, you're going" --

24             **MR. KEGLOVITS:**  Sure.

25             **THE COURT:**  -- "to have to brief it."  But I'm happy

```
 1   to try to set those up and expedite those types of things.

 2       Are you all still having your weekly meet-and-confers?

 3           MR. KEGLOVITS:  I don't know that they're weekly

 4   anymore.

 5           THE COURT:  I thought they were.

 6           MR. KEGLOVITS:  They're more as needed --

 7           THE COURT:  Okay.

 8           MR. KEGLOVITS:  -- that we've been doing them.

 9           THE COURT:  Well, you know, I'm happy to set a hearing

10   at the end of this but, you know, I would expect you all to

11   call me and cancel it if --

12           MR. KEGLOVITS:  Absolutely.

13           THE COURT:  -- there's nothing to talk about.  But

14   I'll thing about that, but I'm --

15           MR. KEGLOVITS:  Okay.

16           THE COURT:  -- very amenable to that process.

17           MR. KEGLOVITS:  So, as I mentioned, --

18           THE COURT:  Okay.

19           MR. KEGLOVITS:  -- on the additional sources, if you

20   need more detail about the database and the paper,

21   Mr. Doverspike would be the one on our team to talk about that.

22           THE COURT:  Well, let's go in order then.  Under this

23   final phase I discovery schedule, Patheon production deadline,

24   let's talk about that, and then the privilege claim process,

25   and then the sources of documents.
```

1          **MR. KEGLOVITS:**  Okay.  You'll recall that the court

2   granted the motion to compel --

3          **THE COURT:**  Yes.

4          **MR. KEGLOVITS:**  -- the production of Patheon.  K&L

5   Gates, I think, was representing Patheon.  The lawyer at K&L

6   left and joined a new firm.  I don't know whether he's entered

7   an appearance under his new firm, but he's represented to us

8   that he's going to continue his representation of Patheon.

9      He sent us an e-mail Monday, I believe, of this week saying

10  he understood the competing proposals were essentially two

11  months for us to finish discovery, or six months from

12  Genentech, and that Patheon could comply and produce within

13  either of those two schedules.  But I do think it would be

14  important to have a date certain for Patheon to complete its

15  production, because while the order compelled them to produce,

16  it didn't give them a date by which they needed to produce.

17  And so --

18          **THE COURT:**  Did he --  What's your proposal for that

19  date?

20          **MR. KEGLOVITS:**  I would like it to be short of the end

21  date on discovery so that we can use them in depositions.  You

22  know, ideally, 30 days short of the end date on discovery.

23          **THE COURT:**  Okay.  That's Judge Kern's order, but my

24  guess is that he would not mind me, you know, amending that to

25  add a deadline.  So I'll take that under advisement at the --

1          **MR. KEGLOVITS:**  Okay.

2          **THE COURT:**  –– end, as well.

3      Privilege claim process.

4          **MR. KEGLOVITS:**  Ms. Fogleman can address where we are

5   on that.

6          **THE COURT:**  Okay.

7          **MR. KEGLOVITS:**  There's not an issue present right

8   now, but it's going to be built into the time line.

9          **THE COURT:**  Okay.

10         **MS. FOGLEMAN:**  Good morning, Your Honor.

11         **THE COURT:**  Good morning.

12         **MS. FOGLEMAN:**  We're really in the beginning stages of

13  this privilege claim issue, so we wanted to go ahead and just

14  alert you to it.  We received their –– first, a little

15  background.

16      The ESI protocol in this case allows 60 days for production

17  of a privilege log from the date of the production of

18  documents.  So, this current dispute –– or we received our

19  first privilege log from them, and it was timely, on September

20  26th, and it dealt with documents from production 21.

21  Production 21 occurred on July 28th.  So we get the documents

22  on July 28th, we get the log on September 26th.  All of these

23  documents were from the custodial file of Dr. Camellia Zamiri

24  who was deposed a month before we got the privilege log, and so

25  she was deposed on August 24th.  So we received the log and it

1  has 623 entries and we've reviewed it and we're challenging 484

2  of those entries.

3          **THE COURT:**  Okay.

4          **MS. FOGLEMAN:**  So we've raised this for you to let you

5  know these disputes are out there.  We sent them the letter

6  last week.  They haven't had an opportunity to respond.  I

7  don't intend to go into the merits of those --

8          **THE COURT:**  Okay.

9          **MS. FOGLEMAN:**  -- claims since they haven't --

10         **THE COURT:**  Sure.

11         **MS. FOGLEMAN:**  -- we haven't had a meet-and-confer on

12  it yet.  But we raised it because we wanted to let you know it

13  was out there and also because we feel like there's an issue

14  with this 60 days and the ESI protocol under the expedited time

15  frame that we're dealing --

16         **THE COURT:**  Sure.

17         **MS. FOGLEMAN:**  -- with here because we have -- and

18  these facts kind of show you where the problems are.  You know,

19  we've already deposed the witness that these documents -- whose

20  files these documents came from.  And so we've asked them, and

21  they haven't had an opportunity to respond yet, but we have

22  asked them if they would agree to shorten that 60-day window

23  because we want to be able to resolve these privilege claims as

24  expeditiously as possible.

25         **THE COURT:**  In light of those 484 possible disputes,

1  and I'm sure you'll work a lot of those out, but do you -- I

2  mean, do you still think you -- are you still sticking with

3  your two months?  I mean, this sounds like there's going to be

4  some work to be done on these, but --

5          **MS. FOGLEMAN:**  I think we are.

6          **THE COURT:**  Okay.

7          **MS. FOGLEMAN:**  I mean, we are sticking with it.  We

8  think -- I mean, just a preview -- again, I don't want to go

9  into the merits -- but these really fall into two categories.

10 I mean, so it's not like there's a bunch of random privilege

11 disputes.

12         **THE COURT:**  Okay.  Work product, I'm guessing, or --

13         **MS. FOGLEMAN:**  Well, no, there's --

14         **THE COURT:**  No?

15         **MS. FOGLEMAN:**  -- not even a work -- they didn't

16 assert work product --

17         **THE COURT:**  Okay.

18         **MS. FOGLEMAN:**  -- except with just a handful of

19 documents.  I mean, 205 of those communications do not have an

20 attorney on the communication.  They're communications between

21 nonattorneys, and they've asserted the privilege over those.

22 We think that those things are presumptively not privileged

23 unless they can show that the communication itself reflects an

24 attorney-client communication.  So, if you have an e-mail from

25 one business person to another saying, "I talked to the

1    attorney and she said blah, blah, blah," then maybe that

2    portion of it could be redacted, but the entire communication

3    between the two business people we don't think is privileged.

4    So that's one broad category --

5            THE COURT:  Okay.

6            MS. FOGLEMAN:  -- that if we get a ruling from you on

7    that, then maybe that will help, because there have been

8    multiple productions, so we're going to have lots of these logs

9    coming forward.  So, if we get some rulings right out of the

10   box as to what the parameters are, then we think that can

11   streamline it later on.

12           THE COURT:  Okay.

13           MS. FOGLEMAN:  The second category, 279 communications

14   that just cc an attorney or has an attorney listed as one of

15   multiple recipients.  And so we think that what they've done,

16   at least on this first log, is any communication that has an

17   attorney on it has been claimed privileged, and these are

18   in-house lawyers, many of them work in business -- I mean, it's

19   a typical -- this is the problem you have in privilege disputes

20   all the time, is your in-house lawyer working as a lawyer or as

21   a business person?  And so you'll have a document with 20

22   recipients, only one of whom is a lawyer, and they've claimed

23   privilege.  And it raised a red flag because there are 334

24   communications on the log listing one lawyer, Ms. Gross, as a

25   recipient.  They've only produced three documents that she was

1  a recipient on, and that was three copies of the same e-mail.

2  So, we think that that's what's happened here.  And again, this

3  was the first log, everybody is kind of working through the

4  process, we're hopeful we can resolve this.  But because these

5  do fall into two broad categories, we think either the parties

6  can work it out or we can get some kind of broad --

7         **THE COURT:**  Ruling?

8         **MS. FOGLEMAN:**  -- ruling from the court that will

9  guide the process going forward.

10        **THE COURT:**  Okay.  Thank you for bringing that to my

11 attention.  That will certainly impact what we do here today.

12        **MS. FOGLEMAN:**  Thank you.

13        **THE COURT:**  Okay.  On those -- oh, I'm sorry.  We

14 still have sources of documents from Mr. Pebsworth; right?  Oh,

15 Doverspike.  Sorry.  Sorry about that.

16        **MR. DOVERSPIKE:**  No problem, Your Honor.  Thank you.

17        **THE COURT:**  There's a lot of you here.

18        **MR. DOVERSPIKE:**  Yes, there are, a lot to keep track

19 of.

20    On sources of documents, as you mentioned, Genentech

21 provided us a list of newly revealed sources that may contain

22 responsive information.  We've exchanged letters since then and

23 Genentech has agreed to produce from some of those databases

24 and provided more information on why they don't intend to

25 produce from others.

1      So I believe we're down to two real categories where we

2   don't see eye to eye.  The first is their database that

3   contains their standard operating procedures.  We believe

4   standard operating procedures related to how they communicate

5   with the FDA and their manufacturing process and the types of

6   changes and things they could have done are relevant to the

7   preemption issue and we've asked them to produce those.  We're

8   obviously willing to work out using our current search terms or

9   a narrower list in that search, but right now they don't intend

10  to produce the standard operating procedures from that

11  database.

12     And then the second is paper files.  That could cover a lot

13  of different things, to our knowledge.  They haven't identified

14  a specific paper file but we know they have Legacy systems that

15  are harder to access.  Probably the most vivid example is

16  Mr. Robert Garnick who they identified as a former employee

17  likely to have substantive knowledge on multiple of the

18  interrogatory answers.  When they produced his custodial file,

19  it only included five documents.  And we asked them, "Is this

20  everything?  Have you looked in the paper files?"  And their

21  response was, "Genentech at this time has no knowledge of

22  additional sources of documents for Robert Garnick."

23     So, we think they need to be looking in the paper files,

24  especially for these former employees who were involved in the

25  1998, '99, 2000, 2001 era where there might not be as many

1  electronic documents for those employees.

2      **THE COURT:**  Are there paper files?

3      **MR. DOVERSPIKE:**  We believe there are, but I don't

4  know that we've gotten a definitive answer on that.  We've

5  heard of Legacy systems, and our understanding is that those

6  include paper files.

7      **THE COURT:**  Oh, okay.  The word "systems" implied to

8  me that that would not include paper files, but --

9      **MR. DOVERSPIKE:**  I could be confused about --

10      **THE COURT:**  Okay.

11      **MR. DOVERSPIKE:**  -- their internal workings.

12      **THE COURT:**  Yeah.

13      **MR. DOVERSPIKE:**  A lot of the last year has been

14  trying to learn those things.

15      **THE COURT:**  Yeah.

16      **MR. DOVERSPIKE:**  And it would be good for them to

17  clarify if there are paper files and if they intend to produce

18  from them.  Right now, our understanding is they do not.

19      **THE COURT:**  So what are you asking me to decide here

20  today on these issues?

21      **MR. DOVERSPIKE:**  Sure.  That those -- mostly that that

22  affects the size and scope of what needs to be discovered.  So

23  whether they're included or not, we believe that Judge Kern's

24  order listing -- asking them to list sources that may contain

25  relevant information was to prompt this discussion on whether

 1   they need to be searched, and we've worked out most of those.

 2   I think we'd seek an order saying that these standard operating

 3   procedures are relevant to the preemption issue and should be

 4   produced, and paper files related to these custodians also

 5   contain responsive relevant information and should be produced.

 6          **THE COURT:**  Okay.

 7          **MR. DOVERSPIKE:**  Thank you, Your Honor.

 8          **THE COURT:**  Thank you.

 9      Okay.  I would like to hear from you all on those three --

10   I guess there's really not anything on the additional

11   custodians, so just the Patheon deadline, if you have any input

12   on that, the privilege claim and how much time you think that's

13   going to add and what that involves, and then the sources of

14   documents issue.

15          **MS. DONAHUE:**  Thank you, Your Honor.

16          **THE COURT:**  Thank you.

17          **MS. DONAHUE:**  And thank you for allowing me to be

18   here.  It's a pleasure to meet you.

19          **THE COURT:**  Yes, you too.

20          **MS. DONAHUE:**  It's a pleasure to be in Tulsa.

21          **THE COURT:**  Yes.  It's nice to put faces with the

22   names of briefs I've been reading.

23          **MS. DONAHUE:**  So just kind of as an overview to start

24   up, I think what we would say generally in response to the

25   subcategories under, you know, item number 1 here, is that, you

1  know, when we get to this briefing schedule and the scheduling

2  order and, you know, our request for the six months, each of

3  these issues, you know, we believe supports, you know, our

4  rationale for needing more time because it is a work in

5  progress and there's a lot going on.

6      I do think, though, it's worth talking a little bit about

7  the custodians and the additional custodians because we've

8  prepared a list showing, you know, what the additional 51

9  that's the subject of Judge Kern's -- or maybe your September

10  12th order.  If I could hand that up?

11          **THE COURT:**  That's all Judge Kern's.

12          **MS. DONAHUE:**  Okay.  It kind of shows where we are on

13  that process and gives the court some indication of what that

14  process entails.

15      You know, the truth is that we don't know exactly what is

16  in each of these files.  We're currently looking through them,

17  collecting them.  There's 27 of the people on this list are

18  former employees.  To Mr. Doverspike's point, there are --

19  there very well may be paper for some of these folks and we're

20  looking for it and when we find it we'll go through it.

21      But, you know, the process is a long one and it's timely

22  and we can't help the fact that it's timely.  It just is.

23  That's not because we're delaying or doing anything other than

24  doing our due diligence.  You know, reviewing for privilege and

25  redacting, you know, for privacy, we have a lot of HIPAA issues

1  here with, you know, patient privacy on various things, other

2  products.  So, you know, there's a lot that goes into the

3  process of collecting, reviewing, and I can walk you through

4  that process, but it's just -- it's time consuming.  So, that

5  alone, I think, you know, gives the court some indication of

6  the reason why we need -- it would be really impossible for us

7  to get this custodial issue complete in the next 30 days or so.

8           **THE COURT:**  Did I read that -- I feel like something

9  said there was only 30 of the 50 that there were custodial

10  files for.  Is that accurate?

11          **MS. DONAHUE:**  That's what we -- 30 that we've been

12  able to locate so far.

13          **THE COURT:**  Okay.

14          **MS. DONAHUE:**  We're still looking.  Thirty for which

15  we have some form of electronic --

16          **THE COURT:**  Okay.

17          **MS. DONAHUE:**  -- documentation that we can trace.  In

18  terms of the --

19          **THE COURT:**  But you haven't stopped looking for those

20  other 20?

21          **MS. DONAHUE:**  Yeah, in terms of the paper, we're still

22  looking.

23          **THE COURT:**  Okay.  Go ahead.

24          **MS. DONAHUE:**  Okay.  So then in regard to the Patheon

25  issue, to answer your question, no, I think what Mr. Keglovits

*Greg Bloxom, RMR, CRR*
United States Court Reporter
Northern District of Oklahoma

In Re:  Genentech Herceptin (10-10-2017 Scheduling Conference)          21

```
1   has proposed in terms of, you know, a time line for that is
2   fine as far as we're concerned.  We haven't been in touch with
3   Patheon.  I think he must have looked at the docket for the
4   order because we haven't talked to them since that order --
5           THE COURT:  Okay.
6           MS. DONAHUE:  -- came down.
7       As to the privilege process and the sources of documents,
8   we got the letter on privilege, you know, late last week, and
9   we got the letter on the sources of documents responding to our
10  database letter Friday night.  So, you know, we would like an
11  opportunity to consider, to meet and confer, to start that
12  process, and would request that the court not make any ruling
13  on the substantive issues raised in those letters at this
14  point.
15      To further address those, Mr. Egli and Ms. Schwartz, my
16  colleagues, know some -- you know, have some knowledge with
17  which to address the issues raised by the plaintiffs, but we're
18  not there yet at all in terms of informing the court of our
19  full positions on those.  I do hope that we can work out the
20  privilege log issues quite a bit, but, again, that process is
21  going to take time.
22      So, I mean, all of this is just a way of kind of teeing
23  up -- hopefully we can have a full discussion as to their
24  position on timing, --
25          THE COURT:  Yes.  That's next.
```

```
 1          MS. DONAHUE:  -- our position on timing, and that's
 2   what we'll do next.
 3          THE COURT:  Great.  Okay.  Thank you.
 4          MS. DONAHUE:  Thank you.
 5          THE COURT:  Okay.  I think on this issue I'd like to
 6   start with defendant and hear from you, because you obviously
 7   have more -- the most information on what still needs to be
 8   done and why we need the amount of time that you are asking
 9   for.
10          MS. DONAHUE:  Okay.
11          THE COURT:  Now, I want to make sure I understand what
12   you guys agree on because I feel like -- it's my understanding
13   that everyone agrees on a written discovery deadline one month
14   prior to the final discovery cutoff.  You both have that in
15   your proposals.  Is that correct, defendant?
16          MS. DONAHUE:  We agree, but we are not adverse --
17          THE COURT:  I know you don't --
18          MS. DONAHUE:  -- to them taking depositions as we go
19   if they decide they'd like to do that.
20          THE COURT:  Okay.
21          MS. DONAHUE:  But we're agreeable to -- either way.
22          THE COURT:  You both -- but is it correct that you
23   both have in your proposed schedules one month prior to the
24   final discovery cutoff of written discovery?  Did I
25   misunderstand that?
```

1      **MS. DONAHUE:**  I think it was document -- I think what

2  they have proposed is a bifurcation so that document production

3  is completed and 30 days post that their eight depositions,

4  eight remaining depositions.

5          **THE COURT:**  And yours is the same, --

6          **MS. DONAHUE:**  Ours is the same but I think --

7          **THE COURT:**  -- is it not, document production?

8          **MS. DONAHUE:**  -- I think we put a caveat in there that

9  said we're not -- we are amenable to them taking depositions as

10 they go if they'd like to do that.  It doesn't have to be one

11 or the other, in other words.

12         **THE COURT:**  Okay.

13         **MS. DONAHUE:**  Okay?

14         **THE COURT:**  Okay.  Got it.  So it sounds like there is

15 no disagreement on that.

16    And then you also agree on the 14, 28, and 21 days; it's

17 just a matter of when we're going to have this cutoff be.  So

18 you agree on a lot of things.  Just that and then the expert

19 rebuttal issue.

20    So let's start from defendant, and I want to hear from you

21 on your reasons for requesting the time frame that you've

22 requested.

23         **MS. DONAHUE:**  Okay.  Thank you.

24         **THE COURT:**  Yes.

25         **MS. DONAHUE:**  Again, we have what we've put together

1   as the discovery time line.  And as you say, you are familiar
2   with a lot of this given your history with the case, but we
3   wanted to put things in context for the court and to try to,
4   you know, give some understanding to how we arrived here today.
5        What we're proposing is six months to complete discovery.
6   And what I would tell the court and what we said in our
7   submission and that we sincerely mean is that we will do our
8   best to come in under that, but we have had so many fits and
9   starts and so many distractions via motion practice and
10  meet-and-confer letters and all kinds of things that, you know,
11  our point is give us -- we want a final deadline and we want to
12  be finished by that deadline and we don't want to have to come
13  back to you asking for more time.  So we're trying to make sure
14  that we have enough time to go through the 51 additional
15  custodians that have now been added.  I think plaintiffs' point
16  is that, "Well, you did those first additional 17 -- I mean,
17  the first 17, you know, in a certain amount of time, so you
18  should be able to do these quicker because they probably have
19  less documents."
20       The process that we go through to produce the documents is
21  very time intensive.  You know, it starts by interviewing
22  employees, collecting everything that they've got.  You know,
23  imaging their computers.  If we can get their e-mails remotely,
24  but if they're not in south San Francisco, we have to have
25  their computers sent to us, and then we image them -- if they

1   are in south San Francisco, we image them, and then we send

2   them to a third-party vendor who loads them up on a searchable

3   platform.  We do, you know, the search term review, and then we

4   give it to -- I'm going to get this confused, and Gabe is

5   probably thinking, "No, you missed that," -- but ultimately it

6   goes to -- we have 50 lawyers who are reviewing them for

7   privilege, redaction for other products, redaction for privacy

8   information, and we've got, you know, people working seven days

9   a week to get this done, and still, you know, you can see where

10  we are.

11      So, we've completed, of the original 17 that were, you

12  know, first identified for us and were the first subject of the

13  May 8th order, we have completed four.  They have four full

14  custodial files.  They are substantially completed, we have

15  substantially completed the entire 17, but there's still some

16  trickling in of documents that go through this review process.

17      I was under the impression that we were reviewing it

18  custodian by custodian, but in reality we do it, you know, in

19  phases of what the review -- what review is going on, you know,

20  at a specific time because that is the most expeditious way to

21  do it.  In other words, if the reviewers are reviewing for

22  privilege, they're reviewing, you know, a number of custodians

23  for that particular privilege, and that makes it go quicker.

24      So, that's why substantial completion is sometimes, you

25  know, a little bit longer than --

1          **THE COURT:**  I understand.  You're not finishing one

2    custodian and --

3          **MS. DONAHUE:**  Yeah.  Right.

4          **THE COURT:**  -- then starting the next.

5          **MS. DONAHUE:**  Exactly.  Exactly.

6      I think Judge Kern, in his September 12th order, you know,

7    anticipated a significant extension of the discovery in order

8    to get it completed.  And I don't think that, you know, five

9    weeks from now or the November 22nd deadline for us to get all

10   this production done, number one, it's not significant, and,

11   number two, in all honesty, Your Honor, it's impossible and we

12   cannot do it.  We'd like to be able to.  You know, we don't

13   have any skin in the game of delay.  We have a motion on file

14   that's been on file for over a year that we'd like to get

15   heard.  This is not to delay.  I mean, no motivation for delay

16   at all.

17      So, our six months, you know, anticipates a realistic

18   deadline that we can comply with and not seek additional time

19   from the court.  It anticipates the issues that the plaintiffs

20   have raised under their, you know, point number 1.

21      There are going to be -- there's going to be some more

22   back-and-forth.  I mean, historically, that's just how this

23   case is operating, unfortunately, you know, there's not a lot

24   of agreement on a lot of stuff.  So, we think six months is

25   reasonable and that it's doable and that, you know, we won't be

1   back and that we'll finally be finished and we can move on to

2   having them respond to our motion and the motion heard and take

3   it from there.

4         **THE COURT:**  Let me ask you one question.  Plaintiffs,

5   I feel like in their briefs, they're kind of -- their argument

6   is, to some extent, that defendants have -- I think in the last

7   section -- that the defendants have been secretive, they've

8   been misleading, and that maybe -- I feel like part of what

9   they're arguing is that, whatever you say, I should view with

10  some degree of skepticism because of past practices in this

11  case, and I want to hear your response to that.

12        **MS. DONAHUE:**  Quite frankly, I'm offended by it.  We

13  haven't been secretive, we haven't been anything other than

14  above board.  As you can see from the time line, we've made 45

15  productions of documents, rolling productions.  As I said

16  before, we have spent hundreds of thousands of dollars.  We

17  have 50 lawyers working on just the document issue alone.

18        You know, I think the time line also puts in context the

19  fact that Judge Wilson -- you know, the key issue on some of

20  this discovery, Your Honor, was custodial files.  We felt very

21  firmly and argued very vehemently that custodial files should

22  not -- we should not have to produce, review, etc.

23        Judge Wilson, you know, took almost a year to consider that

24  issue.  We were on a standstill from -- you know, the first

25  discovery hearing occurred on August 3rd and we got our first

1   order compelling us to do the -- you know, to produce more than

2   we had produced already on May 8th.  So, there was no

3   misleading on our part.  There was no delay on purpose on our

4   part.  We were waiting to see what Judge Wilson was going to

5   tell us to do in terms of these custodial files.

6        He also told us to, "Go look and see what you've got but

7   don't review, don't collect, don't -- you know, Genentech, I'm

8   not telling you to do any of that and I don't want you to do

9   that," and so we didn't.  You know, and I don't think we can be

10  faulted for not wanting to spend the time and money that we may

11  never have had to spend.

12       So, once we got the May 8th order, you can see that we

13  expeditiously started doing everything that the order -- you

14  know, that we were compelled to do by the order, and that the

15  order of productions speak for themselves.  You'll see

16  production after production after production.  Before that, we

17  did -- I think we did five productions before the first

18  discovery hearing and we continued to do productions of

19  noncustodial files after the first discovery hearing.

20       So I don't know if that answers your question but, you

21  know, this is my first time appearing before you and I would

22  hope that you would please give me the bene- -- us the benefit

23  of the doubt and know that we are not -- that characterization

24  of how we operate is just inaccurate and not true.

25            **THE COURT:**  Thank you.

1          **MS. DONAHUE:**  Thank you.

2          **MR. KEGLOVITS:**  Your Honor, so I think a short version

3   of the time line, the real time line here is going to be

4   helpful in assessing this adjective "significant" as it

5   modifies the extension.

6      Our case was filed April, 2015.  The initial joint status

7   report was filed with the court on November 30th of 2015.  In

8   that joint status report, Genentech said it needed 13 months,

9   it thought the case required 13 total months to do all of the

10  discovery in the case.  Presumably, that would have included

11  their principal defense: preemption.

12     As you know, we made a side trip to the joint panel on

13  multidistrict litigation because Genentech was not content to

14  have different cases litigated in one district without being

15  forced to do it, so we went on that side trip and came back.

16  And we came here for our first case management conference on

17  June 24th, I think it was, of 2016.  At that conference,

18  Genentech proposed to the court that we would stop everything

19  in the case, class certification, merits discovery, so that

20  they could present this simple purely legal defense:

21  preemption.  And based on that representation, Judge Kern put

22  an order in place that had everything, discovery, briefing,

23  everything finished in 90 days, October 6th, 2016.

24     So here we are now, a year past the anniversary date that

25  was created by the court, because Genentech told the court all

1  of this can be done quickly and efficiently and will make the

2  processing of the case better.

3      We are not close, I admit, to having the document

4  production finished, but I don't know that that is our fault.

5  I think what Judge Wilson told the folks at this table was, "If

6  you insist on going out, collecting every document, reviewing

7  every document, don't come back to me and say that's going to

8  be a problem on timing, because that's a self-inflicted wound.

9  There are other ways to produce this information than reviewing

10 every page of it."

11     Genentech, to my knowledge, and I could be corrected, has

12 not even completed the production from Dana Swisher's files.

13 Mr. Swisher submitted an affidavit back in June, a long

14 affidavit filled with factual contentions, June of 2016.  So

15 here we are, what, 14 months later and they haven't even

16 finished Mr. Swisher's production.  They, I don't think, are

17 moving either efficiently or with a purpose to get this

18 finished.

19     So, when we got the court's order, we asked ourselves:

20 What do we do?  Well, we thought one of the things to do would

21 be to engage Genentech in a conversation.  There are a lot of

22 custodians left to search.  And we said to them, and you'll see

23 the letters back and forth, "We want to know who these people

24 are.  We know very little about them.  It's possible that some

25 of them are duplicative or some of them may not be interesting

1  to us.  Let's talk about who they are.  Let's talk about where

2  they are.  Let's talk about what kind of documents they

3  have."  The answer was, "No," and, in essence, it was, "You

4  asked for it, you're going to get it, and with whatever time

5  constraints that come along with that.  We are not going to

6  give you anymore information about it."

7        **THE COURT:**  Did you think Judge Kern's order gave them

8  that option?

9        **MR. KEGLOVITS:**  Well, I don't know whether the order

10  itself contemplated that, but what we were offering was to

11  reduce the burden, to make this case process better.

12        **THE COURT:**  But didn't Judge Kern say that you can

13  reduce the burden on yourself, you can either help them limit

14  this list or you can produce it all?

15        **MR. KEGLOVITS:**  As I read it, and I may not remember

16  it correctly, it said you either have to produce everything or

17  send them a letter saying there are no documents for these

18  custodians.  And what we were telling them was, "I think we

19  will agree to go back to the court and ask for a modification

20  of the first part of that to say you don't need to have all

21  those custodians if you just engage us in a dialogue."  Why are

22  we throwing down this curtain that says, "We won't tell you any

23  information about these people?"  We went so far as to ask,

24  "Have you at least sent discovery hold orders to all of the

25  custodians?"  And the response from Genentech is, "We don't

1  have to tell you that.  That's work product."

2      So that's the level of communication that Genentech has

3  been willing to give us.  That, to me, is not a group that is

4  open in this process and one that should be accorded much

5  deference when they come to you and say, "It's going to take a

6  long time now."

7      I don't need to belabor the issue of whether they've made

8  accurate representations to the court.  I don't blame the

9  lawyers at this table because I don't think they knew whether

10 there were organizational charts, but their client sent them in

11 here to say that a company of that size, a division of Roche,

12 has no organizational charts, and the court said to produce

13 them, and we get, what, 10,000 pages of organizational charts.

14 Of course, everybody knew there were organizational charts.

15 Why would Genentech ask them to come in here and say that?  I

16 don't know.

17     And again, it's not a criticism of these lawyers, and

18 really it doesn't have anything to do with the case other than

19 to say we don't want to be forced into trusting them because we

20 haven't gotten accurate information from Genentech.

21     What we would really like to have happen here is to have

22 the discovery in this case finished by December 31st, 2017.

23 That is two-and-a-half years after our case was filed back in

24 April of 2015, and it is 18 months after Genentech took us down

25 this detour on preemption.  We think that is plenty of time.

1          **THE COURT:**  Can I ask you a question?

2          **MR. KEGLOVITS:**  Uh-huh.

3          **THE COURT:**  Do you think that their efforts have been

4    reasonable since May 8th?  I know -- I know you have issues

5    with everything that happened before that, and I don't think

6    anybody is really thrilled with that length of time, but since

7    May 8th, do you feel like that your -- their production of

8    documents has been frequent and appropriate?

9          **MR. KEGLOVITS:**  I'm going to be honest with you, Your

10   Honor, I don't know anything about it, because they won't

11   share.  We asked about time, "How long does it take to collect

12   the documents, how long does it take you to process them," and

13   they wouldn't share that information with us.  So I don't have

14   a basis --

15         **THE COURT:**  You don't know.

16         **MR. KEGLOVITS:**  -- to say whether they're working

17   efficiently.

18     If you look at the number of documents that have been

19   produced, I think by our count we've had 64,000 documents

20   produced to us so far.  I don't do a lot of this, but 50

21   lawyers to get 64,000 documents pushed out the door?  The first

22   production, July of 2016, the last one, October 9th, I guess

23   last night.  And they clearly are producing more now than they

24   were before.

25     But, you know, they built a process that was going to

1  generate this outcome.  They insisted on this defense, which

2  made discovery broader than the claims.  They resisted any

3  efforts that Judge Wilson put in front of them to reduce the

4  number of issues on which discovery would be sought.  They

5  wouldn't agree to stipulate to any facts.  That was one of the

6  solutions that he proposed.  You say this is an issue of law,

7  then stipulate to all their facts, they should be material to

8  your motion.  But they refused to do that.  They put in two

9  affidavits, one is really from a fact witness, the other is

10 from a so-called expert on what the law is that's about 30

11 pages long.  So they've made this a very fact-intensive,

12 laborious process, and they won't engage with us in a way to

13 try to reduce the time to get it done.  So, you've made your

14 bed, let's get this done by December 31st.

15      If the court is inclined, I would say, to make it longer

16 than that, if we have some period longer than that, then I

17 would ask the court to consider some process with interim dates

18 where we can tell them, "You must finish these five custodians

19 by November 1st, you must finish these next five by November

20 15th," so we can at least try to prioritize the people we think

21 we need for depositions.

22      And then the last point I'll make is on the briefing.  I

23 don't think there's really any dispute about the intervals

24 between the briefs.  I do want to point out for the court,

25 though, that there is a possibility we could file a response

1   brief earlier than the last date that you give for us, so we

2   would want the reply brief to be tethered to the date of our

3   filing of the response brief and not a hard baked date.  So

4   let's say we were able to get it on file two weeks --

5           **THE COURT:**  Yes.

6           **MR. KEGLOVITS:**  -- early, that doesn't build in a

7   two-week extension for them.

8           **THE COURT:**  I think both of your proposals have it --

9           **MR. KEGLOVITS:**  Okay.

10          **THE COURT:**  -- tethered to the response deadline, so I

11  will be sure to do that.

12          **MR. KEGLOVITS:**  And that's all I have for Your Honor.

13          **THE COURT:**  Okay.

14          **MR. O'CONNOR:**  Your Honor, may I add a few comments on

15  this issue?

16          **THE COURT:**  You may.

17          **MR. O'CONNOR:**  Thank you.

18      It's hard to sit there and to listen to a characterization

19  of our discovery effort as you just heard.  It's really -- it's

20  difficult.  The fact that we somehow have detoured this case or

21  that we have in any way intended any delay, first of all, we

22  have no motivation for that, we want our motion heard.  But

23  throughout this meet-and-confer process, and throughout the --

24  we have notebooks of letters that are exchanged weekly on all

25  of these issues.  Throughout all of this motion practice,

1  throughout all of the things that divert us from the attention

2  of concluding the discovery, we are pressed for all custodians.

3  We are never provided any compromise.

4      The suggestion that we should now go review -- I mean, what

5  they're proposing and what they proposed and was contemplated

6  in Judge Kern's order, that we go review all of the custodian

7  files and then we make our own subjective determination of who

8  may be meaningful for their response to the preemption, who may

9  be material, who may be slightly relevant, maybe not that

10  relevant, maybe not relevant at all, would take us two or three

11  more times the amount of time than simply reviewing it, as

12  Ms. Donahue said, for production.

13      This collection and review, we have a chart that shows with

14  respect to each custodian the dates of the productions.

15  They're rolling.  So, let's take Dana Swisher, for example.

16  Productions on August 7, August 11, August 14, August 18,

17  August 21, August 23rd, September 11th, September 22nd,

18  September 25, October 2nd, and I believe October 9th,

19  yesterday.  So, we had that with respect to all of these.

20      We are not here trying to concoct some extension that we

21  think would somehow benefit us.  We're simply trying to not

22  appear in front of you again, because the suggestion, after

23  they wanted all of these custodians, that we can now get it

24  concluded in six weeks, that's what they're asking.  I mean,

25  we're not here to say -- in all due respect, if you said,

1   "You've got six weeks to do this," we've spent -- she's being

2   kind on the hundreds of thousands of dollars.  It's much, much

3   more than that.  So, when we went back into this

4   proportionality discussion in the course of the discovery,

5   we've now established, as a matter of fact, the significant

6   resources and costs.  And here we are, the suggestion that we

7   have put up a wall or haven't helped.

8        The tone -- I tell you, the tone in the meet-and-confers is

9   a lot different than the tone in these hearings and in their

10  papers, and it's disappointing, because we have worked together

11  and we've reached a lot of compromises.  It wasn't until August

12  2nd that we agreed on search terms.

13       So, to suggest that we've sat on our hands in any way since

14  that May 8 order, there have been 35 productions since then.

15  So, I just take offense.  With all this suggestion of costs or

16  some sanction, the hallmark of their strategy here seems to be

17  delay on their part.  I don't understand that.  I don't

18  understand how you say, "Give us everything but shorten the

19  time."  Or after we tried to limit the custodians to some

20  degree, they wanted everybody.  Now they want us to go do all

21  this substantive review.  And I guarantee we'd be back here

22  again on motion practice because they wouldn't agree with our

23  conclusion or suggestion that maybe 10 of these custodians have

24  nothing to do with it, but for us to reach that conclusion

25  would take a monumental effort.

1     So, it's not hide the ball, it's not cloaked in secrecy.

2  All we're doing is trying to comply with the court's orders,

3  reach a production after it's collected.  And, you know, this

4  chart really reflects a lot.  I mean, this talks about what

5  we're doing.  So, the suggestion that we haven't sought, you

6  know, paper documents, that's part of the interview with every

7  employee.  We start with their e-mails, "Where is that?"

8  "Well, on this one, we're investigating."  "What's

9  'investigating' mean?"  "It means we're interviewing them.

10  We're trying to decide, you know, are there flash drives, are

11  there paper sources, are there hard copies."  With the former

12  employees, it's more difficult.

13     There's searches for hard copies that, unfortunately, we

14  don't have the benefit of their presence.  So, it's difficult.

15  We have employees in Germany and Switzerland that have a whole

16  host of privacy issues and laws that we are trying to navigate

17  through, but it's just more time.

18          **THE COURT:**  Mr. O'Connor, how do you respond to their

19  argument that this is a self-inflicted wound, that yes, it's

20  taking a long time because the process you chose takes a long

21  time and they shouldn't be held responsible for that?

22          **MR. O'CONNOR:**  Well, we simply couldn't do what they

23  wanted us to do, which is, in their view, produce everything

24  and then we'll deal with the privilege and everything else.  We

25  can't operate that way.  We have too many clinical studies with

1  privacy information.  We have -- intertwined with all the

2  documents are a lot of other products that Genentech

3  manufactures.  There's simply -- there's no way to do that

4  effectively.  And, frankly, our client can't do it, as a matter

5  of law, with respect to three or four of those categories.  And

6  we do want to review for privilege, and we don't find -- I

7  mean, we can talk about this as we proceed on the

8  meet-and-confers, but, you know, those privilege designations

9  weren't made lightly.

10      And we're really -- you know, while he talks about, you

11  know, 64,000 documents, that's reflective of this review

12  process.  There's 905,000 pages that have been produced.  One

13  document in Dhyshy's production was 11,000 pages.  So this is

14  another, you know, attempt -- you know, after all this effort,

15  we only have 64,000 documents.  Well, here's a million pages.

16  And let me tell you, there are 50 lawyers and they are working

17  extensively, some seven days a week.  It's going and going and

18  going to make this happen.

19      But to tell us, "Give us all, give us all, Judge, we need

20  everybody, we want everybody, we need all these custodians, we

21  need all the documents," and then to come back at this point

22  and suggest that, "Well, they never wanted to reduce the

23  number, they never wanted to give any kind of limitation," that

24  there's some big cloak over here where we operate in secrecy,

25  that is -- that's disturbing and it really is kind of a punch

1   in the gut after the work that's going on, that has gone on and

2   continues to go on.

3       I have worked with Mr. Keglovits for 30 years, we've worked

4   together, we've been adverse, I have great respect for him, but

5   I just think to undermine this effort -- we are doing the best

6   we can.  We're asking only for a reasonable schedule that will

7   accommodate this, not anything that would delay, but that would

8   allow us to conclude the production of these 51 custodians.

9           **THE COURT:**  Okay.  Thank you, Mr. O'Connor.

10          **MR. O'CONNOR:**  Thank you.

11          **THE COURT:**  Okay.  The final thing that I want to hear

12  from you both on -- well, first, I want to tell you my thoughts

13  on this expert.  Is there anything else on that we need to

14  cover or are we ready to move on?  Okay.

15      The expert rebuttal affidavit issue.  Here's my thoughts.

16  To me, this is really more of an issue that goes to what Judge

17  Kern's going to consider or not consider on his preemption

18  motion, and I'm not sure that when he referred this issue to me

19  for scheduling, that that was really contemplated in that

20  referral.  Your arguments were kind of in footnotes, if I

21  recall, it was kind of buried.  I'm not confident that that

22  issue is before me and I think it would be a better procedure

23  for there to be a motion on file specifically by defendant

24  asking for that.  And if he refers it, great, and I'll be happy

25  to decide it at that time, but it goes to what he -- the last

1   thing I want to do is, under the guise of entering a schedule,

2   tie the district judge to considering or not considering

3   something that he wants to do.  So -- and at that point, he can

4   decide how he wants to handle that.  Probably sooner rather

5   than later is a better course, although I'm not going to tell

6   you, you know, how to go about doing that.

7           **MS. DONAHUE:**  That's fine.  We understand, Your Honor.

8           **THE COURT:**  Okay.

9           **MS. DONAHUE:**  If you could just include the fact that

10  you directed us to do that in an order or --

11          **THE COURT:**  Yes.  So, this issue is not going to be

12  part of this scheduling order.  It doesn't mean I'm not happy

13  to decide it at a future time.  However, I have decided that I

14  think it would be helpful to go ahead and hear argument on

15  that, if you're ready today.  That way, we don't have to come

16  back if he does refer it.  Or, if he keeps it, he can have the

17  benefit of your oral argument here today, he can listen to

18  that.  So, I would like to hear from you on the expert rebuttal

19  affidavit issue.

20          **MR. O'CONNOR:**  Thank you.

21          **THE COURT:**  Thanks.

22          **MR. O'CONNOR:**  I think this is a novel case in many

23  respects.  We start with Rule 26(a)(2)(d)(ii) which

24  specifically allows 30 days for a rebuttal report.  This is

25  very unique in that we disclosed our expert and provided

1   plaintiffs with our expert's declaration before we ever even

2   filed the motion for summary judgment, and then it accompanied

3   the summary judgment papers.  That was done without the benefit

4   of any discovery.

5       During the course of that discovery, the court allowed an

6   amended summary judgment with an amended declaration.  Since

7   that time, there have been depositions taken, there has been a

8   million pages of documents produced, there are going to be, you

9   know -- you know, I would think -- they've designated 30 days

10  for depositions at the conclusion of this discovery.

11      So, it's really a situation where they've had our expert

12  for, as Mr. Keglovits said, for over a year.  They want us to

13  have their expert, who we don't even know -- they haven't

14  disclosed that they have one, but if they do have one, it seems

15  like we wouldn't be in this dialogue if they didn't intend to

16  provide one.  They want us to then have this limited time frame

17  to consider.  I think the reason they want it tethered to their

18  response is because it would provide even less time for us to

19  have an expert consider whatever declaration they submit.

20      But, you know, there is, they claim, prejudice that they

21  wouldn't be able to respond.  Well, the case law is pretty

22  clear that there's no prejudice; you're not entitled to rebut a

23  rebuttal.  The case law --  There's plenty of case law in the

24  Tenth Circuit on this very issue where courts have allowed

25  rebuttal witnesses, rebuttal experts.  They've seen the

1  reasonableness of it.  They think it's proper.  I mean, the

2  very essence of rebuttal is that you either contradict or

3  oppose the declaration that's submitted in the response brief.

4  So I guess --

5          **THE COURT:**  I don't have the benefit of these cases or

6  anything, but I do have a question.  Are those cases -- is

7  there new information being raised in their response for the

8  first time?

9          **MR. O'CONNOR:**  The only new information that could be

10  categorized that way is information responsive to the -- here

11  it would be the plaintiffs' expert.

12          **THE COURT:**  Okay.

13          **MR. O'CONNOR:**  Typically, it's a reverse party.  But

14  we're not talking about -- we're talking about a response to

15  their expert.  That's what -- I mean, I think that's what the

16  rebuttal contemplates.  It's not about us going out to a whole

17  new source of documents, creating new opinions for which they

18  would never then be able to respond.  It's simply an

19  opportunity after -- since we didn't have the benefit of all

20  this discovery record, to then have the benefit of that, see

21  what their expert says, and have the expert --

22          **THE COURT:**  Isn't that a risk you took by filing an

23  early motion for summary judgment on this issue, or not?

24          **MR. O'CONNOR:**  Well, I guess it --

25          **THE COURT:**  Prior to, because you could have waited

1  until discovery was over and filed a motion for summary

2  judgment on everything --

3          **MR. O'CONNOR:**  Well, --

4          **THE COURT:**  -- and then you would have known every

5  fact that you wanted to know before you filed that motion.

6  Instead, you chose this process where you filed it early.

7          **MR. O'CONNOR:**  Right.

8          **THE COURT:**  And I just want to know, is that a risk

9  that you think you --

10          **MR. O'CONNOR:**  I don't think we viewed it as a risk.

11  I think we understood -- I think the norm is a rebuttal expert

12  declaration.  I don't think that's an extraordinary request.  I

13  think it's what the rules contemplate, what the case law

14  contemplates.  So I don't see it as -- I mean, when you're

15  filing a declaration to oppose, to suggest that either the

16  other side's expert is incorrect or otherwise opposing it, I

17  think that's what's contemplated.

18          **THE COURT:**  Okay.

19          **MR. O'CONNOR:**  So I don't see any prejudice.  We're

20  limiting the scope of the expert report to true rebuttal, so we

21  either contradict theirs or oppose it.

22      And, you know, it is the norm, as you said, Your Honor,

23  that the summary judgment would be filed after discovery and

24  that expert reports would accompany them at that time, but this

25  was a unique situation.  And I think, with all due respect, I

 1   believe Judge Kern believed that it was potentially dispositive

 2   of the issues, and it allowed us, even as burdensome as this

 3   has been in discovery, you know, it has allowed the court to

 4   consider the issue in advance of any class discovery or merits

 5   discovery.

 6          **THE COURT:**  Yeah, and I think he made that decision

 7   and he said, "I still find value in this process, I still find

 8   value in proceeding in this way."  I'm not criticizing the fact

 9   that we're doing that.  I'm just saying it has its consequences

10   sometimes.  Thank you.

11          **MR. O'CONNOR:**  Thank you.

12          **THE COURT:**  Thanks.

13          **MR. KEGLOVITS:**  Your Honor is right, this is a custom

14   process designed by Genentech for its purposes and they should

15   live with the results of the process that they asked for.

16       There really are two declarations that were attached to

17   their motion.  One is a fact witness, Mr. Swisher, who is

18   testifying about Genentech's own manufacturing processes, what

19   can and cannot be done.  It's hard to imagine that he would

20   need now to come in with a supplemental affidavit saying

21   something else about what can and cannot be done after he's

22   deposed.

23       The other is a Dr. Lynn, who purports to be an expert on

24   what the regulations mean.  He obviously was proved wrong once

25   by FDA action, so he had to come in and amend his first

 1   declaration to conform it to what the FDA actually says is the

 2   regulations.  Now I guess they're asking for him to have a

 3   chance to come in again.

 4       It is not fair, I don't think, to have the movant have an

 5   unchallenged last word.  And what I mean by that is the last

 6   word would come in after we would have filed our response

 7   brief, and the last word comes in when we don't even know what

 8   it is.  Under any conventional discovery process, you're going

 9   to have the report from the other side's expert, they're going

10   to have your report, and then you're going to depose the

11   experts.  And in those depositions, you're going to be able to

12   find out everything that their expert thinks about what your

13   expert said, so that when you sit down to file your motion for

14   summary judgment, everybody knows everything that's going to be

15   admissible at trial, and anything else that somebody tries to

16   throw into the mix, either at summary judgment or trial, stands

17   a very high likelihood of being excluded because it wasn't

18   disclosed timely, and they're proposing to throw all that

19   aside.  And we would go depose their fact witness and their

20   regulations expert, we would file a response brief, and then

21   they would come in with a declaration that says, "Here's a

22   bunch of other things," and we would just sit on the sideline

23   and say, "Gosh, it would have been nice to know that when we

24   filed our response brief."

25       And I think it's notable that it wasn't part of their ask

 1  back in June of 2016, and it certainly wasn't part of the

 2  court's order, and I think at this point, given everything that

 3  we're trying to accomplish here, to add another layer of last

 4  word in a way that is unfair to us shouldn't happen.

 5           **THE COURT:**  Thank you.

 6      Hearing from both of you, I'm even more convinced that this

 7  would be a good subject of a motion with procedural rules and

 8  case law because I think that would be -- either me or Judge

 9  Kern would like to consider that.

10      Okay.  I am going to take all of this under advisement and

11  I'm going to issue an amended scheduling order sometime in the

12  next few days, and you'll know what your deadlines are going to

13  be.

14      Mr. Keglovits, I am interested in one thing you said, which

15  is if you're going to extend it, we want a chance to have

16  some -- it sounded like interim deadlines.  I think it might be

17  worthwhile, if you have a proposal for that, do you mean with

18  specific people or -- what's your proposal for a schedule that

19  had interim deadlines, assuming that I were going to extend it

20  past December 22nd?  I know that's your first choice.

21           **MR. KEGLOVITS:**  Okay.  Well, first, it's disappointing

22  to hear there's only one interesting thing that I said.

23           **THE COURT:**  You're lucky there was one.

24           **MR. KEGLOVITS:**  I know.  That's the other side of it.

25      I think there are some places that we have not got any

1   documents from.  For example, I think the complaints database,

2   we don't show that we've gotten any documents from that place,

3   as well as custodians.  So, we would want to be able to

4   prioritize it.

5       If Your Honor was to make it three months or

6   three-and-a-half months or something like that, to have within

7   the first 30 or 45 days the particular documents of highest

8   interest to us.  So, be able to say to them, "Search the

9   complaints database and use the search terms and give us those

10  documents and finish Mr. Swisher and finish Mr. Nolden within

11  that first period of time," so that the plaintiffs can dictate,

12  if we're going to have a longer pace, what happens within those

13  different windows.

14          **THE COURT:**  How would you propose that schedule look?

15  Would you like to submit a proposal, or do you want me to come

16  up with -- I mean, how do you propose we go about doing that?

17          **MR. KEGLOVITS:**  I think by the end of today we could

18  send to Your Honor how we would prioritize it if -- let's say

19  we split it into thirds, let's imagine there are going to be

20  three months for discovery, here's what would happen in our

21  world in the first month, here's what would happen in the

22  second month, and everything else would happen in the third

23  month.

24          **THE COURT:**  I understand that would be difficult until

25  you know the time frame that you're working within, --

1          **MR. KEGLOVITS:**  Right.

2          **THE COURT:**  -- but it would be helpful -- I would like

3    you to submit some sort of supplemental -- we could call it a

4    supplemental -- a supplement to your proposed -- to your

5    proposal that's currently on file, and without specifying

6    dates, because I'm going to decide the dates, --

7          **MR. KEGLOVITS:**  Highest priority, second highest

8    priority, --

9          **THE COURT:**  Yes.

10          **MR. KEGLOVITS:**  Okay.

11          **THE COURT:**  That would be helpful.  And I will hear

12    from you on that, as well, Ms. Donahue, right now.  I'm not

13    saying I'm going to do that.  I want to see what he's -- I want

14    to have a visual of what he's --

15          **MS. DONAHUE:**  Right.

16          **THE COURT:**  -- talking about.

17          **MS. DONAHUE:**  And I want to begin by saying we have no

18    problem whatsoever with interim check-ins.  The problem we do

19    have is, if you get down to specifics, for instance, if they

20    were to give Your Honor a list of, "These custodians should be

21    complete by this date," there's a number of reasons why we

22    don't know for sure what we've got about certain people, so for

23    us to commit to a completion and have to come in and tell Your

24    Honor -- I mean, we can tell you why we couldn't do it -- but

25    those are just arbitrary.  I mean, if they have certain folks

 1  that they want us -- that they think are a priority, we'd love
 2  to hear from them on that and we can do something to focus on
 3  those people.
 4      But, you know, as Mr. O'Connor said, the whole Swiss thing
 5  gives us -- you know, it just adds a layer.  They have really
 6  stringent privacy laws there that require -- there's criminal
 7  penalties if we produce in a certain way.  It requires a level
 8  of review that, you know, is different than here in the United
 9  States.  So, there's just certain things that make it difficult
10  for us to commit to certain custodians at certain times.
11      That being said, if they want to tell us who they'd like us
12  to be focusing on, you know, we'll try to do it that way.  I
13  mean, the interim thing is fine.  It's just that with specific
14  deadlines on certain people, it's going to be difficult for us.
15      Secondly, in terms of the complaints file, I think we're
16  close to getting that produced to them, so that's just -- you
17  know, I don't think that's going to be an issue.  And I guess
18  that's it.
19      But in terms of the interim check-ins, we're good.
20          **THE COURT:**  Okay.  Well, I don't want to make more
21  work for both of you, and I don't want to have, you know, too
22  many -- order you to file too many briefs, but I'm still going
23  to ask you to submit that response.
24      And, Ms. Donahue, if there's something that you want to say
25  in response to that, I will give you two days after that.

 1          **MS. DONAHUE:**  Okay.  Thank you, Your Honor.

 2          **THE COURT:**  And I don't anticipate it being long or

 3    anything, --

 4          **MS. DONAHUE:**  No.

 5          **THE COURT:**  -- but I'll give you two days to respond

 6    to that.  And so you will not be getting your amended schedule

 7    until I've received that and I've given them two days, and then

 8    after that you'll get a ruling.

 9       Okay.  Is there anything else that we need to take up here

10    today -- oh, besides the issue of maybe setting a next

11    schedule -- is there anything else besides that from you,

12    Mr. Keglovits?

13          **MR. KEGLOVITS:**  No, Your Honor.

14          **THE COURT:**  From you, Ms. Donahue?

15          **MS. DONAHUE:**  No, Your Honor.

16          **THE COURT:**  Okay.  Like I said, you know, I'm new, I'm

17    learning this process.  I don't know that I love the idea of

18    just setting a hearing for the sake of setting a hearing two

19    weeks out.  I think that it would be better served to wait

20    until something comes up and you all to ask for that hearing.

21    So, as of now, I'm not going to just set a hearing.  If there's

22    an issue, it sounds like we might have some privilege issues.

23    But, again, if you want to call and say, "Listen, we have

24    something we need to talk to you about, we think a telephonic

25    hearing would be helpful or a quick hearing would be helpful,"

1  I'm happy to do that, but I'm not just going to set a hearing

2  two weeks from today.  Like I said, I'm learning, and I may

3  amend that some day and decide that that would be a good idea,

4  but right now I'm going to wait until there's a specific issue

5  to decide.

6          **MR. KEGLOVITS:**  May I ask one question?

7          **THE COURT:**  You may.

8          **MR. KEGLOVITS:**  So, just thinking down the road, let's

9  imagine we get to the end of this week or maybe mid week next

10 week and we've hit a stall on the meet-and-confer on the

11 privilege and we now have to move to compel the production of

12 these documents, there's a 15 or 18-day or whatever the time

13 period is for them to respond, and then us to reply, --

14         **THE COURT:**  Right.

15         **MR. KEGLOVITS:**  -- can we, in the filing of the

16 motion, ask you to set a hearing date that's maybe even got

17 shortened periods?

18         **THE COURT:**  Absolutely.  I think that is very

19 reasonable and I would probably do that anyway --

20         **MR. KEGLOVITS:**  Okay.

21         **THE COURT:**  -- knowing what we're working against.

22 And I've been trying to do that with general motions to compel;

23 I'm not letting the full -- I'm not allowing the full response

24 time, I'm setting responses a week out and then setting for

25 hearing.  In this case, knowing that we're working against, you

1  know, some kind of schedule, scheduling issues, I would

2  definitely not allow a full briefing schedule.  So feel free to

3  request that.

4      Anything else?

5          **MS. DONAHUE:**  No.  Thank you very much.

6          **MR. KEGLOVITS:**  No, Your Honor.

7          **THE COURT:**  Okay.  Thank you.

8      Court's adjourned.

9          **MS. DONAHUE:**  Thank you.

10          **THE DEPUTY COURT CLERK:**  All rise.

11      (PROCEEDINGS CLOSED)

12                        **REPORTER'S CERTIFICATION**

13      WHILE NOT PRESENT IN PERSON TO STENOGRAPHICALLY REPORT THE

14  FOREGOING PROCEEDINGS, I CERTIFY THAT IT WAS TRANSCRIBED TO THE

15  BEST OF MY ABILITY FROM A DIGITAL AUDIO RECORDING.

16

17                  CERTIFIED:   *s/Greg Bloxom*
                                Greg Bloxom, RMR, CRR
18                              United States Court Reporter
                                333 W. 4th Street, RM 411
19                              Tulsa, OK 74103
                                (918)699-4878
20                              greg_bloxom@oknd.uscourts.gov

21

22

23

24

25